UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **Dan Howitt** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:25CV10100MPK** |
| | ) | |
| **Cambridge Health Alliance** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT MOTION OF DEFENDANT CAMBRIDGE HEALTH ALLIANCE TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## I.    STATEMENT OF PRIOR FACTS AND PROCEEDINGS

On May 8, 2023, Dan Howitt filed suit against Cambridge Health Alliance ("CHA"), in Middlesex Superior Court, Docket[1] No. 2381CV01308 arising out of events at and his termination as a patient of CHA alleging claims of defamation and disability discrimination as well as "psychological abuse." [**Ex. 1**, MA Superior Court Doc. No. 1; **Ex. 2**, Superior Court Complaint].[2]  Howitt filed or moved to amend his complaint on at least six occasions, including May 9, 2023 [**Ex. 3; Ex. 1,** MA Doc. No. 3]; June 13, 2023 [**Ex. 4; Ex. 1** MA Doc. No. 7]; June 30, 2023 [**Ex. 1**, MA Doc. No. 11], October 10, 2023 [**Ex. 5; Ex. 1,** MA Doc. No. 17], December 19, 2023 [**Ex. 1,** MA Doc. No. 19], and January 30, 2024 [**Ex. 7**; **Ex. 1**, MA Doc. No. 23].[3]

---

[1] To comply with ECF citations, and to distinguish the Federal from the Massachusetts Superior Court docket, the references to the present Federal Court docket are noted **Ex. 10**, Fed. Doc. No.\_\_\_ and the latter are noted as **Ex. 1**, MA Doc. No.\_\_\_.

[2] As pointed out by Magistrate Kelley, this Court may take judicial notice of state court proceedings relevant to the matter at hand.  Wiener v. MIB Group, Inc., 86 F.4th 76, 81 n.3 (1st Cir. 2023).

[3] During this time, on December 7, 2023, an Order from the Middlesex Regional Administrative Judge (RAJ) Barry-Smith was entered on the docket in Howitt's Superior Court case which reads in part:
> Mr. Howitt may not file any new civil action or complaint or claim in **Middlesex Superior Court** (including Woburn and Lowell) without the prior written approval of the Regional Administrative Justice for Civil Business or his/her designee.  [**Ex. 1**, MA Doc. No. 18]

These were denied for a variety of reasons [**Ex. 1**, Unnumbered Orders of June 12, 2023, June 13, 2023, July 11, 2023, October 4, 2023, October 10, 2023, December 5, 2023, and January 2, 2024]. Judge Sarrouf ordered that Howitt was to be given until February 2, 2024 to submit an appropriate amended complaint [**Ex. 1**, Unnumbered Order of January 17, 2024], but Howitt's January 30, 2024, Amended Complaint [**Ex. 7**] was rejected for the reasons in Judge Sarrouf's Order of February 5, 2024 [**Ex. 1**, MA Doc. No. 25].

On February 14, 2024, CHA again moved to dismiss the Superior Court action under Mass. R. Civ. P. 12(b)(6) [**Ex. 1**, MA Doc. Nos. 27, 27.1], which was allowed (Sarrouf, J.) on May 3, 2024 [**Ex. 8**, Order Allowing Motion to Dismiss; **Ex. 1**, MA Doc. No. 31] and, on the same date, Judgment entered with prejudice in favor of CHA [**Ex. 9**, Judgment in favor of CHA [**Ex. 1**, MA Doc. No. 32]. Howitt filed two Motions for Reconsideration,[4] a Motion to Seal Case, and a Motion to Recuse [5] [**Ex. 1**, MA Doc. Nos. 33, 38, 43, 44]. All of Howitt's motions were denied [**Ex. 1,** Unnumbered Order of Nov. 26,2024, and MA Doc. No. 48].

On June 28, 2024, Howitt filed a Notice of Appeal [**Ex. 1**, MA Doc. No. 34]. After he failed to timely docket his appeal, CHA moved in Superior Court to dismiss the appeal [**Ex. 1**, MA Doc. No. 40]. On October 2, 2024, the Appeals Court separately made an entry in the Superior Court docket, noting that Howitt had failed to docket his appeal, and that he would need to file a motion to do so late in order to proceed [**Ex.1**, MA Doc. No. 42]. In the year and a half since the Appeals Court warning, Howitt has abandoned his appeal, altogether failing to make any effort to docket the appeal late [**Ex. 1**].

---

A similar Order was entered in Suffolk County, noting that in four years, Howitt had filed 43 actions in state and Federal Court, *See* Howitt v. Sawai, Suffolk Superior Court, 2584CV00973, MA Doc. No. 17.

[4] Howitt's first Motion for Reconsideration attached yet another Amended Complaint dated May 5, 2024 [**Ex. 1**, unnumbered Exhibits/Attachments dated May 9, 2024].

[5] The Motion to Recuse stated Howitt had filed a complaint against Judge Sarrouf with the Judicial Conduct Commission (CJC) [**Ex. 1**, MA Doc. No. 44, ¶5 (sic)].

Instead, on January 14, 2025, Howitt filed a 28-page Complaint in Federal Court against CHA, the "Patient Relations Department", and eleven individuals [**Ex. 10**, Fed. Doc. No. 1; **Ex. 11**, Complaint in 1:25-CV-10100], asserting 39 counts alleging disability discrimination, retaliation, defamation, breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional infliction of psychological [emotional] distress – all causes of action he previously asserted in the now-dismissed Superior Court case [Compare **Ex. 11** with **Ex. 7**]. The legal theories in Howitt's current Federal Court complaint mirror the legal theories asserted in his January 30, 2024, proposed amended complaint in Superior Court:

> This is a complaint about the following. A multitude of violations of **MGL c272 s98** [discrimination in place of public accommodation]. A multitude of instances of **retaliation** in response to complaints that I filed, including being terminated from CHA's Medical Specialties Department and Primary Care Department. … A multitude of instances of **tortious conduct**. A multitude of instances of **breach of contract, and breach of the implied covenant of good faith and fair dealing. Defamation**. [**Ex. 7**, p. 1] (Emphasis and bracketed information supplied).

Further, the operative facts in Howitt's current Federal Complaint mirror the facts in Howitt's numerous amended complaints filed in Superior Court, including:

> 1) medical assistant "Jane Doe … stated to CHA practice manager of the primary care department, Dr. Yamini Saravanan, that in my appointment with her (Jane Doe) I referred to her as 'fat'." [Compare **Ex. 2**, p. 3; **Ex. 3**, p. 4; **Ex. 7**, p. 3 with **Ex. 14**, p. 3, ¶37];

> 2) Dr. Saravanan terminated Howitt from CHA for being rude, disrespectful, unprofessional, and a safety concern [Compare **Ex. 2**, p. 3; **Ex. 3**, p. 4; **Ex. 5**, p. 4-5; **Ex. 7**, p. 3 with **Ex. 14**, p.4, ¶38)

> 3) Judy Petelle called Howitt from her cell phone and left a voicemail stating, "You're crazy." [Compare **Ex. 7**, p. 6, ¶¶8-8d with **Ex. 14**, p. 2, ¶¶16, 19].

Howitt's first Federal Complaint specifically referred to the dismissal of his prior Superior Court case [**Ex. 11**, p. 4]. In view of this, on June 27, 2025, this Court (M.J. Page Kelley) issued an order that "[i]f Howitt wishes to pursue this action, he must show cause within thirty-five (35) days why the complaint should not be dismissed for failure to state a claim upon which relief may be granted based on the doctrine of *res judicata* (claim preclusion)." [**Ex. 12; Ex. 10** Fed.

3

Doc. No. 7].  Mr. Howitt filed a Response [**Ex. 13; Ex. 10**, Fed. Doc. No. 19] and an Amended

Complaint [**Ex. 14; Ex. 10**, Fed. Doc. No. 20], alleging the same claims but only naming CHA as

a defendant, and omitting any reference to the dismissal of his Superior Court case [**Ex. 14**, pp.

4-6].  CHA now moves to dismiss Howitt's Amended Complaint under Fed. R. Civ. P. 12(b)(6)

for failure to state a claim upon which relief may be granted based on *res judicata* and other

grounds.

## II.    STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(6)

A motion to dismiss should be granted when a party fails to state a claim upon which relief

may be granted. Fed.R.Civ.P. 12(b)(6). To satisfy the pleading requirements of Rule 12(b)(6), a

plaintiff must assert "allegations plausibly suggesting (not merely consistent with) agreement

reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to

"sho[w] that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly,  550 U.S. 544, 557

(2007).  This requires more than labels and conclusions; "a 'formulaic recitation' of the elements

of a cause of action will not do. Factual allegations must be enough to raise a right to relief above

the speculative level." Bell Atl, 550 U.S. at 545. The court must accept as true the complaint's

well-pleaded factual allegations and any reasonable inferences in favor of the party whose claims

are the subject of the motion, but legal conclusions cast in the form of factual allegations are not

acceptable. *See ."* Bell Atl*, supra, and* San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687

F.3d 465, 471 (1st Cir. 2012).

## III.    ARGUMENT

### A.  Plaintiff's Claims are Barred by the Doctrine of *Res Judicata*/Collateral Estoppel

Under Massachusetts law, "'*res judicata*' includes … claim preclusion," Kobrin v. Bd. of

Registration in Med*.,* 444 Mass. 837, 843 (2005) *citing* Heacock v. Heacock*,* 402 Mass. 21, 23

n. 2 (1988), "mak[ing] a valid, final judgment conclusive on the parties and their privies, and

bars further litigation of all matters that *were or should have been adjudicated in the action*."

Massaro v. Walsh, 71 Mass. App. Ct. 562, 565 (2008) *quoting* Heacock, 402 Mass. at 23

(emphasis supplied). "The doctrine [of claim preclusion] is a ramification of the policy

considerations that underlie the rule against splitting a cause of action, and is 'based on the idea

that the party to be precluded has had the incentive and opportunity to litigate the matter fully

in the first lawsuit.'" Massaro, 71 Mass. App. Ct. at 565, *quoting* Heacock, 402 Mass. at 24.

CHA can readily show the three necessary elements to invoke claim preclusion:

1) the identity or privity of the parties to the present and prior actions;

2) identity of the cause of action; and

3) prior final judgment on the merits.

Kobrin, 444 Mass. at 843, *quoting* DaLuz v. Dept.Correction, 434 Mass. at 45 (2001); *see* Hatch v. Trail King Indus., Inc., 699 F.3d 38, 45 (1st Cir. 2012) (same elements apply under Federal law).

Regarding the first element, it is indisputable that the prior state Superior Court action was

brought by the same plaintiff Dan Howitt against CHA [**Ex. 2, 3, 4, 5,** and **7**]. In Howitt's

Amended Complaint in this case, the only defendant named is CHA [**Ex. 14**], resulting in

complete identity of parties.  Kobrin, 444 Mass. at 843.

With respect to the second element - the requirement for identity of the cause of action -

there is no question that the legal theories and operative facts in Howitt's Superior Court case are

indistinguishable from Howitt's present Amended Complaint filed in Federal Court [Compare

**Ex. 2, 7** with **Ex. 14**].  Howitt's original Complaint in Federal Court contained forty-four Counts,

but has been pared down to the following eleven Counts and requests for relief based on the

following legal theories:

Count 1 – Federal Discrimination under 42 U.S.C. §12182
Count 2 – Federal Retaliation under 42 U.S.C. §12203
Count 3 – Federal Retaliation under 42 U.S.C. §12203
Count 4 – Federal Retaliation under 42 U.S.C. §12203
Count 5 – Federal Retaliation under 42 U.S.C. §12203

Count 6 – Defamation/slander
Count 7 – Intentional infliction of psychological distress
Count 8 – Intentional infliction of psychological distress
Count 9 – Intentional infliction of psychological distress
Count 10 – Breach of Contract
Count 11 – Breach of implied covenant of good faith and fair dealing [**Ex. 14**, pp. 4-6]

In his prior state court case, Howitt brought or attempted to bring the same claims based on the same theories of liability as his present Federal case.  In his myriad amended complaints, Howitt previously asserted claims for:

1) disability discrimination [**Ex. 5**, p. 1, 6; **Ex. 7**, p. 3, ¶5h, Counts 28-29, 39-40]

2) retaliation [**Ex. 5**, p. 7; **Ex. 7**, *passim*, including Counts 24-26, 29, 35, 37-40]

3) defamation [**Ex. 2**, pp. 1, 4; **Ex. 3**, p. 1; **Ex. 5**, p. 1, 6-7; **Ex. 7**, p. 1, p. 9, ¶12, Counts 24-26]

4) extensive psychological injury [**Ex. 2**, p. 2 ; **Ex. 5**, p. 1, 4, 6 ; **Ex. 7**, p. 2, ¶2a, 3b, p. 3, ¶5m, p. 6, ¶8c]

5) breach of contract and breach of the implied covenant of good faith and fair dealing [**Ex. 7**, ¶¶2, 3a, 5k, 5l, 6e, 6f, 7l, 7m, 8d, 8g, 14, 15, and Counts 3, 6, 10, 11, 14, 16, 18, 20, 22, 23, 25, 31-35, 37, 43, 44].

Further, both Howitt's Federal and state court actions are derived from the same series of events or operative facts:

1) "Jane Doe … stated to CHA practice manager of the primary care department, Dr. Yamini Saravanan, that in my appointment with her (Jane Doe) I referred to her as 'fat'." [Compare **Ex. 2**, p. 3; **Ex. 3**, p. 4; **Ex. 7**, p. 3 with **Ex. 14**, p. 3, ¶37];

2) Dr. Saravanan terminated Howitt from CHA for being rude, disrespectful, and for safety concerns [Compare **Ex. 2**, p. 3; **Ex. 3**, p. 4; **Ex.** 5, p. 4-5; **Ex. 7**, p. 3 with **Ex. 14**, p.4, ¶38)

3) Judy Petelle called Howitt from her cell phone and left a voicemail stating, "You're crazy." [Compare **Ex. 7**, p. 6, ¶¶8-8d with **Ex. 14**, p. 2, ¶¶16, 19].

Thus, Howitt's Federal Amended Complaint is not based on new facts or claims but is a retelling of the events giving rise to his previously dismissed Superior Court action.  Where CHA has shown Howitt's current claims are based on the same legal theories and the same operative

6

facts as his prior Superior Court case, it has satisfied the second element to show the identity of the causes of action. Kobrin, 444 Mass. at 843.

As to the third element – a prior final judgment on the merits – after having been given a final opportunity to amend, a Massachusetts Superior Court judge (Sarrouf, J.) allowed CHA's Motion to Dismiss Howitt's complaint for failure to state a claim on May 3, 2024, and judgment was entered for CHA with prejudice on the same date [**Ex. 1**, MA Doc. Nos.31, 32; **Ex. 9**]. Mr. Howitt filed a Notice of Appeal, which CHA moved to dismiss for failure to timely docket and separately, the Appeals Court later entered an Order in his case noting his failure to docket his appeal [**Ex. 1**, MA Doc. Nos.34, 40, 42]. The time for Howitt to docket his appeal has long since expired without any action on his part, demonstrating that he abandoned his appeal. Thus, where Howitt "had a full and fair opportunity to litigate the issue," Mullins v. Corcoran, 488 Mass. 275, 282 (2021), his decision to forego his appeal does not obviate that a prior final judgment on the merits bars his current Federal action, and that the judgment of the Superior Court is binding.

Howitt is not entitled to relitigate his failed Superior Court case. As aptly stated in Wei-Chi as Tr. of 240 Harrison St. Tr. v. Town of Duxbury Zoning Bd. of Appeals:

> "The rule of res judicata is designed to forestall a plaintiff from getting 'two bites at the apple.' " Anderson v. Phoenix Inv. Counsel of Boston, Inc., 387 Mass. 444, 452 (1982). It appears to the court that the plaintiff made a strategic decision to drop her appeal of the decision in the first action, and instead attempted to relitigate the same issue in the already-pending present action, perhaps on the belief that she had better facts given the greater scale of the work. However, litigants are not entitled to start over in that fashion. The plaintiff was obligated, if she believed the court's conclusion in the first action to be error, to complete her appeal, and not seek to re-argue the same issue in a second case. Having chosen to allow the judgment in the first action to become final and binding, the plaintiff may not now get a "do-over" by raising the same issue in a second case.
> No. 20 MISC 000137 (HPS), 2023 WL 3168310, at *4 (Mass. Land Ct. May 1, 2023).

Magistrate Judge Kelley's Order of June 27, 2025, raised the potential application of *res judicata* [**Ex. 1**, MA Doc. No. 7]. In his Response, Howitt argued that *res judicata* does not apply because there was no "litigation" in the Superior Court case [**Ex. 11**, p. 1, ¶2]. Motion

7

practice is litigation, and "[u]nder Massachusetts law, as elsewhere, a dismissal for failure to state a claim, under Mass. R. Civ. P. 12(b)(6), operates as a dismissal on the merits, see Mass. R. Civ. P. 41(b)(3), with *res judicata* effect." Isaac v. Schwartz, 706 F.2d 15, 17 (1st Cir. 1983).[6]

The Superior Court Judgment in favor of CHA "was not a product of the parties' consent." Martinez v. Waldstein, 89 Mass. App. Ct. 341, 345 (2016), *quoting* Jarosz v. Palmer, 436 Mass. 526, 531 (2002), but rather, pursuant to Mass. R. Civ. P. 41(b)(3), the involuntary dismissal of Howitt's Superior Court case was an adjudication on the merits:

> Unless the dismissal is pursuant to paragraph (1) of this subdivision (b), or unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision (b) and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, or for improper amount of damages in the Superior Court as set forth in G. L. c. 212, § 3 or in the District Court as set forth in G. L. c. 218, § 19, **operates as an adjudication upon the merits**. (Emphasis supplied).

Thus, where the dismissal of Howitt's Superior Court case was involuntary, and the judgment was with prejudice, the dismissal of Howitt's state court complaint operates as an adjudication on the merits. *See* In re Sonus Networks, Inc. Shareholder Derivative Litigation, 422 F.Supp.2d 281 (D. Mass. 2006), aff'd 499 F.3d 47 (2007) ("prior Massachusetts state court judgment dismissing … suit for failure to adequately plead demand or futility of demand was 'on the merits'"); Khramova v. Van Ness, 105 Mass. App. Ct. 1113 (2025) (Rule 23 case) ("Under Rule 41(b)(3), a dismissal for failure to state a claim operates as an adjudication on the merits.").

Howitt also argues that his Federal Court claims are not subject to dismissal because he is now suing under Federal statutes, incorrectly asserting that the Massachusetts Superior Court lacked jurisdiction over his Federal statutory discrimination claims [**Ex. 5**, p. 1, ¶3]. A state court has jurisdiction to hear and decide discrimination and retaliation claims under the ADA

---

[6] The June 27, 2025, Order of this Court (M.J. Kelley) cited case law pertaining to *res judicata*, including the preclusive effect of dismissal for failure to state a claim, *see* Saade v. Wilmington Tr. Nat'l Ass'n, 494 Mass. 1013, 1015 (2024). CHA incorporates herein by reference the cases and legal reasoning cited therein [Ex. 12, pp. 4-6].

because Congress did not make Federal jurisdiction exclusive.  That he did not raise these Federal statutory claims in his Superior court case does not obviate the rule against claim splitting, which "will be applied to extinguish a claim even though the plaintiff is prepared in the second action to present evidence, grounds, or theories of the case not presented in the first action or to seek remedies or forms of relief not demanded in the first action."  Massaro, 71 Mass. App. Ct. at 565, *quoting* Boyd v. Jamaica Plain Co-op. Bank, 7 Mass. App. Ct. 153, 163 (1979).  Thus, Howitt's claims are barred by claim preclusion, and he does not get a "do-over" simply because he is now suing in Federal Court under Federal statutes. Massaro, 71 Mass. App. Ct. at 565-66; Heacock, 402 Mass. at 23.

Howitt's argument that he is suing under Federal law is a textbook example of claim splitting.  Howitt may not disregard the "requirement that all legal theories supporting a claim be presented when the opportunity is available, not preserved for presentation through piecemeal litigation." Day v. Kerkorian, 61 Mass. App. Ct. 804, 811 (2004) (emphasis supplied), *citing* Bagley v. Moxley, 407 Mass. 633, 638 (1990). "Whether expressed as claim preclusion or as a rule against claim splitting, the doctrine presupposes that a claimant has had an opportunity to assert his claims against a given defendant, and ***has failed to assert those claims*** or has asserted the claims and had them adjudicated adversely." Day, 61 Mass. App. Ct. at 811-12 (emphasis supplied), citing Restatement (Second) of Judgments § 24(1) ("When a valid and final judgment... extinguishes the plaintiffs claim pursuant to the rules of merger or bar ... the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."). Thus, where Howitt could have asserted Federal statutory discrimination and retaliation claims in his Superior Court case, they are now barred by *res judicata*.  Heacock, 402 Mass. at 23 (bars further litigation of all matters that were or could have been brought).

9

Having succeeded in obtaining a judgment in Superior Court, CHA should not now have to defend a second action by the same plaintiff arising out of the same facts. "The underlying policy reason for the bar of former adjudication is that parties and the judiciary should be spared repetitive actions based on the same wrong." Saint Louis v. Baystate Med. Ctr., Inc., 30 Mass. App. Ct. 393, 399 (1991). Given that Howitt fully recognized and appreciated the nature of his claims at the time his Superior Court complaint was dismissed, collateral estoppel should bar this second case, even if he is suing under Federal discrimination statutes. Gloucester Marine Railways Corp. v. Charles Parisi, Inc., 36 Mass. App. Ct. 386, 391 (1994) ("claim preclusion bars not only relitigation of all matters decided in a prior proceeding but those *that could have been litigated as well*.").

The proper avenue for Howitt to challenge the dismissal of his Superior Court case was to prosecute his appeal of the Superior Court Judgment to the Massachusetts Appeals Court, not to file a separate Federal Court action bringing the same claims based on the same operative facts. See Bigelow v. Reem Prop., LLC, 102 Mass. App. Ct. 590, 596 (2023) (adverse judgment binding on party to prior action who did not appeal judgment of dismissal). Where Howitt abandoned his appeal in his state court case, he forfeited any right to review of those claims and should not be allowed to collaterally attack or disavow the prior Superior Court judgment entered against him. Hall v. Fed. Nat'l Mortg. Ass'n, 100 Mass. App. Ct. 1108 (2021) (Rule 23 case).

Stated succinctly, Howitt's Federal Court case, including the underlying facts, the alleged legal claims of defamation, discrimination, retaliation, intentional infliction of emotional distress, and contract-related claims, and his purported damages, were already adjudicated in his Superior Court case against the same defendant CHA, which was dismissed on the merits, a judgment entering for CHA, and is final. Where CHA has shown

identity of parties, identity of causes of action, and dismissal of the first action on the merits, CHA has satisfied all the elements to invoke claim preclusion. Town of Brookline v. Alston, 487 Mass. 278, 297-8 (2021), *citing* DeGiacomo v. Quincy, 476 Mass. 38, 42 (2016). Accordingly, for these reasons, this Court must dismiss Howitt's Federal Court complaint and enter judgment in favor of CHA based on *res judicata*/collateral estoppel.

### B. Howitt's Contract-Based Claims Should be Dismissed Where He Failed to Allege Even Basic Factual Allegations Sufficient to Find the Existence of a Contract

Count 10 of Howitt's Amended Complaint alleges breach of contract and Count 11 alleges breach of the implied covenant of good faith and fair dealing [**Ex. 14**, p. 6].  Under Massachusetts law, "[t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contact; the defendant committed a breach of the contract, and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016).  In relation to the provision of medical care and treatment, Massachusetts courts permit plaintiffs to recover breach of contract damages but require an express promise, such as to bring about certain results. *See* Sullivan v. O'Connor, 363 Mass. 579, 583 (1973); *see also* Clevenger v. Haling, 379 Mass. 154, 157-158 (1979); Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 519 (1979); Earley v. Savin, 101 Mass. App. Ct. 198, 201-202 (2022).

In his Amended Complaint, Howitt alleges that "CHA engaged in a breach of contract by committing the above Count 1-10 violations, regarding their contract with me as a patient to not engage in any violations." [**Ex. 14**, p. 6, Count 10, ¶48], but Howitt's complaint does not allege the existence of a contract between Howitt and CHA, and nowhere in the complaint are any ***facts*** alleged to support such a finding. There is no allegation that an express or oral agreement was

11

discussed or agreed to between CHA and Howitt. Further, Howitt does not identify any material contract provision that CHA violated.  Howitt's complaint contains nothing more than an broad legal conclusion cast in the form of a factual allegation that he had a contract with CHA.[7] *See* San Gerónimo Caribe Project, Inc., 687 F.3d at 471. Accordingly, Count 10 should be dismissed.

Relatedly, Count 11 of Howitt's Amended Complaint alleges CHA breached a covenant of good faith and fair dealing. Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it." Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n. 9 (1990), *quoting* Kerrigan v. Boston, 361 Mass. 24, 33 (1972). *See* Clark v. State St. Trust Co., 270 Mass. 140, 152–153 (1930). This implied covenant applies to all *contracts*, but, where there is no factual basis to believe any contract exists, "there can be no derivative covenant of good faith and fair dealing." Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (D. Mass. 2005).  Again, where Howitt has not alleged any facts even approaching a contract with CHA, Count 11 alleging breach of an implied covenant of good faith and fair dealing also fails.  Where Howitt's Amended Complaint contains no factual allegations supporting a finding that he had a contract with CHA, Counts 10 and 11 should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### C.  Howitt Fails to State a Claim for Defamation

In Count 6 of his Amended Complaint, Howitt asserts a claim of defamation against CHA based on the allegation that "Jane Doe engaged in defamation …by contriving that I referred to her as 'fat' in my appointment with her." [**Ex. 12**, p. 5, Count 6, ¶44].  The sum total of Howitt's factual allegations of defamation is his allegation that "Jane Doe … stated to CHA practice

---

[7] To the extent Howitt is attempting to assert contract-based claims based on his provider-patient relationship with CHA, it has long been Massachusetts law that actions for the breach of implied contracts not to commit malpractice do not survive. See Gabrunas v. Miniter, 289 Mass. 20, 21 (1935) (holding no implied or express contract to provide care "carefully and skillfully").

manager of the primary care department, Dr. Yamini Saravanan, that in my appointment with her

(Jane Doe) I referred to her as 'fat'." [**Ex. 14**, p. 3, ¶37].

To state a claim for defamation against CHA, Howitt had to allege that CHA negligently

published a false statement about him to a third party that either caused him economic loss or

was of the type that is actionable without proof of economic loss. *See* Phelan v. May Dep't Stores

Co., 443 Mass. 52, 55–56 (2004), *citing* White v. Blue Cross & Blue Shield of Mass., Inc., 442

Mass. 64, 66 (2004). His Amended Complaint makes no such allegation. Howitt fails to identify

false statements that were made and published outside of CHA.  More importantly, Howitt failed

to allege that Jane Doe's statement caused him economic loss necessary to support a claim of

defamation. Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006), *citing* Ravnikar v.

Bogojavlensky, 438 Mass. 627, 629-630, 782 N.E.2d 508, 510-511 (2003).  The failure to allege

either publication to a third party or resulting economic loss warrants dismissal for failure to

state a claim for defamation under Fed. R. Civ. P.12(b)(6).

**D. Howitt's Claims for Damages and Injunctive Relief for Discrimination and Retaliation Fail to State a Claim Upon Which Relief May Be Granted**

In Count 1, Howitt alleges disability discrimination under 42 U.S.C. §12182, and in Counts

2-5, alleges retaliation claims under 42 U.S.C. §12203.  He seeks general, punitive, and treble

damages, and injunctive relief for each of the claims made in Counts 1-5 [**Ex. 3**, p.4-5].  The

requested relief is either not available under Title III's enforcement provisions or has become

moot.  First, Section 12182 is part of Title III, and its enforcement provision is §12188:

> (1) The remedies and procedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter.

In turn, 42 U.S. Code § 2000a-3(a) provides in pertinent part:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a–2 of this

13

title, a civil action *for preventive relief*, including an application for a permanent or temporary injunction, restraining order, or other order." [Emphasis supplied].

The statutory relief available under §2000a-3(a) does not include general, punitive, or treble damages, or any "damages for past harms," *see* Goodwin v. C.N.J., Inc., 436 F.3d 44, 51 (1st Cir. 2006), but *only* allows a private litigant the remedy of injunctive relief. Similarly, §12203 does not set out the specific remedies for retaliation claims; instead, the remedies available for retaliation depend upon the discriminatory practice complained of. G. v. Fay Sch., 931 F.3d 1, 10 (1st Cir. 2019) (damages not an available remedy for a Title V retaliation claim premised upon an exercise of rights under Title III). Thus, where Howitt alleges discrimination under §12182, the remedy for his retaliation claims under §12203 is again confined to the prospective injunctive relief available under §12188 and §2000a-3(a) and does not provide for damages. Accordingly, Howitt's claims for monetary damages in Counts 1-5 fail to state a claim upon which this Court can grant the requested relief and must be dismissed.

Finally, the injunctive relief available under §2000a-3(a) is "for preventive relief," and thus is *prospective*. Howitt is not entitled to injunctive relief where the issue has become moot. As he has affirmatively represented to his Court, Howitt does not treat at CHA and now receives "treatment with Massachusetts General Hospital." [**Ex. 14**, Introduction, ¶1; *see also* **Ex. 10**, Fed. Doc. No. 11, Notice of Appeal], and there is no reason to believe "any person [from CHA] is about to engage in any [discriminatory or retaliatory] act or practice" against Mr. Howitt in the future. Fay Sch., 931 F.3d at 11 (injunctive relief request mooted by graduation from school). Thus, where the only relief available for the claims raised in Howitt's Amended Complaint for discrimination and retaliation is prospective injunctive relief for "some ongoing harm (or, at least, a colorable threat of future harm)," *see* J.S.H. v. Newton, 654 F. Supp. 3d 7, 18 (D. Mass. 2023), and where the alleged discrimination at issue is not alleged to be a systemic or policy

14

failure, but personal to Howitt, any entitlement to relief became moot since he no longer receives his care at CHA.  Accordingly, Counts 1-5 should be dismissed for failure to state a claim upon which the requested relief may be granted.  Fed. R. Civ. P. 12(b)(6).

### E.  <u>Howitt Fails to State a Claim for Intentional Infliction of Emotional Distress</u>

In Counts 7-9, Howitt alleges intentional infliction of psychological [emotional] distress, [**Ex. 14**, pp. 4-6].  As alleged, the basis for the claim of intentional infliction of emotion distress is the alleged discrimination and retaliation.  As set forth above, Congress did not provide for monetary damages under Title III, and Howitt cannot evade that limitation by attempting to reframe his claims under a different common law theory.

Further, under controlling law his claims for intentional psychological abuse are insufficient. As outlined by this Court (Kelley, J.) in <u>Barnia v. Kaur</u>:

> To establish an intentional infliction of emotional distress claim, a plaintiff must show that (1) the defendants intended to inflict emotional distress or knew that emotional distress were the likely result of the conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendants were the cause of the plaintiff's distress; and (4) the emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure it.
> 646 F. Supp. 3d 154, 171 (D. Mass. 2022), citing <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 355 N.E.2d 315, 318-19 (1976).

Even assuming every fact alleged is true, Howitt's allegations are insufficient to meet the "very high" standard to show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community." <u>Roman v. Trustees of Tufts College</u>, 461 Mass. 707, 964 N.E.2d 331, 341 (2012).

In Count 8, Howitt claims Dr. Saravanan intentionally inflicted emotional distress on him. His allegations pertaining to Dr. Saravanan state:

15

> Saravanan terminated me from the CHA primary care department, where I had been a patient since 2014, stating to me that my complaints about the above Stacey Doe (8/8/15), Jane Doe (10/14/22), and staff of CHA rhinolaryngology in February-March 2023, warranted my termination, because, according to her, I was "rude" "disrespectful" [and] "unprofessional" causing the employees "safety concerns", and that I asked for the last name of Stacey Doe (for the purpose of filing a complaint with the State), and mentioned her abuse to two other employees to 2024, and that these demonstrate that I am unable to "move on" from that past incident, and that this causes "safety concerns" for the employees. [**Ex. 14**, p. 4, ¶38].

In Count 9, Howitt claims Jane Doe intentionally inflicted emotional distress on him for informing Dr. Saravanan that Howitt stated she was "fat" during an appointment [**Ex. 14**, p. 3, ¶37]. Even assuming these allegations are true, neither event is the type of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community" necessary to state a claim for intentional infliction of emotional distress. *See* Barnia, 646 F. Supp. 3d at 171, *citing* Roman v. Trustees of Tufts College, 461 Mass. 707, 964 N.E.2d 331, 341 (2012). At best, Howitt has alleged a "situation[] where only bad manners and mere hurt feelings are involved," which is insufficient to state a claim for intentional infliction of emotional distress. Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996), and thus Howitt's Amended Complaint fails to state a claim.

Further, Howitt does not allege any facts supporting a claim that he sustained severe emotional distress "of a nature that no reasonable person could be expected to endure it." Agis, 371 Mass. at 145. Insofar as Howitt alleges "substantial psychological distress," this is little more than an inadequate "'formulaic recitation' of the elements of [intentional infliction of emotional distress that is not] enough to raise a right to relief above the speculative level." Bell Atl, 550 U.S. at 545. Howitt's legal conclusions cast in the form of factual allegations are not an acceptable pleading. *See* San Gerónimo Caribe Project, Inc., 687 F.3d at 471. Given the

16

inadequacy of his allegations of both conduct and damages to support his claims, these Counts should be dismissed for failure to state a claim upon which relief may be granted.

### F. Howitt Should be Required to Restate His Claims and Immaterial and Impertinent Allegations Stricken

If this Court does not dismiss Howitt's Amended Complaint, CHA moves pursuant to Fed. R. Civ. P. 12(f), that so much of Howitt's Amended Complaint that is immaterial and impertinent, be stricken. By way of example, paragraphs 5-13 in the Facts section are irrelevant and unnecessary, as Howitt is not asserting a claim of medical negligence [**Ex. 14**, p. 1], and CHA should not be required to answer these paragraphs. Similarly, paragraphs 18, 19, 22, and 36 are irrelevant to his claims.

CHA further moves under Rule 12(e) for a more definite statement to comply with the letter and spirit of Fed. R. Civ. P. 8(a), requiring Howitt to provide a short plain statement of his claims and the factual basis for each.

Further, Howitt's Amended Complaint also does not comply with Fed. R. Civ. P. 8(e) requiring pleadings to be concise and direct. As written, Howitt's Amended Complaint simply repeats all prior paragraphs for each Count, making it impossible for CHA to decipher which facts support which claims. For this reason, if his Amended Complaint is not otherwise dismissed, Howitt should be required to redraft his complaint, subject to approval of the Court as to its compliance with minimal pleading practice.

## IV.   CONCLUSION

For the reasons set forth herein, CHA asks that this Court grant the following relief:

1. Dismissal of Howitt's Amended Complaint in its entirety, with prejudice, for failure to state a claim upon which relief may be granted based on *res judicata*/claim preclusion;

2. Dismissal of Counts 10 and 11 for failure to state contract claims upon which relief may be granted;

17

3. Dismissal of all Counts 7-9 alleging intentional infliction of emotional distress for failure to state a claim upon which relief may be granted;

4. Dismissal of Count 6 alleging defamation for failure to state a claim upon which relief may be granted;

5. Dismissal of Howitt's Claims for Discrimination and Retaliation Under Title III for failure to state a claim upon which relief may be granted;

5. Alternatively, CHA moves pursuant to Fed. R. Civ. P. rule 12(f) to strike so much of Howitt's Amended Complaint that is immaterial, impertinent, full of invective ad hominem that are inappropriate in a pleading.  CHA further moves under Rule 12(e) for a more definite statement to comply with the letter and spirit of Fed. R. Civ. P. Rule 8(a), requiring a short plain statement of his claims and the factual basis for each.

## V.   REQUEST FOR ORAL ARGUMENT

Unless this Court is inclined to grant the instant motion to dismiss on the papers, CHA requests a hearing pursuant to L.R. 7.1(d).

The Defendant,
**Community Health Alliance,**
By its attorneys,

*/s/ Terésa J. Farris*
Vincent P. Dunn Esq. BBO No. 551034
Vdunn@hmdrslaw.com
Terésa J. Farris, BBO#554655
tfarris@hmdrslaw.com
Hamel, Marcin, Dunn, Reardon & Shea, PC
350 Lincoln Street, Suite 1101
Hingham, MA 02043
Tel: (617) 482-0007

Dated:  March 20, 2026

18

<u>**CERTIFICATE OF SERVICE**</u>

I, Teresa J. Farris, attorney of record for the Defendant, CHA, do hereby certify that the foregoing document was electronically filed using the ECF system and was this day served via electronic mail, on the following:

Dan Howitt
dhowitt@alumni.colgate.edu

*/s/ Teresa J. Farris*
Teresa J. Farris BBO No. 554655

Dated:  March 20, 2026

**Exhibits to CHA's Motion to Dismiss**

1. Docket in Middlesex Superior Court 2381CV01308

2. Complaint Middlesex Superior Court dated May 8, 2023

3. Amended Complaint Middlesex Superior Court dated May 9, 2023

4. Amended Complaint Middlesex Superior Court dated June 11, 2023

5. Amended Complaint Middlesex Superior Court dated October 2, 2023

6. January 2, 2024 Order Denying Motion to Amend

7. Amended Complaint Middlesex Superior Court dated January 30, 2024

8. Order of May 3, 2024 allowing CHA's Motion to Dismiss

9. Judgment with prejudice entered in favor of CHA dated May 3, 2024 in Middlesex Superior Court 2381CV01308

10. Federal Court Docket in 1:25CV101000MPK

11. Federal Court Complaint in 1:25CV101000MPK

12. Magistrate Kelley's Order of June 27, 2025

13. Howitt's Response to Magistrate Kelley's Order

14. Howitt's Amended Complaint in 1:25CV101000MPK

# EXHIBIT 1

## 2381CV01308 Howitt, Dan vs. Cambridge Health Alliance - Cambridge Hospital



- Case Type:
- Torts
- Case Status:
- Open
- File Date
- 05/08/2023
- DCM Track:
- A - Average
- Initiating Action:
- Defamation
- Status Date:
- 05/08/2023
- Case Judge:
-
- Next Event:
-

| All Information | Party | Event | Tickler | Docket | Disposition |
|---|---|---|---|---|---|

### Party Information

**Howitt, Dan**
- Plaintiff

**Alias**

**Party Attorney**
- Attorney
- Pro Se
- Bar Code
- PROPER
- Address
- Phone Number
-

**More Party Information**

**Cambridge Health Alliance - Cambridge Hospital**
- Defendant

**Alias**

**Party Attorney**
- Attorney
- Dunn, Esq., Vincent P
- Bar Code
- 551034
- Address
- Hamel, Marcin, Dunn, Reardon and Shea, P.C.
350 Lincoln St
Suite 1101
Hingham, MA  02043
- Phone Number
- (617)482-0007
- Attorney
- Farris, Esq., Teresa J
- Bar Code
- 554655
- Address
- Hamel, Marcin, Dunn, Reardon and Shea
100 Franklin St
Suite 901
Boston, MA  02110
- Phone Number
- (617)482-0007
- Attorney
- Robinson, Esq., Amy
- Bar Code
- 696205
- Address
- Kiernan Trebach LLP
40 Court St
3rd Floor
Boston, MA  02108

- Phone Number
  (617)426-3900

**More Party Information**

## Events

| Date | Session | Location | Type | Event Judge | Result |
|------|---------|----------|------|-------------|--------|
| 09/25/2023 02:30 PM | Civil B Rm 720 | | Motion Hearing to Amend Complaint | Tabit, Hon. Salim | Rescheduled |
| 10/03/2023 03:00 PM | Civil B Rm 720 | | Motion Hearing to Amend Complaint | Sarrouf, Camille | Held as Scheduled |
| 01/17/2024 12:00 PM | Civil B Rm 720 | Courtroom 720 | Motion Hearing to Amend Complaint | Sarrouf, Camille | Held as Scheduled |
| 03/19/2024 03:00 PM | Civil B Rm 720 | Courtroom 720 | Rule 12 Hearing | Sarrouf, Camille | Rescheduled |
| 04/16/2024 03:30 PM | Civil B Rm 720 | Courtroom 720 | Rule 12 Hearing | Sarrouf, Camille | Held - Under advisement |
| 01/07/2025 03:30 PM | Civil B Rm 720 | | Motion Hearing | | Held as Scheduled |

## Ticklers

| Tickler | Start Date | Due Date | Days Due | Completed Date |
|---------|-----------|----------|----------|----------------|
| Service | 05/08/2023 | 08/07/2023 | 91 | |
| Answer | 05/08/2023 | 09/05/2023 | 120 | |
| Rule 12/19/20 Served By | 05/08/2023 | 09/05/2023 | 120 | 05/03/2024 |
| Rule 12/19/20 Filed By | 05/08/2023 | 10/05/2023 | 150 | 05/03/2024 |
| Rule 12/19/20 Heard By | 05/08/2023 | 11/06/2023 | 182 | 05/03/2024 |
| Rule 15 Served By | 05/08/2023 | 07/01/2024 | 420 | 05/03/2024 |
| Rule 15 Filed By | 05/08/2023 | 07/31/2024 | 450 | 05/03/2024 |
| Rule 15 Heard By | 05/08/2023 | 07/31/2024 | 450 | 05/03/2024 |
| Discovery | 05/08/2023 | 04/28/2025 | 721 | 05/03/2024 |
| Rule 56 Served By | 05/08/2023 | 05/27/2025 | 750 | 05/03/2024 |
| Rule 56 Filed By | 05/08/2023 | 06/26/2025 | 780 | 05/03/2024 |
| Final Pre-Trial Conference | 05/08/2023 | 10/24/2025 | 900 | 05/03/2024 |
| Judgment | 05/08/2023 | 05/07/2026 | 1095 | 05/03/2024 |
| Service | 05/11/2023 | 08/09/2023 | 90 | |
| Under Advisement | 04/16/2024 | 05/16/2024 | 30 | |

## Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|-------------|-------------|---------------|--------------|
| 05/08/2023 | Case assigned to: DCM Track A - Average was added on 05/8/2023 | | Image |
| 05/08/2023 | Complaint electronically filed. | 1 | Image |
| 05/09/2023 | Amended: amended complaint filed by Dan Howitt and demand for Jury Trial | 3 | Image |
| 05/09/2023 | Civil action cover sheet filed. | 4 | Image |
| 05/10/2023 | Demand for jury trial entered. | | |
| 05/11/2023 | Pleading titled, complaint and demand for jury trial, filed with the court on 05/11/2023, returned to Pro Se amended complaint is already docket p#3 | | |
| 06/01/2023 | Service Returned for Defendant Cambridge Health Alliance - Cambridge Hospital: Service through person in charge / agent; Andrew Fugoa on 5/25/2023 at Executive Offices, 1493 Cambridge Street, Cambridge, MA 02139 | 5 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 06/05/2023 | Defendant's Notice of intent to file motion to Dismiss<br><br>Applies To: Cambridge Health Alliance - Cambridge Hospital (Defendant) | 6 | Image |
| 06/05/2023 | Attorney appearance<br>On this date Richard F Cheslofska, Esq. added for Defendant Cambridge Health Alliance - Cambridge Hospital | | |
| 06/12/2023 | Pleading titled, Amended Complaint, filed with the court on 06/12/2023, returned to Pro Se Dan Howitt<br>Since the defendant has filed a responsive pleading, and you have already amended your complaint, you must file a motion to amend your complaint.  See MRCP 15(a)<br>(Returned through efileMA) | | Image |
| 06/13/2023 | Plaintiff Dan Howitt's Motion to amend the<br>Complaint | 7 | Image |
| 06/13/2023 | Pleading titled, Motion to Amend Complaint, filed with the court on 06/13/2023, returned to Dan Howitt<br>Rule 9A not followed | | Image |
| 06/13/2023 | Received from<br>Defendant Cambridge Health Alliance - Cambridge Hospital: Answer to amended complaint; demand jury trial ( see p#3) | 8 | Image |
| 06/13/2023 | Defendant Cambridge Health Alliance - Cambridge Hospital's Submission of<br>Withdrawal of Notice of intent to file motion to dismiss | 9 | Image |
| 06/30/2023 | Plaintiff Dan Howitt's Motion to<br>Amend Complaint | 10 | Image |
| 07/10/2023 | Endorsement on Motion to amend the complaint (#10.0): DENIED<br>Denied without prejudice for failure to comply with Rule 9A<br><br>Judge: Tabit, Hon. Salim | | Image |
| 07/10/2023 | Plaintiff Dan Howitt's Motion to<br>Amend Complaint<br><br>Applies To: Howitt, Dan (Plaintiff) | 11 | Image |
| 07/11/2023 | Opposition to the Plaintiff's Motion to Amend Complaint for Failure to Comply with Superior Court Rule 9A and Other Reasons Set Forth Herein filed by Cambridge Health Alliance - Cambridge Hospital<br><br>Applies To: Cambridge Health Alliance - Cambridge Hospital (Defendant) | 12 | Image |
| 07/11/2023 | Request for hearing filed<br><br>Applies To: Cambridge Health Alliance - Cambridge Hospital (Defendant) | 12.1 | Image |
| 07/11/2023 | Certificate of service of attorney<br><br>Richard F Cheslofska, Esq. | 12.2 | Image |
| 07/17/2023 | Attorney appearance<br>On this date Vincent P Dunn, Esq. added as Private Counsel for Defendant Cambridge Health Alliance - Cambridge Hospital | | |
| 07/17/2023 | Attorney appearance<br>On this date Amy Robinson, Esq. added as Private Counsel for Defendant Cambridge Health Alliance - Cambridge Hospital | | |
| 07/17/2023 | Attorney appearance electronically filed. | | Image |
| 07/18/2023 | Attorney appearance<br>On this date Richard F Cheslofska, Esq. dismissed/withdrawn for Defendant Cambridge Health Alliance - Cambridge Hospital | | |
| 07/18/2023 | Attorney appearance electronically filed. | | Image |
| 09/01/2023 | Plaintiff Dan Howitt's Motion for<br>Virtual Hearings | 13 | Image |
| 09/05/2023 | Plaintiff Dan Howitt's Submission of<br>2nd Motion for Virtual Hearings | 14 | Image |
| 09/06/2023 | Endorsement on Motion for virtual hearing (#14.0): Other action taken<br>After review, motion DENIED without prejudice for failure to comply with Rule 9A and for failing to attach the document referenced in this motion<br><br>Judge: Tabit, Hon. Salim | | |

Case Details - Massachusetts Trial Court N4

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 09/20/2023 | Event Result:: Motion Hearing to Amend Complaint scheduled on:<br>  09/25/2023 02:30 PM<br>Has been: Rescheduled     For the following reason: By Court prior to date<br>Comments: on trial<br>Hon. Salim Tabit, Presiding<br>Staff:<br>  Debra J Newman, Assistant Clerk | | |
| 09/20/2023 | Plaintiff Dan Howitt's Motion for Judgment | 15 | Image |
| 09/21/2023 | Endorsement on Motion for Judgment (#15.0): DENIED | | Image |
| 09/25/2023 | Plaintiff Dan Howitt's Motion for Virtual Hearings | 16 | Image |
| 09/25/2023 | Endorsement on Motion for virtual hearing (#16.0): ALLOWED<br><br>Judge: Tabit, Hon. Salim | | |
| 10/03/2023 | Event Result:: Motion Hearing to Amend Complaint scheduled on:<br>  10/03/2023 03:00 PM<br>Has been: Held as Scheduled<br>Camille Sarrouf, Presiding<br>Staff:<br>  Debra J Newman, Assistant Clerk | | |
| 10/04/2023 | Endorsement on Motion to amend the complaint (#1.0): DENIED<br>See scanned endorsement<br><br>Judge: Sarrouf, Camille | | Image |
| 10/09/2023 | Plaintiff Dan Howitt's Motion to Amend Complaint | 17 | Image |
| 10/10/2023 | Endorsement on Motion to Amend Complaint (#17.0): Other action taken<br>Pleading returned for not filling Rule 9A. Please wait 10 days for a response for the defendant then file. | | Image |
| 12/05/2023 | Endorsement on Motion to Amend Complaint (#11.0): No Action Taken<br>No action taken, you must file under Rule 9A and wait for the opposition or no opposition as instructed on 10/10/23. | | Image |
| 12/07/2023 | ORDER: RE: Dan Howitt<br>I have reviewed nine lawsuits filed by Mr. Howitt during 2023, four of which remain pending, four of which have been dismissed, and one of which was removed to federal court by the defendant, Harvard University:<br><br>2381CV01308 Howitt v. Cambridge Health Alliance<br>2381CV02200 Howitt v. Mayerson<br>2381CV02348 Howitt v. Russo<br>2381CV02678 Howitt v. Jarada<br><br>2381CV01532 Howitt v. Harvard<br>2381CV01711 Howitt v. Harvard<br>2381CV01823 Howitt v. Harvard<br>2381CV02906 Howitt v. Anderson<br>2381CV02930 Howitt v. Anderson<br><br>Based on my review of those lawsuits, which routinely do not conform to Mass. R. Civ. P. 8 and often do not state a cognizable claim, and the nature of Mr. Howitt's filings, I issue this order restricting Mr. Howitt's filing of matters in this court. Mr. Howitt may not file any new civil action or complaint or claim in Middlesex Superior Court (including Woburn and Lowell) without the prior written approval of the Regional Administrative Justice for Civil Business or his/her designee. Before filing any new civil action or complaint or claim or the like, Mr. Howitt must file a petition seeking leave of court for such a filing. The petition must include a copy of this ORDER together with a copy of the document(s) that Mr. Howitt seeks to file. The documents shall be accepted by the clerk, date-stamped, and forwarded to the Regional Administrative Justice (or designee) who will approve or disapprove the petition in writing. A copy of this order is to be kept in the Clerk's Office in Lowell and Woburn and will be distributed to each of the civil session clerks.<br><br>This order does not impact the civil actions already pending in Middlesex County (the first four pending cases, listed above).<br><br>This order does not mean that Mr. Howitt may not file civil actions in Middlesex County. It means that his proposed filings will first be reviewed by the Regional Administrative Judge before the filings cause expenditure of the time and resources of the Clerk's Office and the Civil Sessions in Middlesex County.<br><br>So Ordered.<br><br>Dated December 7, 2023 | 18 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 12/19/2023 | Plaintiff Dan Howitt's Motion to amend complaint. | 19 | Image |
| 12/19/2023 | Opposition to the Plaintiff's motion to amend complaint. filed by Cambridge Health Alliance - Cambridge Hospital | 19.1 | Image |
| 12/19/2023 | Reply/Sur-reply<br><br>Opposition to motion to amend complaint.<br><br>Applies To: Howitt, Dan (Plaintiff) | 19.2 | Image |
| 01/02/2024 | ORDER: on Plaintiff 's Motion to Amend Complaint Pursuant to M. R. Civ. P. Rule 8 and 15<br>The Motion to amend Plaintiff's Complaint is DENIED.<br>So Ordered<br>Dated : January 2, 2024<br>See 4 Scanned Copies & copies mailed. | 20 | Image |
| 01/09/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Notice of service of motion to dismiss. | 21 | Image |
| 01/17/2024 | Docket Note: After hearing , Amended complaint to be filed by 02/02 per order of Judge Sarrouf | | |
| 01/17/2024 | Event Result:: Motion Hearing to Amend Complaint scheduled on:<br>    01/17/2024 12:00 PM<br>Has been: Held as Scheduled<br>Camille Sarrouf, Presiding<br>Staff:<br>    Debra J Newman, Assistant Clerk | | |
| 01/30/2024 | Plaintiff Dan Howitt's Notice to Amend the Complaint. | 22 | Image |
| 01/30/2024 | Amended: amended complaint filed by Dan Howitt | 23 | Image |
| 01/30/2024 | Plaintiff Dan Howitt's Motion for Tolling of Statutes of limitations | 24 | Image |
| 01/31/2024 | Exhibits/Appendix<br><br>Exhibits attached to Affidavit of Indigency | | |
| 02/05/2024 | ORDER: Order on Plaintiffs Motion to Amend Complaint :<br>Plaintiff's newly amended complaint (Paper #23), viewed as if filed pursuant to M. R. Civ. P. 15, was filed with this Court on January 30, 2024 , and seemingly sets forty four (44) causes of action claiming, seemingly, violations of multiple statutes, including claims for medical malpractice, against the named defendant, CHA Cambridge Hospital ("CHA") and otherwise, against approximately twelve (12) individuals who are not named as defendants . There's an inability to comprehend, and therefore incorporate, the "facts" with the enumerated claims which do not identify either the claim and/or the resulting harm/damage/prayer for relief, and/or the appropriate defendants.<br>The proposed amended complaint, even read liberally, in a light most favorable to the plaintiff, fails to comply with Massachusetts Rules of Civil Procedure Rule 8. Specifically, Rule 8 (a) as well as Rule 15. Therefore, for the reasons stated herein, the motion to amend plaintiff's complaint is DENIED.<br>SO ORDERED. | 25 | |
| 02/09/2024 | Plaintiff Dan Howitt's Motion for Review of New Amended Complaint Without Rule 9A | 26 | Image |
| 02/12/2024 | Endorsement on Motion for review of new amended complaint without Rule 9a (#26.0): No Action Taken The Amended Complaint was reviewed and a ruling was made Denying same. Therefore the present Motion is Moot<br><br>Judge: Sarrouf, Camille | | |
| 02/13/2024 | Opposition to Cambridge Hospital's Motion to Dismiss the Original Complaint Dated May 8, 2023 filed by Dan Howitt | 28 | Image |
| 02/14/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Motion to dismiss the Plaintiff's Original Complaint dated May 8, 2023 | 27 | Image |
| 02/14/2024 | Cambridge Health Alliance - Cambridge Hospital's Memorandum in support of Motion to Dismiss | 27.1 | Image |
| 02/14/2024 | Opposition to Motion to Dismiss filed by Dan Howitt | 27.2 | Image |
| 02/14/2024 | Affidavit of Compliance with Rule 9A<br><br>Applies To: Dunn, Esq., Vincent P (Attorney) on behalf of Cambridge Health Alliance - Cambridge Hospital (Defendant); Robinson, Esq., Amy (Attorney) on behalf of Cambridge Health Alliance - Cambridge Hospital (Defendant) | 27.3 | Image |

Case Details - Massachusetts Trial Court N4

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 02/14/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Certificate of 9C compliance | 27.4 | Image |
| 02/14/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Notice of service of Motion to dismiss | | Image |
| 02/14/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Notice of Filing and List of Documents | | Image |
| 03/15/2024 | Event Result:: Rule 12 Hearing scheduled on:<br>    03/19/2024 03:00 PM<br>Has been: Rescheduled     For the following reason: By Court prior to date<br>Comments: on trial<br>Camille Sarrouf, Presiding<br>Staff:<br>    Debra J Newman, Assistant Clerk | | |
| 04/08/2024 | Plaintiff Dan Howitt's Motion for Equitable Tolling | 29 | Image |
| 04/08/2024 | Plaintiff Dan Howitt's Motion to Appear Virtually | 30 | Image |
| 04/16/2024 | Matter taken under advisement: Rule 12 Hearing scheduled on:<br>    04/16/2024 03:30 PM<br>Has been: Held - Under advisement<br>Camille Sarrouf, Presiding<br>Staff:<br>    Debra J Newman, Assistant Clerk | | |
| 05/03/2024 | ORDER: Decision and Order on Defendants Motion to Dismiss :<br>Defendant moves to dismiss plaintiff's original complaint (the "Complaint"), dated May 8, 2023 . The Complaint, a six (6) page introductory-type dialogue about plaintiff's interactions with CHA Cambridge Hospital ("CHA"), read in the light most favorable to the plaintiff, seemingly, forwards claims against CHA, for psychological abuse by an unnamed medical assistant dating back to interactions in August 2015, defamation, disruption of medical care, and claims of medical malpractice . The only named defendant however is, and remains throughout the pendency of this action, CHA. CHA has moved numerous times to dismiss, however during the pendency of this litigation there have been a multitude of motions to amend filed by the plaintiff, the last of which was denied by this court on January 30, 2024 (see fn. 1).<br>To withstand a motion to dismiss pursuant to Rule 12(b)(6), a claim must allege facts plausibly suggesting an entitlement to relief (emphasis added). Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008). Rule 12(b)(6) imposes a relatively low standard for surviving a motion to dismiss. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 (2004). Nevertheless, a plaintiff is obligated to provide more than mere labels and conclusions. Iannacchino, 451 Mass. at 636. When considering a claim, the court accepts as true the allegations set forth in the complaint and draws any reasonable inferences in the plaintiff¿s favor. Sisson v. Lhowe, 460 Mass. 705, 707 (2011). "In the instant case the Complaint does not forward claims which would ¿plausibly suggest the plaintiff is entitled to relief". (emphasis added). Further, understanding the constraints by which this court must analyze the Complaint, in recognition of M. R. Civ. P. 8 , and based upon the foregoing analysis and consideration of the history of amended complaints, Rule 12 (b)(6), relevant case law and arguments by the parties at the hearing held, the motion seeking dismissal of all claims is ALLOWED. | 31 | Image |
| 05/03/2024 | JUDGMENT on Defendants, Cambridge Health Alliance - Cambridge Hospital 12(b) motion to dismiss against Plaintiff(s) Dan Howitt.<br>It is ORDERED and ADJUDGED:<br>that the matter is hereby DISMISSED with prejudice | 32 | Image |
| 05/09/2024 | Self-Represented Plaintiff Dan Howitt's Motion for Reconsideration | 33 | Image |
| 05/09/2024 | Exhibits/Appendix | | Image |
| 05/09/2024 | Exhibits/Appendix | | Image |
| 05/09/2024 | Opposition to Motion for reconsideration filed by Cambridge Health Alliance - Cambridge Hospital | 33.1 | Image |
| 05/28/2024 | NOTICE OF APPEAL: This is a Notice to Appeals Court regarding the dismissal of this case.<br><br>Applies To: Howitt, Dan (Plaintiff) | 34 | Image |
| 06/20/2024 | Notice of assembly of record sent to Counsel | 35 | Image |
| 06/20/2024 | Notice to Clerk of the Appeals Court of Assembly of Record | 36 | Image |
| 06/20/2024 | Appeal: Statement of the Case on Appeal (Cover Sheet). | 37 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 07/10/2024 | Plaintiff Dan Howitt's Motion to Seal Case | 38 | Image |
| 07/15/2024 | Opposition to motion to seal. filed by Cambridge Health Alliance - Cambridge Hospital | 39 | Image |
| 07/15/2024 | Affidavit of compliance with superior court rule 9A. | 39.1 | Image |
| 07/15/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Notice of filing and list of documents | 39.2 | Image |
| 07/17/2024 | Endorsement on Motion to Seal Case (#38.0): DENIED<br>Dated July 16, 2024<br><br>Denied without prejudice, for failure to follow the procedures for filing and serving motions required by Superior Court Rules, including Rules 9A and 9C, as well as Trial Court VIII, the Uniform Rules of Impoundment Procedure. | | Image |
| 07/18/2024 | Defendant Cambridge Health Alliance - Cambridge Hospital's Motion to dismiss the plaintiff's appeal | 40 | Image |
| 07/18/2024 | Cambridge Health Alliance - Cambridge Hospital's Memorandum in support of<br><br>their  Motion to dismiss the plaintiff's appeal | 40.1 | Image |
| 08/07/2024 | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Dunn, Esq., Vincent P (Attorney) on behalf of Cambridge Health Alliance - Cambridge Hospital (Defendant) | 41 | Image |
| 10/02/2024 | Notice of docket entry received from Appeals Court<br>NOTICE OF FAILURE TO ENTER APPEAL TIMELY PURSUANT TO MASS.R.A.P. 10(a)(1)<br><br>On June 20, 2024, the Middlesex Superior Court transmitted a notice of assembly to the Appeals Court in the above-referenced case, pursuant to Mass.R.A.P. 9(e). The Appeals Court received the notice on June 20, 2024.<br>Pursuant to Rule 10(a)(1) of the Massachusetts Rules of Appellate Procedure, each appellant has 14 days from receipt of the notice of assembly to docket the appeal in the Appeals Court by paying the required entry fee or moving for waiver of the fee on grounds of indigency.<br>As of today's date, October 2, 2024, no appellant has entered the appeal pursuant to Mass.R.A.P. 10(a)(1). This notice is sent for informational purposes only and does not constitute a dismissal of the appeal. If an appellant or cross-appellant in this matter wishes to pursue the appeal, the party must file a motion to the single justice for leave to docket the appeal late. Otherwise, an appellee may file a motion to dismiss the appeal in the trial court. See Mass.R.A.P. 10(c). | 42 | Image |
| 10/08/2024 | Attorney appearance electronically filed.<br><br>Applies To: Farris, Esq., Teresa J (Attorney) on behalf of Cambridge Health Alliance - Cambridge Hospital (Defendant) | | Image |
| 11/26/2024 | Endorsement on Motion for reconsideration (#33.0): DENIED<br>Plaintiff moves this court to reconsider its decision allowing defendant's motion to dismiss plaintiff's original complaint (the "Complaint"), dated May 8, 2023 . The decision and order on the motion to dismiss was docketed on May 3, 2024, and the present motion was filed with the court on May 9, 2024 .<br>After his initial filing of May 8, 2024, the plaintiff's filings were as follows:<br>1  5.9.23  Amended Complaint;<br>2  6.12.23  Amended Complaint;<br>3  6.13.23  Motion to Amend Complaint;<br>4  6.30.23  Motion to Amend Complaint;<br>5  7.10.23  Motion to Amend Complaint;<br>6  9.20.23  Motion for Judgement;<br>7  10.9.23  Motion to Amend Complaint;<br>8  12.7.23  Middlesex Order issued by the Regional Administrative Judge<br>9  12.19.23  Motion to Amend Complaint;<br>10  1.30.24  Notice to Amend Complaint, Amended Complaint, and Motion for Tolling of Statute of Limitations; and<br>11  2.9.24  Motion for Review of New Amended Complaint<br><br>In each instance, including a hearing in which the court, essentially, walked plaintiff through the steps needed to seek redress for his medical malpractice related claims, the plaintiff simply continued to file/refile the same document with the same allegations over and over again. In each instance the amended complaints were not allowed and/or the motions to amend were denied. Ultimately the motion of defendant, CHA Cambridge Hospital, to dismiss the original complaint was allowed on May 3, 2024.<br>Plaintiff now seeks reconsideration through the filing of another re-formatted amended complaint versus actual reconsideration pursuant to Mass. Sup. Ct. R. 9D which states:<br>"A Motion for Reconsideration shall be based on (1) newly discovered evidence that could not be discovered through the exercise of due diligence before the original motion was filed; (2) a change of relevant law; or (3) a particular and demonstrable error in the original ruling or decision. A Motion for Reconsideration shall otherwise raise no new grounds for relief not raised in the original motion or | | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| | opposition and shall not reiterate previously advanced arguments.<br>Plaintiff's repeated attempts to amend his complaint, now through, a motion for reconsideration, is not in accordance with the Rule, and therefore the motion is DENIED.<br>SO ORDERED. | | |
| 12/03/2024 | Plaintiff Dan Howitt's Motion for Reconsideration (second motion) | 43 | Image |
| 12/03/2024 | Opposition to Plaintiff's second Motion for reconsideration filed by Cambridge Health Alliance - Cambridge Hospital<br><br>Applies To: Howitt, Dan (Plaintiff) | 43.1 | Image |
| 12/03/2024 | Plaintiff Dan Howitt's Motion to recuse Judge Sarrouf | 44 | Image |
| 12/03/2024 | Opposition to Plaintiff's Motion to recuse Judge Sarrouf filed by Cambridge Health Alliance - Cambridge Hospital | 44.1 | Image |
| 12/03/2024 | Reply/Sur-reply<br><br>Reply to Defendant's Oppositions to Motion to reconsider, and Motion to recuse Judge Sarrouf | 44.2 | Image |
| 12/17/2024 | Affidavit of Indigency and request for waiver substitution of state payment of fees and costs filed without Supplemental affidavit<br>The Plaintiff Seeks Plaintiff seeks filing fees that need to be requested of the appeals court this case is no longer before this court. The court ALLOWS costs of Transcripts of proceedings only.Dated 12/19/2024 (Tabit,J.). | 45 | |
| 12/17/2024 | Plaintiff Dan Howitt's Certificate of MERIT. | 45.1 | Image |
| 12/23/2024 | ORDER: PRELIMINARY ORDER AND ACTION TAKEN ON PLAINTIFF'S MOTIONS FOR RECONSIDERATION AND FOR RECUSAL<br>Plaintiff has filed numerous post dismissal pleadings seeking, initially, reconsideration and, most recently, recusal (Papers 43 and 44 respectively).<br><br>In each filing, post dismissal, plaintiff has included the names of individuals (known and unknown) in the caption of those pleadings. None of the named defendants in the pleadings is a party to the present action but for CHA Cambridge Health Alliance.<br><br>The publication in naming a multitude of defendants, in pleadings, not involved in the present action is inappropriate and shall be eliminated from any and all future filings until such time, if any, where this court accepts a motion to amend. The present posture of this case is that it is awaiting resolution of the above identified motions before the filed appeal of this court's decision on defendant's motions to dismiss can be addressed. Therefore, this court Orders plaintiff to refrain from publishing the names of non-party litigants as named defendants until such time, if any, where this court accepts a motion to amend.<br><br>SO ORDERED<br><br>Dated: December 23, 2024 | 46 | Image |
| 12/26/2024 | Objection to The Defendant Cambridge Health Alliance to Plaintiff's Affidavit and Request to Have The Commonwealth Pay for his Medical Expert Fees filed by Cambridge Health Alliance - Cambridge Hospital | 47 | Image |
| 01/07/2025 | Event Result:: Motion Hearing scheduled on:<br>01/07/2025 03:30 PM<br>Has been: Held as Scheduled<br>Camille Sarrouf, Presiding | | |
| 01/09/2025 | ORDER: Omnibus Decision and Order on Plaintiffs Post Dismissal Motions : Papers #43,44,45<br>Please see scanned 3 page Decision<br><br>Judge: Sarrouf, Camille | 48 | Image |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Disposed by Court Finding | 05/03/2024 | |

# EXHIBIT 2

person is often extremely difficult.  Moreover, the above has caused immense humiliation, and an exacerbation of my already severe chronic depression.  Moreover, all of my visits with Dr. Hastings have included substantial discussion about my severe depression, my past treatment of medicines, hospitalizations, and Electro Convulsive Therapy, including Dr. Hastings inquiring into detail of my current state of depression, including recommending a partial hospitalization program.  As such, Dr. Saravanan, despite having knowledge of this, as an even minimally competent practice-manager would, engaged in the above May 2022 failure to handle my complaint, and April 2023 psychological abuse of me over 20 minutes via telephone, and termination of me from my place of medical care, and on the basis of the defamatory fraud of the defendant.

## AFFIRMATION

I swear under the pains and penalties of perjury that my Statement Of Facts is true to the best of my knowledge and recollection.

Submitted by,

Dan Howitt
dth055@g.harvard.edu
857-247-0764
Date: 5/6/23

6

RECEIVED
5/6/2023    HG

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
MIDDLESEX SUPERIOR COURT

MIDDLESEX, ss                                              Docket #

_____
                                    )
Dan Howitt,                         )
                    Plaintiff,      )
                                    )
v.                                  )
                                    )
CHA Cambridge Hospital,             )
Employee X,                         )
                                    )
                    Defendants.     )
_____    )

**COMPLAINT and DEMAND FOR JURY TRIAL**

**JURISDICTION and VENUE**

The Middlesex Superior Court of the Massachusetts Trial Court has jurisdiction for claims for damages of defamation.

Venue is appropriate in the Middlesex Session since the business where the disability discrimination occurred is in Cambridge, MA.

**PARTIES**

I Dan Howitt am the plaintiff, and am a resident of Cambridge, MA.  I receive SSI and MassHealth, and am disabled with diagnosed (as of 1999) Autism Spectrum Disorder, Major Depressive Disorder, and PTSD (dissociative symptomology).

Employee X (hereafter "defendant", whose name is unknown by me), was the medical-assistant who received my primary-care physician's (Dr. Stephanie Hastings) 10/14/22 order for the following "screening tests", "labs", via several blood samples:

(Z00.00) Preventative health care
Comment: Will obtain screening tests today and continue to discuss preventative medicine at follow-up. We did not discuss HB vaccine but will obtain HBsAg. Provided consent for HIV test.
Plan: PROSTATIC SPECIFIC ANTIGEN, LIPID PANEL, HEMOGLOBIN A1C, POC IMMUNOASSAY FECAL OCCULT BLOOD TEST, HIV ANTIGEN ANTIBODY 5TH GEN, HEPATITIS C ANTIBODY, VITAMIN D,25 HYDROXY, VITAMIN B12, HEPATIC FUNCTION PANEL, THYROID SCREEN TSH REFLEX FT4

PROSTATIC SPECIFIC ANTIGEN

1

LIPID PANEL
HEMOGLOBIN A1C
HIV ANTIGEN ANTIBODY 5TH GEN
HEPATITIS C ANTIBODY
VITAMIN D, 25 HYDROXY
VITAMIN B12
HEPATIC FUNCTION PANEL
THYROID SCREEN TSH REFLEX FT4

## FACTS

On 10/14/22, I met with my CHA Cambridge Hospital primary-care doctor Dr. Stephanie Hastings. She stated that she would like to assess the above via blood samples. I agreed; and after my appointment, she walked me to the medical-assistant room where blood samples are taken.

I stated to Dr. Hastings several times prior to the above that, due to psychological abuse and physical abuse that I was subjected to by a medical-assistant at the same hospital, and in the same room, on 8/18/2015, who received my then doctor Dr. William Zinn's following order

VENIPUNCTURE BLOOD DRAW
CBC + PLT + AUTO DIFF
RBC SEDIMENTATION RATE

 that I would be audio recording or audio-video recording my visits with other medical-assistants, and others as I might find necessary.

**Background**

Regarding my above 8/18/2015 appointment with Dr. Zinn, after his appointment I was directed to the same, above medical-assistant room. I waited in the room for about 10 minutes, and decided to slowly step around the room to pass the time. The medical-assistant, whose first name is Stacy, embarked on the following: She entered the room, I turned to her and said "hi", she yelled "What are you doing?!", I said that I was just stepping around the room, she looked at me with hatred, and then began to treat me like a dog who she hates, by stating "Sit!", "Sit!", and pointed to, and kept jutting her pointed-finger at, the blood-draw chair. I calmly and slowly walked to the chair while I looked at her with significant discomfort. She then walked in front of me, while pulling over a rolling supply table, which had blood-draw equipment on it. She put one sterile glove on, and then upon taking the other glove out of the box of gloves, she dropped it to the floor. The floor was visibly dirty, including causing her and my shoes to make a sticking sound as we walked around. She picked up the contaminated glove off of the ground with her gloved hand, and put it on her other hand. She then began to handle the sterile gauze, syringe, etc, as well as handle my harm, and tie a tourniquet onto my arm. I found this to be medical misconduct, but I was unable to assert myself out of fear that she would harm me via retaliatory anger by, for example, causing injury with the needle and feigning that she was sorry for doing X or Y, causing air to enter my vein by not properly preparing the syringe, contaminating my blood vials, etc. She took some blood vials, and then hastily and aggressively handled my arm and the equipment, including hastily removing the tourniquet, hastily removing the inserted needle and the tape that secured it to my arm, etc. She then rapidly walked about 10 feet away to the supply cupboard area, and began yelling "Fuck!", "Fuck!", "Damn It Fuck!". She then angrily stated that she forgot to take one blood vial that Dr. Zinn ordered and said that she would have to do the

2

procedure with the syringe, etc., again. As I was looking at her, her look turned to patent hatred again, and she yelled at me "Well you don't have to!" "I don't care!" "It doesn't matter". I calmly stated that I believe that it is important if Dr. Zinn ordered it. She then hastily set up a new supply of equipment, brought it to where I was still seated, and began to do the above process over. At the instant of her beginning to do so, I calmly said "I think that you dropped a glove to the ground before". She said "What!", and began tilting her head down to the ground and back up to me, and did this several times, and said "I don't see a glove on the ground". She then viciously said to me with a look of hatred "I could change my gloves! If you want! I was stricken with additional fear that she might engage in the above speculated abuse against me that I quietly said "It's ok". She did not change her gloves, nor sterilize the outside of her gloves. Of the decades of blood draws that I have had, the second blood draw from her was done with immense aggression, entailed pain and deep soreness, and as I expected, resulted in a full week of massive bruising over an approximate 6" long and 4" wide region.

When I walked out of the room, I saw Dr. Zinn in the hallway, and informed him of what occurred. He said "It doesn't matter" "It won't hurt you". I then sent him a detailed MyChart message about what Stacy did, and he sent a MyChart message-reply to me stating:

> I do think you will be better off when you can develop a relationship with a new primary care physician.

**Present circumstance:**
Regarding my above mentioned 10/14/22 laboratory order, I audio recorded my 8 minute 03 second visit with the defendant. I began to record after I entered the room and before the medical-assistant arrived. When she arrived, I pointed at my phone and mentioned that I record my visits for my own record and safety. I then, in a time-period of about 30 seconds, conveyed some of the above about the 2015 medical assistant Stacy. The defendant said that she knows Stacy and then stated Stacy's last name, and asked me if I remember that name. I said that I only remember her first name. As I am with all clinicians, I was polite, soft-spoken, slow spoken, and mostly quiet. She commented on how my arm veins are ideal for blood draws, and took 3-5 vials I believe, and did so very professionally and carefully. I thanked her and then left.

On 4/25/23, at 4:28pm, I received a telephone call by the practice-manager of the Primary Care Department, Dr. Yamini Saravanan. She left me three voice-mails over three days prior to this, but did not leave a return telephone number. I had an appointment with the above Dr. Hastings on the next day (4/26/23), which I was scheduled about 1 month prior, and which was for the purpose of doing an additional blood test screening, and to assess how her prescription for Vitamin D for me had been for me, by doing a blood test for this. I had a 20 minute 15 second telephone call with her, and at the outset of our discussion I sated "Call's being recorded". She hesitated, and then began.

Dr. Saravanan stated that I was "terminated" from the Primary Care Department, and over approximately 15 minutes, repetitively reiterated that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated". I found her need to be that repetitive to be psychologically abusive, and, to demonstrate her desire to abuse me. Moreover, her tone of voice was of a highly inappropriate friendly nature, as if she enjoyed subjecting me to such severe claims, and the severe termination. Moreover, this demonstrated to me that she is likely emotionally abject with regarding to understanding how any patient would likely receive such severe claims and termination. That is, she was clearly devoid of empathy.

I spent approximately the first 15 minutes of the 20 minutes politely inquiring into whether there are any examples of what she stated, and she would embark on the above repetitive reiterations, and clearly, in my opinion, in order to attempt to further abuse me, and to attempt to anger me and elicit an emotional upheaval from me, which I do not engage in. She finally, at my final of many requests for

3

even one example of what she claimed, stated that I called my previous medical-assistant "fat". I stated that I did not, that I have never used such language, nor any language of that nature, over decades since perhaps my early childhood, and that I never used language of that nature since I began at Cambridge Hospital in 2014. She added that I asked the medical-assistant "for the name" of my 2015 medical-assistant, and added that this demonstrates that I am unable to move on from that past incident, and that this, as such, causes "staff" "safety concerns". I stated to her that I did not ask for the above name, and rather, that the medical-assistant, on her own accord, provided me with the above name.

On 5/23/22, I sent the above Dr. Hastings a MyChart message with a brief version of my complaint agains the above medical-assistant Stacy. On 5/31/22, the above Dr. Saravanan sent me the following MyChart message-reply:

> I am Dr. Saravanan, the Medical Director at the Cambridge Primary Care Center. We want to make sure that you are fully heard and have asked our colleagues from Patient Relations to contact you.

As was the case in 2015 onward, and from 5/23/22 to the present, the Patient Relations that she mentions above left me a voicemail, I returned their call 3-4 times over 2 weeks, they have never answered the telephone of the innumerable times that I have called them since 2015, and then eventually return my call and leave me another voicemail. They have never made an attempt to set a telephone-appointment date and time, nor ask me to meet with them in-person. A multitude of times, in my voicemails to them, I asked for both of these, and they never replied. I have never had one telephone conversation with anyone of that department. Moreover, Dr. Saravanan never attempted to call me to discuss the matter.

Paradoxically, regarding the language "rude'" "disrespectful" "unprofessional" and "safety concerns", this is the nature of the above Stacy's abuse of me, as well as Dr. Saravanan's handling of my telephone call with her. Again, I have interacted with a multitude of medical-assistants, nurses, physician assistants, medical students, physicians, and an administrative staff at that hospital, and in a multitude of departments, since 2014, and no one else has claimed that I used any misconduct-language to anyone; and I have never done so.

The hospital, per their public literature, https://www.challiance.org/file%20library/patient%20notices/privacy_rights-poster-2020-combined.pdf state the following; and this public literature is also posted on the walls of every room in the hospital:

> You have the right to know the identity and the role of individuals involved in your care
>
> You have the right to file a complaint if you feel your rights are violated
>
> We will not retaliate against you for filing a complaint

Despite this, my several requests over approximately 1 month for the full name of the above 2015 medical-assistant was never provided to me, and despite that I stated that I needed this for my Medical Examiners Board complaint against the person, and that the Board stated that they cannot proceed with my complaint unless I have the person's name. Moreover, on 4/29/23, I sent the above Patient Relations an email requesting the name of the defendant; and I have not been provided her name, nor an email acknowledging my request.

The defendant engaged in proven defamation against me, and this resulted in my termination from where I receive medical care, as well as the abrupt termination of my next-day appointment with

4

the above Dr. Hastings. Moreover, the above Dr. Saravanan, without my consent, as she stated in the above telephone call, both selected a new Primary Care location for me, namely in Union Square, selected a new primary care doctor for me, namely Dr. Elizabeth Davis, and selected the date and time of my appointment with Dr. Davis. This is consistent with the aforementioned devoid empathy of Dr. Saravanan: Any doctor with even minimal empathy would first desire, and take the time, to ask the patient which alternative location would be best, which new doctor would be best (including whether male or female), and which dates and times would be best. Aside, Dr. Saravanan in 2014 gave the following 9 minute speech about her experience at Cambridge Hospital https://www.youtube.com/watch?v=jz8wPASlioY and at the beginning onward discusses that she had a "professional crisis" about two years prior, which was of her,

> I'm a primary care doctor at the Cambridge Health Alliance, and I'm standing her today because I had a professional crisis. A crisis about two years ago where I started feeling more and more disconnected from a group of my patients. I couldn't really make sense of their illnesses, their needs, their lives.

Her conduct in my telephone call with her, her failure to handle and follow-up on my above 5/23/22 complaint, and her termination of me from the Primary Care Department, and the abusive way that she did this, are clear demonstrations of her above 2014 statement, which I would argue was a circumstance of hers that was caused by her impoverishment of empathy, and ensuing psychological abuse of patients, such as discussing their problems in the above inappropriate friendly/enjoyable way, and likely worse.

Aside, as is shown in my telephone call with Dr. Saravanan, she shows (1) that she believes that my above 2015 matter with the medical-assistant was in "2017-2018", and repeatedly refers to this as my "pre-pandemic" conduct, and (2) that she did not know of the date of my above 2022 medical-assistant appointment, including asking me when it was. She repetitively stated that I engaged in "pre-pandemic" and "post-pandemic" conduct that is the basis for her termination of me. She did not address the above 5/23/22 matter, namely her failure to contact me in any way, and to handle the matter in any way, and the Patient Relations Department's failure to do either as well.

As Dr. Hastings stated to me in my above 10/14/22 appointment with her, Stacy "no longer has access to patients", and "instead has an administrative position". I speculate that the defendant engaged in defamation against me as retaliation for my complaint against a staff member who she knows, a complaint which succeeded in removing Stacy from her work with patients and into an administrative position.

I have received consistent medical care since 1993, and have no record of engaging in any even minimal form of any kind of abuse against anyone, and to the contrary, am consistently referenced as a highly polite, soft-spoken, introverted, engaged, careful, and thoughtful patient who, moreover, consistently thanks all of my clinicians.

## CONCLUSION

The defendant engaged in defamation against me with the intent to have me excluded from either the hospital's Primary Care Department, or the entire hospital, and succeeded in having me excluded from the Primary Care Department, which has entailed a severe disruption of my medical care via a termination of my clinical relationship with my primary-care doctor Dr. Stephanie Hastings, as well as my now having to travel a farther distance to a new facility; and travel for me as a disabled

5

# EXHIBIT 3

3

**COMMONWEALTH OF MASSACHUSETTS**
**THE TRIAL COURT**
**MIDDLESEX SUPERIOR COURT**

MIDDLESEX, ss                                    Docket # 2381CV01308

| | |
|---|---|
| Dan Howitt, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CHA Cambridge Hospital, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT and DEMAND FOR JURY TRIAL**

**COMPLAINT**

The following is a complaint of defamation via slander by a medical clinician done with malicious intent, and the committing of MGL c272 s98 by the below discussed several of clinicians of the hospital.

**JURISDICTION and VENUE**

The Middlesex Superior Court of the Massachusetts Trial Court has jurisdiction for claims for damages of defamation. The venue is appropriate in the Middlesex Session since the business where the disability discrimination occurred is in Cambridge, MA.

**PARTIES**

(1) I Dan Howitt am the plaintiff, and am a resident of Cambridge, MA. I receive SSI and MassHealth, and am disabled with diagnosed (as of 1999) Autism Spectrum Disorder, Major Depressive Disorder, and PTSD (dissociative symptomology).

(2) CHA Cambridge Hospital, as the employer of Employee X (whose name is unknown by me), who was the medical-assistant who received my primary-care physician's (Dr. Stephanie Hastings) 10/14/22 order for the following "screening tests", "labs", via several blood samples:

(Z00.00) Preventative health care

1

Comment: Will obtain screening tests today and continue to discuss
preventative medicine at follow-up. We did not discuss HB vaccine but
will obtain HBsAg. Provided consent for HIV test.
Plan:
LIPID PANEL
HEMOGLOBIN A1C
HIV ANTIGEN ANTIBODY 5TH GEN
HEPATITIS C ANTIBODY
VITAMIN D, 25 HYDROXY
VITAMIN B12
HEPATIC FUNCTION PANEL
THYROID SCREEN TSH REFLEX FT4
PROSTATIC SPECIFIC ANTIGEN
POC IMMUNOASSAY FECAL OCCULT

Because Cambridge Hospital has not provided me with the name of the defendant, I have listed
Cambridge Hospital as the defendant in the meantime, which is located at:

    CHA Cambridge Hospital
    1493 Cambridge Street
    Cambridge, MA 02139


    (3) Dr.Yamini Saravanan, practice-manager of Cambridge Hospital.


    (4) Lorraine Vendetti, Cambridge Hospital, Patient Relations Department.  Hereafter "Patient
Relations".


    (5) Denise Peterson, Cambridge Hospital, Risk Management Department.  Hereafter "Risk
Management".


## FACTS

On 10/14/22, I met with my CHA Cambridge Hospital primary-care doctor Dr. Stephanie
Hastings.  She stated that she would like to assess the above via blood samples.  I agreed; and after my
appointment, she walked me to the medical-assistant room where blood samples are taken.

I stated to Dr. Hastings several times prior to the above that, due to the psychological abuse and
physical abuse that I was subjected to by a medical-assistant at the same hospital, and in the same
room, on 8/18/2015, who received my then doctor Dr. William Zinn's following order,


    VENIPUNCTURE BLOOD DRAW
    CBC + PLT + AUTO DIFF
    RBC SEDIMENTATION RATE


that I would be audio recording or audio-video recording my visits with other medical-assistants, and
others as I might find necessary.


**Background**


2

Regarding my above 8/18/2015 appointment with Dr. Zinn, after his appointment I was directed to the same, above medical-assistant room. I waited in the room for about 10 minutes, and decided to slowly step around the room to pass the time. The medical-assistant, whose first name is Stacy, embarked on the following: She entered the room, I turned to her and said "hi", she yelled "What are you doing!", I quietly, and in a state of abruptly arisen anxiety, said that I was just stepping around the room, she looked at me with hatred, and then began to treat me like a dog who she, moreover, hates, by stating "Sit!", "Sit!", and she pointed to, and kept jutting her pointed-finger at, the blood-draw chair. I calmly and slowly walked to the chair while I looked at her with significant discomfort. She then walked in front of me, while pulling over a rolling supply table, which had blood-draw equipment on it. She put one sterile glove on, and then upon taking the other glove out of the box of gloves, she dropped it to the floor. The floor was visibly dirty, including causing her and my shoes to make a sticking sound as we walked around. Likely the Primary Care Department has hundreds of appointments per day. She picked up the contaminated glove off of the ground with her gloved hand, and put it on her other hand. She then began to handle the sterile gauze, syringe, etc, as well as handle my harm, and tie a tourniquet onto my arm. I found this to be medical misconduct, but I was unable to assert myself out of fear that she would harm me via retaliatory anger by, for example, causing injury with the needle, causing air to enter my vein by not properly preparing the syringe, contaminating my blood vials, etc. She took some blood vials, and then hastily and aggressively handled my arm and the equipment, including hastily removing the tourniquet, hastily removing the inserted needle and the tape that secured it to my arm, etc. She then rapidly walked about 10 feet away to the supply cupboard area, and began yelling "Fuck!", "Fuck!", "Damn It Fuck!". She then angrily stated that she forgot to take one blood vial that Dr. Zinn ordered and said that she would have to do the procedure with the syringe, etc., again. As I was looking at her, her look turned to patent hatred again, and she yelled at me "Well you don't have to!" "I don't care!" "It doesn't matter". I calmly stated that I believe that it is important if Dr. Zinn ordered it. She then hastily set up a new supply of equipment, brought it to where I was still seated, and began to do the above process over. At the instant of her beginning to do so, I calmly said "I think that you dropped a glove to the ground before". She said "What!", and began tilting her head down to the ground and back up to me, several times, and said "I don't see a glove on the ground!". She then viciously said to me with a look of hatred, "I could change my gloves! If you want!" I was stricken with additional anxiety that she might engage in the above speculated abuse against me; so I quietly said, "It's ok". She did not change her gloves, nor sterilize the outside of her gloves. Of the decades of blood draws that I have had, the second blood draw from her was done with comparative immense aggression, it entailed pain and deep soreness, and as I expected, resulted in a full week of massive bruising over an approximate 6" long and 4" wide region, which I conveyed via MyChart.

When I walked out of the room, I saw Dr. Zinn in the hallway, and informed him of what occurred. He said, "It doesn't matter", "It won't hurt you". I then sent him a detailed MyChart message about what Stacy did, and he sent a MyChart message-reply to me stating:

> I do think you will be better off when you can develop a relationship with
> a new primary care physician.

I found this to be disturbing, since, as is shown in the below provided, and discussed, Cambridge Hospital literature, the hospital makes an array of statements about its commitment to handling complaints. Moreover, since Dr. Zinn was one of the senior level physicians of that department, I interpreted his statement to imply that I should not use his department any longer. Moreover, he did not convey my complaint to Patient Relations, nor the department's practice-manager, nor the department's chair. Moreover, he did not recommend, nor arrange for, an alternate physician in his

3

department, which additionally implied to me that he no longer wanted me to use his department.

**Present Circumstance**

Regarding my above mentioned 10/14/22 laboratory order, I audio recorded my 8 minute 03 second visit with the defendant. I began to record after I entered the room and before the medical-assistant arrived. When she arrived, I pointed at my phone and quickly mentioned that I record my visits for my own record and safety. I then, in a time-period of about 30 seconds, conveyed some of the above about the 2015 medical assistant Stacy. The defendant said that she knows Stacy and then stated Stacy's last name, and asked me if I remember that name. I said that I only remember her first name. As I am with all clinicians, I was polite, soft-spoken, slow spoken, and mostly quiet. She commented on how my arm veins are ideal for blood draws, and took 3-5 vials I believe, and did so very professionally and carefully. I thanked her and then left.

Six full months later, on 4/25/23 at 4:28pm, I received a telephone call by the practice-manager of the Primary Care Department, Dr. Yamini Saravanan. She left me three voice-mails over three days prior to this, but did not leave a return telephone number. I had an appointment with the above Dr. Hastings on the next day (4/26/23), which I was scheduled for about 1 month prior, and which was for the purpose of doing an additional blood test screening, and to assess how her prescription for Vitamin D for me had been for me. I had a 20 minute 15 second telephone call with her, and at the outset of our discussion I sated "Call's being recorded". She hesitated, and then began.

Dr. Saravanan stated that I was "terminated" from the Primary Care Department, and over approximately 15 minutes, repetitively reiterated that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated". I found her need to be repetitive to that extent to be unnecessary, unproductive, and, as such, psychologically abusive, and, to demonstrate her desire to abuse me. Moreover, her tone of voice was of a highly inappropriate friendly nature, as if she enjoyed subjecting me to such severe claims, and the severe termination, via a friendly voice, as if she found the matter to be pleasing to her, namely the matter of expressing the above allegations to me, and the matter of her terminating me from her department.. Moreover, this demonstrated to me that she is likely emotionally abject with regarding to understanding how any patient would likely receive such severe claims and severe termination. That is, she was clearly devoid of empathy.

I spent approximately the first 15 minutes of the 20 minutes politely inquiring into whether there are any examples of what she stated, and she would, instead, continue to embark on the above repetitive reiterations, and clearly, in my opinion, in order to attempt to proliferate her abuse me, which clearly was intended to elicit an emotional upheaval from me, which I do not engage in. She finally, at my final of many requests for even one example of what she claimed, stated "you called" my previous medical-assistant "fat". I stated that I did not, that I have never used such language, nor any language of that nature, over decades, since perhaps my early childhood, and that I never used language of that nature since I began at Cambridge Hospital in 2014. She added that I asked the medical-assistant "for the name" of my 2015 medical-assistant, and added that this demonstrates that I am unable to "move on" from that past incident, and that this, as such, causes "staff" "safety concerns". I stated to her that I did not ask for the above name, and rather, that the medical-assistant, on her own accord, provided me with the above name.

11 months prior, on 5/23/22, I sent the above Dr. Hastings a MyChart message with a brief version of my complaint against the above medical-assistant Stacy. On 5/31/22, the above Dr. Saravanan sent me the following MyChart message-reply:

4

I am Dr. Saravanan, the Medical Director at the Cambridge Primary Care Center. We want to make sure that you are fully heard and have asked our colleagues from Patient Relations to contact you.

As was the case in 2015 onward, and from 5/23/22 to the present, the Patient Relations that she mentions above left me a voicemail, I returned their call 3-4 times over 2 weeks, they have never answered the telephone of the innumerable times that I have called them since 2015, and they then eventually return my call and leave me another voicemail. They have never made an attempt to set a telephone-appointment date and time, nor ask me to meet with them in-person. A multitude of times, in my voicemails to them, I asked for both of these, and they never replied. I have never had one telephone conversation with anyone of that department. Moreover, Dr. Saravanan never attempted to call me to discuss the matter.

Paradoxically, regarding the language "rude'" "disrespectful" "unprofessional" and "safety concerns", this is the nature of the above Stacy's abuse of me, as well as Dr. Saravanan's handling of my telephone call with her. Again, I have interacted with a multitude of medical-assistants, nurses, physician assistants, medical students, physicians, and an administrative staff at that hospital, and in a multitude of departments, since 2014, and no one else has claimed that I used any misconduct-language to anyone; and I have never done so.

The hospital, per their public literature, https://www.challiance.org/file%20library/patient%20notices/privacy_rights-poster-2020-combined.pdf state the following; and this public literature is also posted on the walls of every room in the hospital:

You have the right to know the identity and the role of individuals involved in your care

You have the right to file a complaint if you feel your rights are violated

We will not retaliate against you for filing a complaint

Despite this, my several requests over approximately 1 month for the full name of the above 2015 medical-assistant was never provided to me, and despite that I stated that I needed this for my Medical Examiners Board complaint against the person, and that the Board stated that they cannot proceed with my complaint unless I have the person's name. Moreover, on 4/29/23, I sent the above Patient Relations an email requesting the name of the defendant; and I have not been provided her name, nor an email acknowledging my request.

Regarding the above, I include in my complaint that the above Dr. Saravanan, Patient Relations, and the Risk Management Department that I emailed with and spoke with in 2016, engaged in violating MGL c272 s98, via presumptive discrimination against me as a mentally ill person: Despite that I never verbally nor in-writing engaged in any degree of misconduct, they assume, due to their illegal disabilist thought, that I as a mentally ill person, who filed a complaint, and who did so rigorously (that is, precisely as I do in this Complaint), may engage in criminal conduct against the subject of my complaint. Worse, the Risk Management person who handled the matter, akin to the above discussed and below discussed conduct of Dr. Saravanan toward me, engaged in repeated malicious attempts to inflame the matter over several weeks, by (a) not responding to my telephone call after two weeks, (b) leaving me a voicemail with the above Stacy's full name in such a rapid manner that I could not decipher her last name to any extent, (c) not responding to my follow-up voicemail asking for her name to be emailed to me or verbally provided in a clear way, and (d) her initial response, at the start of the

5

matter, that "You don't need her last name; you can just reference the date of the appointment".

The defendant engaged in proven defamation against me, and this resulted in my termination from where I receive medical care, as well as the abrupt termination of my next-day appointment with the above Dr. Hastings. Moreover, the above Dr. Saravanan, without my consent, as she stated in the above telephone call, both selected a new Primary Care location for me, namely in Union Square, selected a new primary care doctor for me, namely Dr. Elizabeth Davis, and selected the date and time of my appointment with Dr. Davis. This is consistent with the aforementioned devoid empathy of Dr. Saravanan: Any doctor with even minimal empathy would first desire, and take the time, to ask the patient which alternative location would be best, which new doctor would be best (including whether male or female), and which dates and times would be best. Aside, Dr. Saravanan in 2014 gave the following 9 minute speech about her experience at Cambridge Hospital https://www.youtube.com/watch?v=jz8wPASlioY and at the beginning onward discusses that she had a "professional crisis" about two years prior, which was of her,

> I'm a primary care doctor at the Cambridge Health Alliance, and I'm standing her today because I had a professional crisis. A crisis about two years ago where I started feeling more and more disconnected from a group of my patients. I couldn't really make sense of their illnesses, their needs, their lives.

Her conduct in my telephone call with her, her failure to handle and follow-up on my above 5/23/22 complaint, and her termination of me from the Primary Care Department, and the abusive way that she did this, are clear demonstrations of her above 2014 statement, which I would argue was a circumstance of hers that was caused by her impoverishment of empathy, and ensuing psychological abuse of patients, such as discussing their problems in the above inappropriate friendly/enjoyable way, and likely worse.

Aside, as is shown in my telephone call with Dr. Saravanan, she shows (1) that she believes that my above 2015 matter with the medical-assistant was in "2017-2018", and repeatedly refers to this as my "pre-pandemic" conduct, and (2) that she did not know of the date of my above 2022 medical-assistant appointment, including asking me when it was. She repetitively stated that I engaged in "pre-pandemic" and "post-pandemic" conduct that is the basis for her termination of me. She did not address the above 5/23/22 matter, namely her failure to contact me in any way, and to handle the matter in any way, and the Patient Relations Department's failure to do either as well.

As Dr. Hastings stated to me in my above 10/14/22 appointment with her, Stacy "no longer has access to patients", and "instead has an administrative position". I speculate that the defendant engaged in defamation against me as retaliation for my complaint against a staff member who she knows, a complaint which succeeded in removing Stacy from her work with patients and into an administrative position.

I have received consistent medical care since 1993, and have no record of engaging in any even minimal form of any kind of abuse against anyone, and to the contrary, am consistently referenced as a highly polite, soft-spoken, introverted, engaged, careful, and thoughtful patient who, moreover, consistently thanks all of my clinicians.

The following is about a 4/14/23 matter. Unfortunately, due to daily suffering that I have to endure, I have written a small number of very poignant MyChart messages to the above Dr. Hastings, and more recently a general-staff member regarding my request for September 2021 medical records.

6

The staff member, Ryan, handled my request with immense apathy, a lack of clarity, and a lack of even minimal guidance. I asked the staff member why he was engaging in such apparent abuse of me, and asked him to discontinue this, and asked him to realize that I am a patient, who, unlike him, is not familiar with the 50+ sections of MyChart, and to tell me precisely where my "telephone-encounter" medical records are. Moreover, he was dishonest that I cannot request such records via MyChart, and instead deceived me to think that I would have to write, print, and mail a letter-request. This is further, clear abuse. He then replied apologizing for having not told me that telephone-encounter records are not in MyChart. I had to ignore his above attempt at deception, and find where, and how to, request records by MyChart. There was involved in the above – Esmie, a woman who I recall exchanging a message with.

11 days after the above, on 4/25/23, Dr. Saravanan sent me a MyChart message asking to speak with me, and, as I discuss above, repeatedly called me with voicemails that day, and did not leave a return-number. Then, I eventually spoke with her at 4:28pm that day.

Returning to an above matter: On 1/25/16, Patient Relations emailed me a letter, and below is an excerpt of it. Here Risk Management, via Patient Relations, predatorily abuses me for their clearly intentional unwillingness, after several weeks, to provide me with the above clinician Stacy's full name. As I discussed above, it was only after a multitude of weeks of Risk Management engaging in the above conduct that they then provided me an non-decipherable voicemail with the person's full name, after which I again had to continue my request. In the below excerpt, Patient Relations shows that they believe that Risk Management provided me with Stacy's name, and that, therefore, my subsequent requests for it were unwarranted, and, worse, a cause for them to consider my conduct "harassment" and a basis for them to contact "Public Safety and Security". This, despite that I contacted Risk Management thereafter and stated that I could not decipher the name that was left for me via voicemail. Aside, much of what the below Patient Relations states about me, and about what they believe that I did, and about what they believe that I stated, is extremely inaccurate, and consists of confabulations designed to demonize me, and to continue their unwillingness to abide by their own public principle, which I provide above, about how they confer to each patient the right to the identity of their clinicians. Moreover, the below Patient Relation's fundamental, and pervasive, unwillingness to do so is shown in the very letter that they condemn me with: In the letter, they, still, do not provide the person's full name; moreover, they state "the date of service and concern is enough information to report." Aside, the below claims – for example, "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us" – are, as I discuss above, of illegal disabilist thought: Again, I began the process from the outset with a very simply stated, one-sentence statement requesting the full name of the clinician Stacy; and this was met, via their illegal disabilist thought, with repeated questioning about why I needed the person's name, and, that, it is not necessary to have the person's name; each time I cited the Cambridge Hospital, Patient Rights literature, and I was 100% polite the entire time. Patient Relations and Risk Management clearly assumed that I as a mentally ill person would engage in criminal conduct against the clinician, and perhaps others of the hospital, despite that not only did I never provide an even minimal intimation of this, but that they cannot, and did not, provide any examples of any misconduct. Worse, it was their own intentional inhumane passive-aggression against me over weeks, via their not abiding by their above public principle, and thereby resulting in my need to continue calling and emailing for the person's full name, that was used by them against me to interpret my several requests over several weeks to result in, again, "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us". A patient's desire to take seriously a public patient right that is conferred by the hospital is legitimate, as

7

is the patient's zealous, polite, and 100% legal pursuit for that right to be abided by.

In July of 2016 you requested the name of the Medical Assistant who provided your care. After many attempts to reach you to discuss this matter, you left me a voicemail stating that you felt harassed requesting no additional contact. You asked to speak with my manager. After several attempts by Denise Peterson, Senior Director, Risk Management to contact you, she also received a message stating you felt harassed by her calls and demanded a voice message with the name of the Medical Assistant and no additional contact. A message was left for you with the name of the Medical Assistant on July 25, 2016.

Most recently, you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us. We had previously provided you with the name of the Medical Assistant as requested. At this point, we have a concern regarding your intentions. If your only intention is to file a complaint with an agency outside of the Cambridge Health Alliance the date of service and concern is enough information to report.

Please understand your concern has been investigated and this matter has been closed. If you continue to call Cambridge Primary Care, Risk Management or the Patient Relations Department regarding this matter or attempt to contact the Medical Assistant in any way we will consider these actions as harassment and Public Safety and Security will be notified.

## Parallel Matter With The Otolaryngology Department, 11/9/22 to 3/22/23

Beginning on 11/9/22, a parallel matter occurred between me and a different department of the hospital, namely the Otolaryngology Department. To begin: I was evaluated by two clinicians on that date, namely James Silva and Meghan Brady. Promptly thereafter I conveyed the following complaint about the two clinicians to the above Dr. Hastings, and others; and I also did so via my 2/3/23 complaint against them with Patient Relations, and my 2/1/23 email-complaint against them with the below discussed medical-director of the department Dr. Ayesha Khalid, and concurrently the chief medical officer of the hospital Dr. Jeffrey Hoffman.

I first met with Silva. I was substantially ill with a viral "cold", including an extreme sore throat; and I am well established over decades to have a highly atypically high pain tolerance. Silva was appointed examining me prior to my audiology exam with Brady. He stayed 6+ feet away from me at all times, and in a rapid movement, he raised a pinpoint light in front of his face, and which shone at me, for 1/10th of a second, while he kept moving laterally. And immediately after he lowered the light, he said "Your throat looks completely normal". Of all of the throat exams that I have had since I was of early childhood, each clinician comes within 1 foot, and often less, of my face, uses a tongue depressor in order to examine the area thoroughly, and shines an instrument-light inside for 5-10 seconds, and often asks me to say "Ahh" so that my throat opening is widened. I found what Silva did to be unacceptable, though I did not convey my concern to him. I began to consider why he would engage in such patent carelessness; and I speculated that he did not like my statement about how I was at his department because of the multifaceted injury that a child caused me at Prospect Hill Park,

8

including spiting into my face twice from about 4-6 inches away from my face, and screaming into my left ear from about 1 inch away from the ear-canal opening. Due to the above about Silva, the next day I went to the CHA Cambridge Hospital urgent care facility in Somervile, and the clinician who evaluated me examined the throat and stated that it was severely inflamed, and then made some ensuing diagnoses and treatment-recommendations.

Regarding Brady: As I have done for a multitude of years, and as I have clearly conveyed to my above Dr. Hastings many times, I prefer the seats that I am to use, and the equipment that is to be used on me, to be sterilized. I politely asked Brady if there were sterilization cloths that I could use on the two seats that I would be using, namely the office seat, and the audiology-room seat. She stated that they are clean, but that she will wipe them again anyway. At that point, I assumed that the two sets of instruments that were to be used on me were already sterilized; and I did not ask for them to be further sterilized. One set of instruments was next to the office seat, and the other set were in the audiology room. Brady proceeded to use one large white sterilization cloth on the office seat, while I stood 2 feet away. She used both sides of the cloth, and each side became lightly brown from having wiped up embedded filth on the surface. To my bewilderment, she then used that same cloth to begin to wipe the many instruments that were to be used on, over, and inside, my ears. I was stricken with confusion, and out of fear of offending her, and possibly, as such, undermining my testing and test-results, I did not express a complaint to her. To my dismay, she used the same wipe on the seat in the audiology room, and then on the instruments in that room, two of which were inserted deeply into both of my ear-canals. While I was in the audiology room, I took an unused white paper towel that I had folded in my pocket, and wiped the seat, and light brown was wiped off by my cloth. I assume that those seats were rarely cleaned, and that if and when they were, they were only very rapidly and superficially. Next: I proceeded with her extensive multifaceted audiology exam. Shockingly, about ¼ of the way through the testing of my above mentioned left ear, she paused the testing, and intervened via speaking to me via the headphones, and told me to be sure to listen with all of the sounds with my left ear, and to be sure to press the response-button when needed. I have been involved in sensory perceptual experimentation in the autism field as a scientist, and a patient, since 2006 – for example, via this study that was presented at the International Meeting For Autism Research, for which I was a collaborating scientist and test-subject,
https://webhome.weizmann.ac.il/home/masagi/yoram/Bonneh-IMFAR-2007-DH.htm
As is well known by all scientists, clinicians, physicians, etc., it is impermissible for the person or people who are administering an exam, experiment, test, etc., to intervene into the *content* of the experiment. The only interventions that are permitted are, for example, if an instrument falls, or moves out of place, or is not working, etc. Here Brady, clearly, could not psychologically tolerate the results of the testing of my above mentioned left ear, and therefore engaged in medical misconduct in order to try to create a situation in which the results were more preferred by her. When patients are subjected to the things that she stated to me, they typically will become extremely worried about the testing, and engage in guess-responses out of fear that the clinician was, and will continue to be, angry with them. If she had concern about the left side, she could have done the testing again, and started with the left side, and, or, did the testing again on another day, and started with the left side. I did not complain to her about this, either. I however did so via MyChart to whoever of that department receives MyChart messages; and again I did so on 2/3/23 to Patient Relations.

As was the case regarding the above Silva, I decided, due to Brady's conduct, to be evaluated by a different Otolaryngology department. The results were significantly different than Brady's results, especially for the left ear. Aside, regarding this new department, regarding a language-reception test, I told the audiologist that the language was being expressed into both ears via the headphones, whereas she told me that the expressions would change from side to side. She then said that a prior patient said

9

the same thing. Yet, no effort was made by hear to evaluate this, nor to repeat the test with me.

On 3/20/23, I saw a notification on MyChart that I was going to be postal mailed a letter-of-termination by practice-manager Judy Patelle of the department. I then received the letter on 3/27/23, which in part stated the following:

> We are sorry to hear of the dissatisfaction with your care at CHA Surgical Specialties. You had communicated your frustration and anger via MyChart previously, and multiple attempts to speak with you by phone at that time were unsuccessful. You continue to express your concerns about he quality of care, and the care provided by providers and staff. We strive to have our clinic be a safe and respectful environment for all out patients and our staff, and this includes building a collaborative and trusting relationship with our patients. Your comments reflect a lack of confidence in the providers and staff within this department, and that you needs were not met. As such, we will terminate your care at the CHA Surgical Specialties clinics ....

However, and as I stated above about Patient Relations regarding the first of the above matters, the attempt by the above Patelle to contact me by telephone, and my attempt to return her call, resulted in persistent missed calls. Moreover, a telephone appointment was not asked of me via voicemail nor MyChart, and instead the above missed calls continued. Moreover, I did take the liberty to express my above complaints about the two above clinicians to my above doctor Dr. Hastings, including via MyChart. As was clearly the case of the above first matter with the Primary Care Department, this department also holds the opinion that I should not continue to express my complaints after a period of time, and that if I do so, this demonstrates that I am subverting the above "We strive to have our clinic be a safe and respectful environment for all our patients and staff ...." However, as is the case of the above first matter, I have never expressed my complaints about particular clinicians to the clinicians themselves; and it is clear that it is assumed that I did, and that I would continue to do so in future appointments, and that I may cause the clinic to be an unsafe and disrespectful place. This is an assumption of disablism, I would argue, which was contrived (pretexted) in order to exclude me from the department: Very easily, the above two clinicians could have been asked if I expressed my complaints to them; and instead, it was assumed, via disablism, that I did; and it was further assumed via disablism that I would do so in my future visits with the clinicians. Moreover, Patelle states above, "You had communicated your frustration and anger ...." I simply conveyed my complaints, and in a detailed manner, and only to the supervising staff, and only via MyChart messaging. Moreover, she via disablism misinterprets my legitimate complaints as "frustration and anger". Moreover, she via disablism misinterprets my writing as expressing "frustration and anger", despite that this was only writing. Moreover, and again, my complaints were simply highly detailed, and rigorous, and have never contained profanity, criminal conduct, etc. Aside, it is extremely reasonable, and expected, for complaints to be expressed with the concurrent emotion; and my detailed complaints not only conveyed the inappropriate conduct of the clinicians, but my opinion on the inappropriateness of any clinician to engage in such conduct.

On 3/22/23, which is prior to my receiving the above letter, I sent the the CEO of the hospital Dr. Assaad Sayah, and concurrently the chief of medicine, Dr. Richard Pells, a brief email objecting to the termination, and provided many of the arguments that I provide in this Complaint, but over a brief paragraph. Khalid telephoned me that day and we spoke for about 30 minutes. She then sent me an email summarizing some of our conversation, and cc'd Hoffman and Patient Relations. She stated the

10

following, including stating,

"I will retract my statement that Dan can no longer be seen in the ENT practice.  Dan is no longer terminated from CHA Otorlaryngology ... He will be seeing me as his provider ...":

> Hi Dan - it was a pleasure to speak with you and I am very glad we had a chance to talk.  I am so sorry that I had not had a chance to speak with you earlier. I wanted to followup on our discussion and am cc'ing Dr. Hoffman and patient relations here.
>
> @Dr. Hoffman and Patient Relations Team: I had a very good and insightful conversation with Dan and I would like us to have a follow up meeting as I would like to hear more about the patient complaint process. I was sad to learn that I was the first person Dan was verbally speaking to in regards to the outcome of his complaint. I apologized to him for that as I know that we want patients at CHA, especially in the Department of Surgery, to feel heard.
>
> Second, I will retract my statement that Dan can no longer be seen in the ENT practice. Dan is no longer terminated from CHA Otolaryngology and I am happy to address this in his chart as well. He will be seeing me as his provider next Wednesday, March 29th at 1:30 pm at Cambridge Surgical Specialties and I will have him added to our schedule.
>
> Third, I will reach out to Dr. Hastings, Dan's PCP, to see if she can fit him in the near future as well.
>
> Finally, as we strive to provide compassionate care at CHA, I really appreciate your sharing your story Dan and I look forward to meeting you in person.
>
> I am sending this email to the rest of folks here as I wanted them to be aware that we spoke.

Also on 3/22/23, the above Dr. Sayah replied to me:

> Thank you for having the courage to raise these concerns with me and others at Cambridge Health Alliance.  I am sorry that you feel as you do about your experience at CHA
>
> A core value of CHA is that we treat all patients with dignity and respect at all times. We do not tolerate any form of retaliation.
>
> I am directing members of the CHA team to make further inquiries into the matters you have brought to my attention.

Clearly, there is a tendency of the practice-managers of both of these departments to engage in essentially the same kind of conduct.  Moreover, the practice-manager of the Otolaryngology

11

Department states "we will terminate your care at the CHA Surgical Specialties clinics", which means that she terminated me from all of the clinics that are found within the CHA Surgical Specialties Department, which include 9 clinics,
https://www.challiance.org/services-programs/specialty-care/surgery
That is, she did not limit her termination of me to only the Otolaryngology Clinic. This is particularly reprehensible. It appears that she is the practice-manager for the entire CHA Surgical Specialties Clinics, and that she decided to terminate me from all of the clinics. 1.5 years ago, Dr. Siva Vithiananthan of the Surgery Clinic did a brief surgical procedure for me, and I had a purely positive extensive interaction and discussion with him. However, sadly, as I conveyed to my above doctor Dr. Hastings, the nurse treated me, in sharp contrast to 95% of my clinicians at Cambridge Hospital, and elsewhere over time, with shocking mocking pity – that is, as if I was a near-invalid who had to be spoken to like a child of 5-6 years old. Moreover, she incessantly told me where to move, where to sit, etc., as if I was a dog who she was training. Moreover, there were two pieces of paper towel on the floor, and she picked them up with her gloved hands, which she then used to assist the above doctor during the procedure. She should not pick up any material from the floor, and instead leave that to the custodial staff, or do so outside of the surgical procedure time-frame. Moreover, she did not even sterilize the outside of her gloves, which she could have done in 5-6 seconds via a foam. She was clearly patently apathetic about following the simple basic protocol that all clinicians are taught, and expected, to follow.

## CONCLUSION

The defendant engaged in defamation against me with the intent to have me excluded from either the hospital's Primary Care Department, or the entire hospital, and succeeded in having me excluded from the Primary Care Department, which has entailed a severe disruption of my medical care via a termination of my clinical relationship with my primary-care doctor Dr. Stephanie Hastings, as well as my now having to travel a farther distance to a new facility; and travel for me as a disabled person is often extremely difficult. Moreover, the above has caused immense humiliation, and an exacerbation of my already severe chronic depression. Moreover, all of my visits with Dr. Hastings have included substantial discussion about my severe depression, my past treatment of medicines, hospitalizations, and Electro Convulsive Therapy, including Dr. Hastings inquiring into detail of my current state of depression, including recommending a partial hospitalization program. As such, Dr. Saravanan, despite having knowledge of this, as an even minimally competent practice-manager would, engaged in the above May 2022 failure to handle my complaint, and April 2023 psychological abuse of me over 20 minutes via telephone, and termination of me from my place of medical care, and on the basis of the defamatory fraud of the defendant.

The above persons, namely Employee X, Stacy, Patient Relations, Risk Management, and Dr. Saravanan, engaged in presumptive disability discrimination, and/or disability discrimination retaliation, against me by assuming that since I am mentally ill, I may engage in criminal conduct against one or more employees, despite not having even an extremely minimal factual basis to think this. Their basis for thinking this is their patent inhumane disabilist thought, which is especially reprehensible of medical providers, who, as such, should have basic knowledge of mental illness, know that 70+ years ago the inhumane prevalent disablist abuse against the mentally ill, both psychological abuse and physical abuse, began to be discontinued due to the improved knowledge of what mental illness is. Moreover, Patient Relations and Risk Management, via their highly negligent and highly uncooperative conduct against me, created the situation that they desired to create, and about which they felt justified to conclude that my persistence regarding my not being deterred by their weeks of

12

unwillingness to provide me with the name of the above clinician can be interpreted as that "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us". Moreover, they continued to sustain their passive-aggression against me in their above mentioned letter by continuing to not provide me with the clinician's name. Moreover, my recent request for the name of my 10/14/22 clinician has still not been provided to me despite my, again, polite written request.

Clearly there is a pattern of this kind of conduct at the hospital.

Due to the above, I would like to ask the court for:

(1) General Damages / Assumed Damages, due to the extensive psychological injury that I was caused, and the termination of my medical care at my Primary Care Department.

(2) Punitive Damages, for the purpose of attempting to constrain the relevant hospital staff from engaging in such conduct with other patients.

## AFFIRMATION

I swear under the pains and penalties of perjury that my Statement Of Facts is true to the best of my knowledge and recollection.

Submitted by,

Dan Howitt
dth055@g.harvard.edu
857-247-0764

Date: 5/10/23

13

# EXHIBIT 4

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
MIDDLESEX SUPERIOR COURT

Docket # 2381CV01308

Dan Howitt,                                    )
                                               )
                                               )
                        Plaintiff,             )
                                               )
v.                                             )
                                               )
CHA Cambridge Hospital,                        )
                                               )
                                               )
                        Defendants.            )
                                               )

**COMPLAINT and DEMAND FOR JURY TRIAL**

**COMPLAINT**

The following is a complaint of: defamation via slander resulting in exclusion; disability discrimination (MGL c272 s98); reprisal; medical malpractice (MGL c231 s60B); two violations of MGL c111 s70E(a); the intentional causing of immense psychological abuse.

**JURISDICTION and VENUE**

The Middlesex Superior Court of the Massachusetts Trial Court has jurisdiction for claims for damages of defamation, disability discrimination, and other torts. The venue is appropriate in the Middlesex Session since the business where the disability discrimination occurred is in Cambridge, MA.

**PARTIES**

(1) I Dan Howitt am the plaintiff, and am a resident of Cambridge, MA. I receive SSI and MassHealth, and am disabled with diagnosed (as of 1999) marked Autism Spectrum Disorder, and marked Major Depressive Disorder. As such I would like to ask the court for some leeway regarding my ability to follow the precise civil procedures that are required.

(2) CHA Cambridge Hospital, as the employer of Employee X (whose name is unknown by me), who was the medical-assistant who received my primary-care physician's (Dr. Stephanie Hastings) 10/14/22 order for the following "screening tests", "labs", via several blood samples:

> (Z00.00) Preventative health care
> Comment: Will obtain screening tests today and continue to discuss preventative
> medicine at follow-up. We did not discuss HB vaccine but will obtain HBsAg.
> Provided consent for HIV test.
> Plan:

1

LIPID PANEL
HEMOGLOBIN A1C
HIV ANTIGEN ANTIBODY 5TH GEN
HEPATITIS C ANTIBODY
VITAMIN D, 25 HYDROXY
VITAMIN B12
HEPATIC FUNCTION PANEL
THYROID SCREEN TSH REFLEX FT4
PROSTATIC SPECIFIC ANTIGEN
POC IMMUNOASSAY FECAL OCCULT

Because Cambridge Hospital has not provided me with the name of the defendant, I have listed Cambridge Hospital as the defendant in the meantime, which is located at:
CHA Cambridge Hospital
1493 Cambridge Street
Cambridge, MA 02139

(3) Dr. Yamini Saravanan, practice-manager of Cambridge Hospital.

(4) Lorraine Vendetti, Cambridge Hospital, Patient Relations Department.  Hereafter "Patient Relations".

(5) Denise Peterson, Cambridge Hospital, Risk Management Department.  Hereafter "Risk Management".

(6) Dr. Stephanie Hastings, physician of the Primary Care Department.

(7) Dr. Ayesha Khalid, physician of the Otolaryngology Department.

(8) Stacey, medical-assistant of the Primary Care Department.

(9) Dr. William Zinn, physician of the Primary Care Department

(10) Dr. Assaad Sayah, CEO of Cambridge Hospital.

(11) James Silva, physician-assistant of the Otolaryngology Department.

(12) Meghan Brady, audiologist of the Otolaryngology Department.

2

## FACTS

On 10/14/22, I met with my CHA Cambridge Hospital primary-care doctor Dr. Stephanie Hastings. She stated that she would like to assess the above via blood samples. I agreed; and after my appointment, she walked me to the medical-assistant room where blood samples are taken.

I stated to Dr. Hastings several times prior to the above that, due to the psychological abuse and physical abuse that I was subjected to by a medical-assistant at the same hospital, and in the same room, on 8/18/2015, who received my then doctor Dr. William Zinn's following order,

VENIPUNCTURE BLOOD DRAW
CBC + PLT + AUTO DIFF
RBC SEDIMENTATION RATE

that I would be audio recording or audio-video recording my visits with other medical-assistants, and others as I might find necessary.

### Background

Regarding my above 8/18/2015 appointment with Dr. Zinn, after his appointment I was directed to the same, above medical-assistant room. I waited in the room for about 10 minutes, and decided to slowly step around the room to pass the time. The medical-assistant, whose first name is Stacy, embarked on the following: She entered the room, I turned to her and said "hi", she yelled "What are you doing!", I quietly, and in a state of abruptly arisen anxiety, said that I was just stepping around the room, she looked at me with hatred, and then began to treat me like a dog who she, moreover, hates, by stating "Sit!", "Sit!", and she pointed to, and kept jutting her pointed-finger at, the blood-draw chair. I calmly and slowly walked to the chair while I looked at her with significant discomfort. She then walked in front of me, while pulling over a rolling supply table, which had blood-draw equipment on it. She put one sterile glove on, and then upon taking the other glove out of the box of gloves, she dropped it to the floor. The floor was visibly dirty, including causing her and my shoes to make a sticking sound as we walked around. Likely the Primary Care Department has hundreds of appointments per day. She picked up the contaminated glove off of the ground with her gloved hand, and put it on her other hand. She then began to handle the sterile gauze, syringe, etc, as well as handle my harm, and tie a tourniquet onto my arm. I found this to be medical misconduct, but I was unable to assert myself out of fear that she would harm me via retaliatory anger by, for example, causing injury with the needle, causing air to enter my vein by not properly preparing the syringe, contaminating my blood vials, etc. She took some blood vials, and then hastily and aggressively handled my arm and the equipment, including hastily removing the tourniquet, hastily removing the inserted needle and the tape that secured it to my arm, etc. She then rapidly walked about 10 feet away to the supply cupboard area, and began yelling "Fuck!", "Fuck!", "Damn It Fuck!". She then angrily stated that she forgot to take one blood vial that Dr. Zinn ordered and said that she would have to do the procedure with the syringe, etc., again. As I was looking at her, her look turned to patent hatred again, and she yelled at me "Well you don't have to!" "I don't care!" "It doesn't matter". I calmly stated that I believe that it is important if Dr. Zinn ordered it. She then hastily set up a new supply of equipment, brought it to where I was still seated, and began to do the above process over. At the instant of her beginning to do so, I calmly said "I think that you dropped a glove to the ground before". She said "What!", and began tilting her head down to the ground and back up to me, several times, and said "I don't see a glove on the ground!". She then viciously said to me with a look of hatred, "I could change my gloves! If you want!" I was stricken with additional anxiety that she might engage in the above speculated abuse against me; so I quietly said, "It's ok". She did not change her gloves, nor sterilize the outside of her gloves. Of the decades of blood draws that I have had, the second blood draw from her was done with

3

comparative immense aggression, it entailed pain and deep soreness, and as I expected, resulted in a full week of massive bruising over an approximate 6" long and 4" wide region, which I conveyed via MyChart.

When I walked out of the room, I saw Dr. Zinn in the hallway, and informed him of what occurred. He said, "It doesn't matter", "It won't hurt you". I then sent him a detailed MyChart message about what Stacy did, and he sent a MyChart message-reply to me stating:

> I do think you will be better off when you can develop a relationship with a new primary care physician.

I found this to be disturbing, since, as is shown in the below provided, and discussed, Cambridge Hospital literature, the hospital makes an array of statements about its commitment to handling complaints. Moreover, since Dr. Zinn was one of the senior level physicians of that department, I interpreted his statement to imply that I should not use his department any longer. Moreover, he did not convey my complaint to Patient Relations, nor the department's practice-manager, nor the department's chair. Moreover, he did not recommend, nor arrange for, an alternate physician in his department, which additionally implied to me that he no longer wanted me to use his department.

**Present Circumstance**

Regarding my above mentioned 10/14/22 laboratory order, I audio recorded my 8 minute 03 second visit with the defendant. I began to record after I entered the room and before the medical-assistant arrived. When she arrived, I pointed at my phone and quickly mentioned that I record my visits for my own record and safety. I then, in a time-period of about 30 seconds, conveyed some of the above about the 2015 medical assistant Stacy. The defendant said that she knows Stacy and then stated Stacy's last name, and asked me if I remember that name. I said that I only remember her first name. As I am with all clinicians, I was polite, soft-spoken, slow spoken, and mostly quiet. She commented on how my arm veins are ideal for blood draws, and took 3-5 vials I believe, and did so very professionally and carefully. I thanked her and then left.

Six full months later, on 4/25/23 at 4:28pm, I received a telephone call by the practice-manager of the Primary Care Department, Dr. Yamini Saravanan. She left me three voice-mails over three days prior to this, but did not leave a return telephone number. I had an appointment with the above Dr. Hastings on the next day (4/26/23), which I was scheduled for about 1 month prior, and which was for the purpose of doing an additional blood test screening, and to assess how her prescription for Vitamin D for me had been for me. I had a 20 minute 15 second telephone call with her, and at the outset of our discussion I sated "Call's being recorded". She hesitated, and then began.

Dr. Saravanan stated that I was "terminated" from the Primary Care Department, and over approximately 15 minutes, repetitively reiterated that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated". I found her need to be repetitive to that extent to be unnecessary, unproductive, and, as such, psychologically abusive, and, to demonstrate her desire to abuse me. Moreover, her tone of voice was of a highly inappropriate friendly nature, as if she enjoyed subjecting me to such severe claims, and the severe termination, via a friendly voice, as if she found the matter to be pleasing to her, namely the matter of expressing the above allegations to me, and the matter of her terminating me from her department.. Moreover, this demonstrated to me that she is likely emotionally abject with regarding to understanding how any patient would likely receive such severe claims and severe termination. That is, she was clearly devoid of empathy.

I spent approximately the first 15 minutes of the 20 minutes politely inquiring into whether there are any examples of what she stated, and she would, instead, continue to embark on the above repetitive reiterations, and clearly, in my opinion, in order to attempt to proliferate her abuse me, which clearly was

4

intended to elicit an emotional upheaval from me, which I do not engage in. She finally, at my final of many requests for even one example of what she claimed, stated "you called" my previous medical-assistant "fat". I stated that I did not, that I have never used such language, nor any language of that nature, over decades, since perhaps my early childhood, and that I never used language of that nature since I began at Cambridge Hospital in 2014. She added that I asked the medical-assistant "for the name" of my 2015 medical-assistant, and added that this demonstrates that I am unable to "move on" from that past incident, and that this, as such, causes "staff" "safety concerns". I stated to her that I did not ask for the above name, and rather, that the medical-assistant, on her own accord, provided me with the above name.

11 months prior, on 5/23/22, I sent the above Dr. Hastings a MyChart message with a brief version of my complaint against the above medical-assistant Stacy. On 5/31/22, the above Dr. Saravanan sent me the following MyChart message-reply:

> I am Dr. Saravanan, the Medical Director at the Cambridge Primary Care Center.
> We want to make sure that you are fully heard and have asked our colleagues
> from Patient Relations to contact you.

As was the case in 2015 onward, and from 5/23/22 to the present, the Patient Relations that she mentions above left me a voicemail, I returned their call 3-4 times over 2 weeks, they have never answered the telephone of the innumerable times that I have called them since 2015, and they then eventually return my call and leave me another voicemail. They have never made an attempt to set a telephone-appointment date and time, nor ask me to meet with them in-person. A multitude of times, in my voicemails to them, I asked for both of these, and they never replied. I have never had one telephone conversation with anyone of that department. Moreover, Dr. Saravanan never attempted to call me to discuss the matter.

Paradoxically, regarding the language "rude" "disrespectful" "unprofessional" and "safety concerns", this is the nature of the above Stacy's abuse of me, as well as Dr. Saravanan's handling of my telephone call with her. Again, I have interacted with a multitude of medical-assistants, nurses, physician assistants, medical students, physicians, and an administrative staff at that hospital, and in a multitude of departments, since 2014, and no one else has claimed that I used any misconduct-language to anyone; and I have never done so.

The hospital, per their public literature, https://www.challiance.org/file%20library/patient%20notices/privacy_rights-poster-2020-combined.pdf state the following; and this public literature is also posted on the walls of every room in the hospital:

> You have the right to know the identity and the role of individuals involved in
> your care
>
> You have the right to file a complaint if you feel your rights are violated
>
> We will not retaliate against you for filing a complaint

Moreover, MGL c111 s70E(a) specifies this:

> Every patient or resident of a facility shall have the right:
> (a) upon request, to obtain from the facility in charge of his care the name and
> specialty, if any, of the physician or other person responsible for his care or the
> coordination of his care;

Despite this, my several requests over approximately 1 month for the full name of the above 2015 medical-

5

assistant was never provided to me, and despite that I stated that I needed this for my Medical Examiners Board complaint against the person, and that the Board stated that they cannot proceed with my complaint unless I have the person's name. Moreover, on 4/29/23, I sent the above Patient Relations an email requesting the name of Employee X, and the full name of the 2015 medical-assistant; and I have not been provided either names, nor an email acknowledging my request.

Regarding the above, I include in my complaint that the above Dr. Saravanan, Patient Relations, and the Risk Management Department that I emailed with and spoke with in 2016, engaged in violating MGL c272 s98, via presumptive discrimination against me as a mentally ill person: Despite that I never verbally nor in-writing engaged in any degree of misconduct, they assume, due to their illegal disabilist thought, that I as a mentally ill person, who filed a complaint, and who did so rigorously (that is, precisely as I do in this Complaint), may engage in criminal conduct against the subject of my complaint. Worse, the Risk Management person who handled the matter, akin to the above discussed and below discussed conduct of Dr. Saravanan toward me, engaged in repeated malicious attempts to inflame the matter over several weeks, by (a) not responding to my telephone call after two weeks, (b) leaving me a voicemail with the above Stacy's full name in such a rapid manner that I could not decipher her last name to any extent, (c) not responding to my follow-up voicemail asking for her name to be emailed to me or verbally provided in a clear way, and (d) her initial response, at the start of the matter, that "You don't need her last name; you can just reference the date of the appointment".

The defendant engaged in proven defamation against me, and this resulted in my termination from where I receive medical care, as well as the abrupt termination of my next-day appointment with the above Dr. Hastings. Moreover, the above Dr. Saravanan, without my consent, as she stated in the above telephone call, both selected a new Primary Care location for me, namely in Union Square, selected a new primary care doctor for me, namely Dr. Elizabeth Davis, and selected the date and time of my appointment with Dr. Davis. This is consistent with the aforementioned devoid empathy of Dr. Saravanan: Any doctor with even minimal empathy would first desire, and take the time, to ask the patient which alternative location would be best, which new doctor would be best (including whether male or female), and which dates and times would be best. Aside, Dr. Saravanan in 2014 gave the following 9 minute speech about her experience at Cambridge Hospital https://www.youtube.com/watch?v=jz8wPASlioY and at the beginning onward discusses that she had a "professional crisis" about two years prior, which was of her,

> I'm a primary care doctor at the Cambridge Health Alliance, and I'm standing her today because I had a professional crisis. A crisis about two years ago where I started feeling more and more disconnected from a group of my patients. I couldn't really make sense of their illnesses, their needs, their lives.

Her conduct in my telephone call with her, her failure to handle and follow-up on my above 5/23/22 complaint, and her termination of me from the Primary Care Department, and the abusive way that she did this, are clear demonstrations of her above 2014 statement, which I would argue was a circumstance of hers that was caused by her impoverishment of empathy, and ensuing psychological abuse of patients, such as discussing their problems in the above inappropriate friendly/enjoyable way, and likely worse.

Aside, as is shown in my telephone call with Dr. Saravanan, she shows (1) that she believes that my above 2015 matter with the medical-assistant was in "2017-2018", and repeatedly refers to this as my "pre-pandemic" conduct, and (2) that she did not know of the date of my above 2022 medical-assistant appointment, including asking me when it was. She repetitively stated that I engaged in "pre-pandemic" and "post-pandemic" conduct that is the basis for her termination of me. She did not address the above 5/23/22

6

matter, namely her failure to contact me in any way, and to handle the matter in any way, and the Patient Relations Department's failure to do either as well.

As Dr. Hastings stated to me in my above 10/14/22 appointment with her, Stacy "no longer has access to patients", and "instead has an administrative position". I speculate that the defendant engaged in defamation against me as retaliation for my complaint against a staff member who she knows, a complaint which succeeded in removing Stacy from her work with patients and into an administrative position.

I have received consistent medical care since 1993, and have no record of engaging in any even minimal form of any kind of abuse against anyone, and to the contrary, am consistently referenced as a highly polite, soft-spoken, introverted, engaged, careful, and thoughtful patient who, moreover, consistently thanks all of my clinicians.

The following is about a 4/14/23 matter. Unfortunately, due to daily suffering that I have to endure, I have written a small number of very poignant MyChart messages to the above Dr. Hastings, and more recently a general-staff member regarding my request for September 2021 medical records. The staff member, Ryan, handled my request with immense apathy, a lack of clarity, and a lack of even minimal guidance. I asked the staff member why he was engaging in such apparent abuse of me, and asked him to discontinue this, and asked him to realize that I am a patient, who, unlike him, is not familiar with the 50+ sections of MyChart, and to tell me precisely where my "telephone-encounter" medical records are. Moreover, he was dishonest that I cannot request such records via MyChart, and instead deceived me to think that I would have to write, print, and mail a letter-request. This is further, clear abuse. He then replied apologizing for having not told me that telephone-encounter records are not in MyChart. I had to ignore his above attempt at deception, and find where, and how to, request records by MyChart. There was involved in the above – Esmie, a woman who I recall exchanging a message with.

11 days after the above, on 4/25/23, Dr. Saravanan sent me a MyChart message asking to speak with me, and, as I discuss above, repeatedly called me with voicemails that day, and did not leave a return-number. Then, I eventually spoke with her at 4:28pm that day.

Returning to an above matter: On 1/25/16, Patient Relations emailed me a letter, and below is an excerpt of it. Here Risk Management, via Patient Relations, predatorily abuses me for their clearly intentional unwillingness, after several weeks, to provide me with the above clinician Stacy's full name. As I discussed above, it was only after a multitude of weeks of Risk Management engaging in the above conduct that they then provided me an non-decipherable voicemail with the person's full name, after which I again had to continue my request. In the below excerpt, Patient Relations shows that they believe that Risk Management provided me with Stacy's name, and that, therefore, my subsequent requests for it were unwarranted, and, worse, a cause for them to consider my conduct "harassment" and a basis for them to contact "Public Safety and Security". This, despite that I contacted Risk Management thereafter and stated that I could not decipher the name that was left for me via voicemail. Aside, much of what the below Patient Relations states about me, and about what they believe that I did, and about what they believe that I stated, is extremely inaccurate, and consists of confabulations designed to demonize me, and to continue their unwillingness to abide by their own public principle, which I provide above, about how they confer to each patient the right to the identity of their clinicians. Moreover, the below Patient Relation's fundamental, and pervasive, unwillingness to do so is shown in the very letter that they condemn me with: In the letter, they, still, do not provide the person's full name; moreover, they state "the date of service and concern is enough information to report." Aside, the below claims – for example, "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us" – are, as I discuss above, of illegal disabilist thought: Again, I began the process from the outset with a very simply stated, one-sentence statement requesting the full name of the clinician Stacy; and this was met, via their illegal disabilist thought, with repeated questioning about why I needed the person's name, and, that, it is not necessary to have the

7

person's name; each time I cited the Cambridge Hospital, Patient Rights literature, and I was 100% polite the entire time. Patient Relations and Risk Management clearly assumed that I as a mentally ill person would engage in criminal conduct against the clinician, and perhaps others of the hospital, despite that not only did I never provide an even minimal intimation of this, but that they cannot, and did not, provide any examples of any misconduct. Worse, it was their own intentional inhumane passive-aggression against me over weeks, via their not abiding by their above public principle, and thereby resulting in my need to continue calling and emailing for the person's full name, that was used by them against me to interpret my several requests over several weeks to result in, again, "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us". A patient's desire to take seriously a public patient right that is conferred by the hospital is legitimate, as is the patient's zealous, polite, and 100% legal pursuit for that right to be abided by.

In July of 2016 you requested the name of the Medical Assistant who provided your care. After many attempts to reach you to discuss this matter, you left me a voicemail stating that you felt harassed requesting no additional contact. You asked to speak with my manager. After several attempts by Denise Peterson, Senior Director, Risk Management to contact you, she also received a message stating you felt harassed by her calls and demanded a voice message with the name of the Medical Assistant and no additional contact. A message was left for you with the name of the Medical Assistant on July 25, 2016.

Most recently, you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us. We had previously provided you with the name of the Medical Assistant as requested. At this point, we have a concern regarding your intentions. If your only intention is to file a complaint with an agency outside of the Cambridge Health Alliance the date of service and concern is enough information to report.

Please understand your concern has been investigated and this matter has been closed. If you continue to call Cambridge Primary Care, Risk Management or the Patient Relations Department regarding this matter or attempt to contact the Medical Assistant in any way we will consider these actions as harassment and Public Safety and Security will be notified.



**CHA Cambridge Hospital**
1493 Cambridge Street • Cambridge, MA 02139

January 25, 2016

Mr. Dan Howitt
52 Irving Street
Apartment 8
Cambridge, MA 02138

Dear Mr. Howitt,

I am writing in response to the most recent voicemail messages we received from you on Monday, January 23, 2017. In your voicemail, you reported having left 5 messages for different people about your August 2015 phlebotomy experience. Dr. Paul Allen also shared that you have been in contact with his office and shared your dissatisfaction with your interactions with me and Ms. Peterson.

We would like to apologize for your continued dissatisfaction. It was not our intention to cause you additional upset. We explained to you on numerous occasions, that after you filed your initial complaint in September, 2015, the Nurse Manager met with the Medical Assistant who provided your care and followed up appropriately about your concern.

In July of 2016 you requested the name of the Medical Assistant who provided your care. After many attempts to reach you to discuss this matter, you left me a voicemail stating that you felt harassed requesting no additional contact. You asked to speak with my manager. After several attempts by Denise Peterson, Senior Director, Risk Management to contact you, she also received a message stating you felt harassed by her calls and demanded a voice message with the name of the Medical Assistant and no additional contact. A message was left for you with the name of the Medical Assistant on July 25, 2016.

Most recently, you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us. We had previously provided you with the name of the Medical Assistant as requested. At this point, we have a concern regarding your intentions. If your only intention is to file a complaint with an agency outside of the Cambridge Health Alliance the date of service and concern is enough information to report.

9

At this point, we have a concern regarding your intentions. If your only intention is to file a complaint with an agency outside of the Cambridge Health Alliance the date of service and concern is enough information to report.

Please understand your concern has been investigated and this matter has been closed. If you continue to call Cambridge Primary Care, Risk Management or the Patient Relations Department regarding this matter or attempt to contact the Medical Assistant in any way we will consider these actions as harassment and Public Safety and Security will be notified.

If you wish to discontinue your care at Cambridge Primary Care our Doctor Finder Service is available to you at 617-665-1398 and can assist you with the transition to a different site within the Cambridge Health Alliance. If you wish to remain at Cambridge Primary Care we respectfully request you do not have any contact with the Medical Assistant (she will not be assigned to you if you come for an appointment) and you do not make any more calls regarding this matter.

AFFILIATED WITH

     

I am sorry for your continued dissatisfaction and would once again like to assure you appropriate follow up has taken place regarding your initial complaint.

Sincerely,

Lorraine Vendetti
Manager Patient Relations

10

**Parallel Matter With The Otolaryngology Department, 11/9/22 – 3/22/23**

Beginning on 11/9/22, a parallel matter occurred between me and a different department of the hospital, namely the Otolaryngology Department. To begin: I was evaluated by two clinicians on that date, namely James Silva and Meghan Brady. Promptly thereafter I conveyed the following complaint about the two clinicians to the above Dr. Hastings, and others; and I also did so via my 2/3/23 complaint against them with Patient Relations, and my 2/1/23 email-complaint against them with the below discussed medical-director of the department Dr. Ayesha Khalid, and concurrently the chief medical officer of the hospital Dr. Jeffrey Hoffman.

I first met with Silva. I was substantially ill with a viral "cold", including an extreme sore throat; and I am well established over decades to have a highly atypically high pain tolerance. Silva was appointed to examine me prior to my audiology exam with Brady. He stayed 6+ feet away from me at all times, and in a rapid movement, he raised a pinpoint light in front of his face, and which shone at me, for 1/10[th] of a second, while he kept moving laterally. And immediately after he lowered the light, he said "Your throat looks completely normal". Of all of the throat exams that I have had since I was of early childhood, each clinician comes within 1 foot, and often less, of my face, uses a tongue depressor in order to examine the area thoroughly, and shines an instrument-light inside for 5-10 seconds, and often asks me to say "Ahh" so that my throat opening is widened. I found what Silva did to be unacceptable. I however did not convey my concern to him out of fear that he would become angry, and then engage in even worse clinical care. I began to consider why he would engage in such patent carelessness; and I speculated that he did not like my statement about how I was at his department because of the multifaceted injury that a child caused me at Prospect Hill Park, including spiting into my face twice from about 4-6 inches away from my face, and screaming into my left ear from about 1 inch away from the ear-canal opening. Due to the above about Silva, the next day I went to the CHA Cambridge Hospital urgent care facility in Somervile, and the clinician who evaluated me examined the throat and stated that it was "severely inflamed", and then made some ensuing diagnoses and treatment-recommendations.

Regarding Brady: As I have done for a multitude of years, and as I have clearly conveyed to my above Dr. Hastings many times, I prefer the seats that I am to use, and the equipment that is to be used on me, to be sterilized. I politely asked Brady if there were sterilization cloths that I could use on the two seats that I would be using, namely the office seat, and the audiology-room seat. She stated that they are clean, but that she will wipe them again anyway. At that point, I assumed that the two sets of instruments that were to be used on me were already sterilized; and I did not ask for them to be further sterilized. One set of instruments was next to the office seat, and the other set were in the audiology room. Brady proceeded to use one large white sterilization cloth on the office seat, while I stood 2 feet away. She used both sides of the cloth, and each side became lightly brown from having wiped up embedded filth on the surface. To my bewilderment, she then used that same cloth to begin to wipe the many instruments that were to be used on, over, and inside, my ears. I was stricken with confusion, and out of fear of offending her, and possibly, as such, undermining my testing and test-results, I did not express a complaint to her. To my dismay, she used the same wipe on the seat in the audiology room, and then on the instruments in that room, two of which were inserted deeply into both of my ear-canals. While I was in the audiology room, I took an unused white paper towel that I had folded in my pocket, and wiped the seat, and light brown was wiped off by my cloth. I assume that those seats were rarely cleaned, and that if and when they were, they were only very rapidly and superficially. Next: I proceeded with her extensive multifaceted audiology exam. Shockingly, about ¼ of the way through the testing of my above mentioned left ear, she paused the testing, and intervened via speaking to me via the headphones, and told me to be sure to listen with all of the sounds with my left ear, and to be sure to press the response-button when needed. I have been involved in sensory perceptual experimentation in the autism field as a scientist, and a patient, since 2006 – for example, via this study that was presented at the International Meeting For Autism

11

Research, for which I was a collaborating scientist and test-subject,
https://webhome.weizmann.ac.il/home/masagi/yoram/Bonneh-IMFAR-2007-DH.htm
As is well known by all scientists, clinicians, physicians, etc., it is impermissible for the person or people who are administering an exam, experiment, test, etc., to intervene into the *content* of the experiment. The only interventions that are permitted are, for example, if an instrument falls, or moves out of place, or is not working, etc. Here Brady, clearly, could not psychologically tolerate the results of the testing of my above mentioned left ear, and therefore engaged in medical misconduct in order to try to create a situation in which the results were more preferred by her. When patients are subjected to the things that she stated to me, they typically will become extremely worried about the testing, and engage in guess-responses out of fear that the clinician was, and will continue to be, angry with them. If she had concern about the left side, she could have done the testing again, and started with the left side, and, or, did the testing again on another day, and started with the left side. I did not complain to her about this, either. I however did so via MyChart to whoever of that department receives MyChart messages; and again I did so on 2/3/23 to Patient Relations.

As was the case regarding the above Silva, I decided, due to Brady's conduct, to be evaluated by a different Otolaryngology department. The results were significantly different than Brady's results, especially for the left ear. Aside, regarding this new department, regarding a language-reception test, I told the audiologist that the language was being expressed into both ears via the headphones, whereas she told me that the expressions would change from side to side. She then said that a prior patient said the same thing. Yet, no effort was made by hear to evaluate this, nor to repeat the test with me.

On 3/20/23, I saw a notification on MyChart that I was going to be postal mailed a letter-of-termination by practice-manager Judy Patelle of the department. I then received the letter on 3/27/23, which in part stated the following:

> We are sorry to hear of the dissatisfaction with your care at CHA Surgical
> Specialties. You had communicated your frustration and anger via MyChart
> previously, and multiple attempts to speak with you by phone at that time were
> unsuccessful. You continue to express your concerns about he quality of care,
> and the care provided by providers and staff. We strive to have our clinic be a
> safe and respectful environment for all out patients and our staff, and this
> includes building a collaborative and trusting relationship with our patients.
> Your comments reflect a lack of confidence in the providers and staff within this
> department, and that you needs were not met. As such, we will terminate your
> care at the CHA Surgical Specialties clinics ....

However, and as I stated above about Patient Relations regarding the first of the above matters, the attempt by the above Patelle to contact me by telephone, and my attempt to return her call, resulted in persistent missed calls. Moreover, a telephone appointment was not asked of me via voicemail nor MyChart, and instead the above missed calls continued. Moreover, I did take the liberty to express my above complaints about the two above clinicians to my above doctor Dr. Hastings, including via MyChart. As was clearly the case of the above first matter with the Primary Care Department, this department also holds the opinion that I should not continue to express my complaints after a period of time, and that if I do so, this demonstrates that I am subverting the above "We strive to have our clinic be a safe and respectful environment for all our patients and staff ...." However, as is the case of the above first matter, I have never expressed my complaints about particular clinicians to the clinicians themselves; and it is clear that it is assumed that I did, and that I would continue to do so in future appointments, and that I may cause the clinic to be an unsafe and disrespectful place. This is an assumption of disablism, I would argue, which was contrived (pretexted) in order to exclude me from the department: Very easily, the above two clinicians could have been asked if I expressed my

12

complaints to them; and instead, it was assumed, via disablism, that I did; and it was further assumed via disablism that I would do so in my future visits with the clinicians. Moreover, Patelle states above, "You had communicated your frustration and anger ...." I simply conveyed my complaints, and in a detailed manner, and only to the supervising staff, and only via MyChart messaging. Moreover, she via disablism misinterprets my legitimate complaints as "frustration and anger". Moreover, she via disablism misinterprets my writing as expressing "frustration and anger", despite that this was only writing. Moreover, and again, my complaints were simply highly detailed, and rigorous, and have never contained profanity, criminal conduct, etc. Aside, it is extremely reasonable, and expected, for complaints to be expressed with the concurrent emotion; and my detailed complaints not only conveyed the inappropriate conduct of the clinicians, but my opinion on the inappropriateness of any clinician to engage in such conduct.

On 3/22/23, which is prior to my receiving the above letter, I sent the the CEO of the hospital Dr. Assaad Sayah, and concurrently the chief of medicine, Dr. Richard Pells, a brief email objecting to the termination, and provided many of the arguments that I provide in this Complaint, but over a brief paragraph. Khalid telephoned me that day and we spoke for about 30 minutes. She then sent me an email summarizing some of our conversation, and cc'd Hoffman and Patient Relations. She stated the following, including stating, "I will retract my statement that Dan can no longer be seen in the ENT practice. Dan is no longer terminated from CHA Otorlaryngology ... He will be seeing me as his provider ...":

> Hi Dan - it was a pleasure to speak with you and I am very glad we had a chance to talk. I am so sorry that I had not had a chance to speak with you earlier. I wanted to followup on our discussion and am cc'ing Dr. Hoffman and patient relations here.
>
> @Dr. Hoffman and Patient Relations Team: I had a very good and insightful conversation with Dan and I would like us to have a follow up meeting as I would like to hear more about the patient complaint process. I was sad to learn that I was the first person Dan was verbally speaking to in regards to the outcome of his complaint. I apologized to him for that as I know that we want patients at CHA, especially in the Department of Surgery, to feel heard.
>
> Second, I will retract my statement that Dan can no longer be seen in the ENT practice. Dan is no longer terminated from CHA Otolaryngology and I am happy to address this in his chart as well. He will be seeing me as his provider next Wednesday, March 29th at 1:30 pm at Cambridge Surgical Specialties and I will have him added to our schedule.
>
> Third, I will reach out to Dr. Hastings, Dan's PCP, to see if she can fit him in the near future as well.
>
> Finally, as we strive to provide compassionate care at CHA, I really appreciate your sharing your story Dan and I look forward to meeting you in person.
>
> I am sending this email to the rest of folks here as I wanted them to be aware that we spoke.

13



Also on 3/22/23, the above Dr. Sayah replied to me:

> Thank you for having the courage to raise these concerns with me and others at
> Cambridge Health Alliance. I am sorry that you feel as you do about your
> experience at CHA
>
> A core value of CHA is that we treat all patients with dignity and respect
> at all times. We do not tolerate any form of retaliation.
>
> I am directing members of the CHA team to make further inquiries into the
> matters you have brought to my attention.

14



Clearly, there is a tendency of the practice-managers of both of these departments to engage in essentially the same kind of conduct. Moreover, the practice-manager of the Otolaryngology Department states "we will terminate your care at the CHA Surgical Specialties clinics", which means that she terminated me from all of the clinics that are found within the CHA Surgical Specialties Department, which include 9 clinics,

https://www.challiance.org/services-programs/specialty-care/surgery

That is, she did not limit her termination of me to only the Otolaryngology Clinic. This is particularly reprehensible. It appears that she is the practice-manager for the entire CHA Surgical Specialties Clinics, and that she decided to terminate me from all of the clinics. 1.5 years ago, Dr. Siva Vithiananthan of the Surgery Clinic did a brief surgical procedure for me, and I had a purely positive extensive interaction and discussion with him. However, sadly, as I conveyed to my above doctor Dr. Hastings, the nurse treated me, in sharp contrast to 95% of my clinicians at Cambridge Hospital, and elsewhere over time, with shocking mocking pity – that is, as if I was a near-invalid who had to be spoken to like a child of 5-6 years old. Moreover, she incessantly told me where to move, where to sit, etc., as if I was a dog who she was training. Moreover, there were two pieces of paper towel on the floor, and she picked them up with her gloved hands, which she then used to assist the above doctor during the procedure. She should not pick up any material from the floor, and instead leave that to the custodial staff, or do so outside of the surgical procedure time-frame. Moreover, she did not even sterilize the outside of her gloves, which she could have done in 5-6 seconds via a foam. She was clearly patently apathetic about following the simple basic protocol that all clinicians are taught, and expected, to follow.

15

**Parallel Matter With The Psychiatry Department / Central Street Clinic, 6/2021 – 3/2023**

Below are some of the core statements that I provided about this matter; and the statements describe the matter such that I do not have to in a separate narrative here.  I will however classify this matter as one of multifaceted medical malpractice.



The following is the above attached letter titled "Boisvert 2".

2-26-23
From Dan Hewitt

Dr. Marcellino-Boisvert,

I will be presenting this to the clinical director of CHA Central Street Psychiatry, and the clinical director of CHA.

(1) I was provided all of my MyChart messages with Sara Stoddard-Gunn and attached them, which is the same list of messages that you referred to in my telephone conversation with you last week. On 9-28-21, Sarah in her message of 4:06pm asked if I have access to a computer camera and microphone for the internet based day treatment program. I replied at 4:16pm that I would have my computer updated. Despite this, she never emailed me again, nor did anyone else. Moreover, I messaged her 1 month later on 10-27-21 about this matter, and she did not respond. Profoundly negligent and apathetic.

(2) Per the attached clinical note by Sarah, I asked her to apply to McLean's program for me on 6-29-21. It took her 3 full months (her above mentioned and attached 9-28-21 message) to tell me that the program is virtual currently. 3 full months. Absurd, and profoundly negligent and apathetic. This information could be obtained in 1-2 days.

(3) You, precisely, stated in my telephone conversation with you last week that I messaged Sarah that I could not do the virtual program due to my computer. Sadly, what you stated is proven false. And in fact, I stated that I would have my computer updated, which it is now. Perhaps if she had told me that I was accepted to the program, and of a start-date, I would have taken steps to have my computer attended to.

(4) In my previous message to you, via my then attached letter, I demonstrate how Sarah was deceptive about a multitude of other things, via deceptive language designed to perpetually place blame on me, and evade admitting to any fault (eg, the well known problem CHA had had, and perhaps still has, with Mend-video), and to evade expending any additional effort for me (eg, obtaining neuropsychological testing at one of the other dozens of facilities throughout Boston, rather than having me wait 6 full months). Moreover, again, she ignored and evaded my message about the McLean program, nor had anyone else follow on this. Moreover, she took 3 months to tell me the program is virtual. Moreover, I have found from McLean that she did not submit an application to the program for me, which shows she was deceptive in stating "I'm working on the McLean PHP application". Moreover, does it take 3 full months to "work on" such an application? At the end of 2020, I thoroughly completed it myself in 30 minutes.

I will proceed to present this to a civil attorney regarding medical malpractice of Sarah Stoddard-Gunn. It is atrocious that an mental health clinician would engage in such conduct; and she likely did so because she conceived of me as a mental ill person who, as such, she could do whatever she wanted to, and get away with it. Her medical neglect is substantial, and proven. Moreover, as of proof, you made a statement in my legally recorded 30 minute 14 second conversation with you via Call Recorder that I stated to her a via MyChart message that I could not do the McLean program due to my computer. Again, this is false, as I expressed in my conversation with you. I will also present this to an attorney. I will moreover be presenting all of this to the general counsel of CHA.

Dan Hewitt



17

## Disability Discrimination of Dr. Stephanie Hastings

Hastings was my primary-care doctor from 2/2021 until my recent termination from her Primary Care Department.

(1) Via MyChart on 4/2/2022 she stated that she would appoint a "complex care specialist" to handle my case, given the nature of my case. However, she never did.

(2) I informed her several times via MyChart, and in-person, that I discuss all matters about my severe/extreme depression with only my psychologist, and that I do not do so with anyone else, and I emphasized all matters; and she agreed. I explained that (a) these are very personal matters, and that discussing them briefly in the form of a question-and-answer interview is highly impersonal and harmful to me. I also told her, a multitude of times, that if I ever am in danger of harm, I will seek assistance, and that I do not want to be asked the following, ever: "Are you in danger of harming yourself, or others" Despite this, in my last appointment with her, she was going through the following standard questions about primary-care matters, and then abruptly transitioned to the below one, which I have on audio recording, as she knew, and which is references in her below medical-record, 3rd sentence in section "Asperger's": "He does not have access to firearms or weapons and denies history of aggression".

- How has your sleep been?
- We could do some labs to check some things.
- Do you have any firearms?

As she states in her below medical-record, all of my symptomology of Major Depressive Disorder has remained consistent; and she is incorrect about a worsening of "mood", as this fluctuates as it always has. Since I began mental health care in 1992, I have never been asked the above abusive question by any non mental health clinician, and only once by a mental health clinician, in 1992. There was zero basis for her to ask this. Her doing so, and ignoring what I discuss above, demonstrates that she is disablist, namely (a) that she enjoyed tormenting me with such a question, and watching, as she did, my response of extreme discomfort, and (b) she enjoyed conceiving of me as not being in control of any aspect of myself, and that if she asked me such a question, I might convey to her something that I have no awareness of, nor control over. Her conception of me is staggeringly inaccurate; her statement was a horrid indignity; the way that she led to her statement was such that she desired to maximally shock me with such a question, which she knew is something that I find to be highly inappropriate and abusive for me. Aside, I should have simply responded to her question with, "I'm sorry but I've mentioned to you many times over 1+ years that I only discuss such questions with mental health clinicians." I speculate that she desired to shock me with that question, in the way that she did, in order to elicit a specific answer. For example, if she had prefaced it with a statement about how she would like to discuss my mental health, then I would have been able to prepare how to handle such questions, as I have before with her. Her questioning was akin to what an officer or interrogator would do, which she clearly did in order to maximize her abuse of me, and completely disrespect my clear and elaborate statements on this kind of matter. Based on everything that I conveyed to her, it was not her place to ask any of such questions, and yet she embarked on this, and in the way that she did, clearly for her enjoyment. Moreover, the kept her positive/pleasant tone of voice, which she used for the prior questions, to ask such an extremely serious question: It is immensely inappropriate, and abusive, to ask such a question as if it is an ordinary, simple question. This is what psychological abusers to, because this is how they maximize their abuse of others.

I consider the above to be disablism, and her failure to see a "complex care specialist" for me, despite her own offering to do so, is of malpractice, because a complex care specialist was clearly warranted. Surely she desired to make this statement, and then not follow through with it, in order to further abuse me. This is clinical passive-aggressive abuse. And here she wanted to demonstrate to me the following, in my words about what the content of her mind was: "A complex care specialist is clearly needed; I will offer this to him;

18

months will go by and he will suffer wondering why this hasn't happened; I have no desire to arrange for this for him because I would like him to suffer more; I don't like him due to his mental disabilities; I asked him if he has firearms in the way that I did in order to shock his mind, and despite that he told me many times to not ask such questions".



19

## CONCLUSION

The medical-assistant defendant engaged in defamation against me with the intent to have me excluded from either the hospital's Primary Care Department, or the entire hospital, and succeeded in having me excluded from the Primary Care Department, which has entailed a severe disruption of my medical care via a termination of my clinical relationship with my primary-care doctor Dr. Stephanie Hastings, as well as my now having to travel a farther distance to a new facility; and travel for me as a disabled person is often extremely difficult. Moreover, the above has caused immense humiliation, and an exacerbation of my already severe chronic depression. Moreover, all of my visits with Dr. Hastings have included substantial discussion about my severe depression, my past treatment of medicines, hospitalizations, and Electro Convulsive Therapy, including Dr. Hastings inquiring into detail of my current state of depression, including recommending a partial hospitalization program. As such, Dr. Saravanan, despite having knowledge of this, as an even minimally competent practice-manager would, engaged in the above May 2022 failure to handle my complaint, and April 2023 psychological abuse of me over 20 minutes via telephone, and termination of me from my place of medical care, and on the basis of the defamatory fraud of the defendant.

The above persons, namely Employee X, Stacy, Patient Relations, Risk Management, and Dr. Saravanan, engaged in presumptive disability discrimination, and/or disability discrimination retaliation, against me by assuming that since I am mentally ill, I may engage in criminal conduct against one or more employees, despite not having even an extremely minimal factual basis to think this. Their basis for thinking this is their patent inhumane disabilist thought, which is especially reprehensible of medical providers, who, as such, should have basic knowledge of mental illness, know that 70+ years ago the inhumane prevalent disablist abuse against the mentally ill, both psychological abuse and physical abuse, began to be discontinued due to the improved knowledge of what mental illness is. Moreover, Patient Relations and Risk Management, via their highly negligent and highly uncooperative conduct against me, created the situation that they desired to create, and about which they felt justified to conclude that my persistence regarding my not being deterred by their weeks of unwillingness to provide me with the name of the above clinician can be interpreted as that "we have a concern regarding your intentions", and "you have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us". Moreover, they continued to sustain their passive-aggression against me in their above mentioned letter by continuing to not provide me with the clinician's name. Moreover, my recent request for the name of my 10/14/22 clinician has still not been provided to me despite my, again, polite written request.

The other persons of the hospital that I discuss above engaged in the conduct that I describe above.

There were two violations of MGL c111 s70E(a). Moreover, the violations were engaged in via disability discrimination (MGL c272 s98).

The above parallel matter regarding the Otolaryngology Department is of a multitude of instances of medical malpractice and retaliation.

The above parallel matter regarding the Psychiatry Department / Central Street Clinic is of a multitude of instances of medical malpractice.

The above parallel matter regarding Hastings is of disability discrimination, and malpractice in the form of psychological abuse.

Due to the above, I would like to ask the court for:

(1) General Damages / Assumed Damages, due to the extensive psychological injury that I was caused, and the termination of my medical care at my Primary Care Department.

(2) Punitive Damages, for the purpose of attempting to constrain the relevant hospital staff from engaging in such conduct with other patients.

20

## AFFIRMATION

I swear under the pains and penalties of perjury that my Complaint is true to the best of my knowledge and recollection.

Submitted by,

Dan Howitt
dth055@g.harvard.edu
857-247-0764

Date: 6/11/23

21

# EXHIBIT 5

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
MIDDLESEX SUPERIOR COURT

Docket # 2381CV01308

_____
)
Dan Howitt,                                    )
                                               )
                    Plaintiff,                 )
                                               )
v.                                             )
                                               )
CHA, Cambridge Hospital,                       )
                                               )
                                               )
                    Defendant.                 )
_____)

COMPLAINT
AND
REQUEST FOR BENCH TRIAL

DISABLILITY REASONABLE ACCOMMODATION REQUEST
        I Dan Howitt the plaintiff am a pro se litigant, I receive Supplemental Security Income, Medicaid, and the Supplemental Nutrition Assistance Program, I have diagnosed severe Autism Spectrum Disorder, and diagnosed severe Major Depressive Disorder, and I therefore ask for leeway regarding civil-procedure.

REQUEST FOR TOLLING OF STATUES OF LIMITATIONS
        Due to the extensive malpractice, extensive disability discrimination, extensive retaliatory maltreatment, and criminal harassment, by the defendant against me, and my entailed chronic fear of escalated retaliation, and the entailed chronic worsening of my illnesses, I was unable to attempt to address this via the court until now, and therefore would like to request a tolling of any exceeded statutes of limitations.

COMPLAINT
        This is a complaint about the following:  defamation via slander resulting in exclusion from my place of medical care; a multitude of instances of disability discrimination (MGL c272 s98); a multitude of instances of reprisal; a multitude of instances of medical malpractice (MGL c231 s60B); two instances of the failure to provide requested medical-provider information (MGL c111 s70E(a)) which were engaged in via violations of MGL c272 s98, criminal harassment (MGL c265 s43A), and the intentional causing of psychological suffering.

JURISDICTION
        Middlesex Superior Court has jurisdiction over the aforementioned and below discussed violations via MGL c212 s4 (original jurisdiction), MGL c212 s6 (criminal jurisdiction), etc.

PARTIES
        1, I Dan Howitt am the plaintiff, and am a resident of Cambridge, MA.
        2, Cambridge Health Alliance (CHA), Cambridge Hospital, is the defendant:
                CHA Cambridge Hospital
                1493 Cambridge Street

1

Cambridge, MA 02139

FACTS

1, 8/8/15 medical-assistant Stacy engaged in a multitude of instances of malpractice against me during her attempted fulfillment of a blood-order of Dr. William Zinn.  At the instant that she entered the room where I was standing alone, and after I politely said "hi", she verbally accosted me, verbally demeaned me, subjected me to her using two highly contaminated medical gloves on her hands (both contaminated by one falling to the ground, which was sticky with filth, and her then handling it with her gloved hand), she used both gloves to begin handling and administering the equipment for the blood-draw, she engaged in further abuse via using sexually vulgar profanity, she engaged in further malpractice by removing all of the blood-draw equipment from my arm and having forgotten to extract an additional full vial of blood per Dr. Zinn's order, she engaged in further psychological abuse by caustically informing me that "it doesn't matter" "I don't care" if I have the vial done, she engaged in further malpractice by hastily administering a new set of blood-draw equipment during which time she vigorously needled my arm causing 10+ days of massive bruising.

2, 8/16/16, Dr. Zinn engaged in illegal retaliation regarding my professionally expressed complaint to him about the above medical-assistant.  Via MyChart Messaging, he wrote to me:  "I do think you will be better off when you can develop a relationship with a new primary care physician."

3, 10/14/22, (a) My primary-care doctor Dr. Stephanie Hastings told me that the above Stacy "no longer has access to patients", and "instead has an administrative position".  (b) I legally audio recorded my 8 minute 03 second visit with my new medical-assistant for Dr. Hasting's blood-order.  I informed her of the above about Stacy.  She asked me for Stacy's last name.  I said that I only remember her first name.  She began to try to remember her last name, and then told it to me, which I since have forgotten.  As I am with all clinicians, I was polite and soft-spoken.  She commented on how my arm veins are ideal for blood draws, took 3-5 vials I believe, and did so professionally and carefully.  (c) 4/25/23, I legally recorded my 13 minute 42 second telephone call with the practice-manager of the Primary Care Department, Dr. Yamini Saravanan.  I had an appointment with my primary care doctor, Dr. Stephanie Hastings, the next day (4/26/23), which was scheduled 1 month prior.  Saravanan stated that I was "terminated" from the Primary Care Department, and obsessively reiterated a multitude of times, for her clear enjoyment, as evidenced by her happy tone of voice, that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated".  I spent approximately the first 10 minutes of conversation politely inquiring into whether there are any examples of what she stated, and she would, instead, continue to embark on the above repetitive statements.  She finally, at my final request for even one example of what she claimed, stated, "you called her fat", referring to the above medical-assistant of 2022.  I stated that I did not, that I have never used such language, nor any language of that nature, including since childhood, and that I never used language of that nature since I began at Cambridge Hospital in 2014.  She added that I asked the medical-assistant "for the name" of my 2015 medical-assistant, and that this demonstrates that I am unable to "move on" from that past incident, and that this, as such, causes "staff" "safety concerns".  I stated to her that I did not ask for that name.

4, My several emailed requests via MGL c111 s70E(a) to the hospital's Patient Relations Department in 2015 and 2022 for the names of the 2015 medical-assistant and 2022 medical-assistant were not fulfilled.  On 1/25/16, Patient Relations stated in writing that they declined my request because of their "concern for the safety" of Stacy, on the basis that I made my request for her name several times over several weeks (each of my requests were not fulfilled), and stated that I was engaging in "harassment", and that if it continued they would contact "Public Safety and Security", and "the date of service and concern is enough information to report" (to the medical board), and "We have a concern regarding your intentions", "You have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us."  The Patient Relations staff engaged in presumptive violations of MGL c272 s98:  They presumed that I as a mentally ill person with

2

autism might have engaged in criminal conduct against Stacy; they interpreted my reasonable and legal request for, and reasonable persistence regarding my request for, the full name of Stacy, as criminal harassment that warranted police action and security notification; since 2021 I have been a co-editor of the world-leading Journal Of Autism & Developmental Disabilities and criminal conduct is not an aspect of the criteria of autism symptomology; persons with disablist minds, akin to those with racist minds, engage in the above kind of presumptions about the mentally ill even in the absence of even minimal supporting evidence.

5, 4/14/23, via MyChart I requested my medical-records.  Employee Ryan handled my request with immense negligence over many days.  I asked him why he was engaging in such apparent abuse of me.  He apologized for having not told me that telephone-encounter records are not in MyChart.  Eleven days after, the above Dr. Saravanan engaged in the above conduct against me.

PARALLEL MATTER WITH THE MEDICAL SPECIALITIES DEPARTMENT

6, 11/9/22, I was evaluated by two clinicians of the Otolaryngology Department, namely James Silva and Meghan Brady.  I conveyed my below complaint about them to Dr. Hastings.

On 2/1/23, I submitted my complaint to the medical-director of the department, Dr. Ayesha Khalid, and the chief-medical-officer of the hospital, Dr. Jeffrey Hoffman.

On 2/3/23, I submitted my complaint to Patient Relations.

I first met with Silva.  I was substantially ill with a viral cold, including an extreme sore throat.  Silva was appointed to examine me prior to my audiology exam with Brady.  He stayed 6+ feet away from me at all times, and in a rapid movement, he raised a pinpoint light in front of his face from 6+ feet away, which shone at me for approximately $1/10^{th}$ of a second, and he then immediately lowered the light and said, "Your throat looks completely normal".  Due to this, the next day I went to Cambridge Hospital, Urgent Care in Somervile, and the clinician who evaluated me stated that my throat was "severely inflamed", and then made some ensuing diagnoses and treatment-recommendations.

Regarding Brady:  (a) I politely asked her if there were sterilization cloths that I could use on the two seats that I would be using, namely the office seat, and the audiology-room seat.  She stated that they were clean, but that she would wipe them anyway.  I assumed that the two sets of instruments that were to be used on me were already sterilized; and I did not ask for them to be further sterilized.  One set of instruments was next to the office seat, and the other set was in the audiology room.  Brady proceeded to use one large white sterilization cloth on the office seat, while I stood 2 feet away.  She used both sides of the cloth, and each side became light brown from having wiped up embedded filth on the surface.  She then used that same cloth to wipe the many instruments that were to be used on, over, and inside, my ears.  She then used the same wipe on the seat in the audiology room, and then on the instruments in that room, two of which were inserted deeply into both of my ear-canals.  While I was in the audiology room, I took an unused white paper towel that I had in my backpack, and wiped the seat, and light brown was wiped off by my cloth.  (b) I proceeded with her audiology exam.  About 1/4 of the way through the testing of my left ear, she paused the testing, spoke to me via my headphones, and told me to be sure to listen with all of the sounds with my left ear, and to be sure to press the response-button when needed.  Brady concluded that my audiology exam was relatively normal.

Silva engaged in malpractice via negligence, and Brady engaged in malpractice via mishandling of medical equipment, and via biased intervention into my audiology exam.  The presumption is that they engaged in such conduct because I informed both of them, upon their request for the basis of my visit, that an approximate 8 year old boy who I did not know, from three inches away from my face at Prospect Hill Park while I was seated, spat into my eyes and over my mouth, twice in about 30 seconds while I was seated, and then snuck around my back and screamed into the opening of my left ear, 2-3 millimeters from the opening, and that I was intending to sue the parents of the boy, who from 15 feet away, observed what occurred and did nothing to intervene, nor apologize to me afterward.  The presumption is that the clinicians disagreed with my intention to sue, and elected to engage in negligence against me, and harm against me, in retaliation.

3

As was the case regarding the above with Silva, I decided, due to Brady's conduct, to be evaluated by a different Otolaryngology department.  The results were significantly different than Brady's results, especially for the left ear, which was found to be significantly abnormal.  As such, Brady engaged in further malpractice via a fraudulent audiology exam.

7, 2/6/23 (approximately 5 days after my aforementioned complaint, at 1:25pm I received an anti-mental illness hate-crime voicemail, via a contrived monstrous-natured guttural voice.  The voicemail source appeared as "Unknown Number".  I subpoenaed the Legal & Emergency Response department of T-Mobile in Parsippany, NJ, via the Morris County Sheriff, Civil Process, and the result of the subpoena showed that the source of the voicemail was the home telephone number of the below discussed Judy Patelle, who is the practice-manager of the hospital's Medical Specialties Department, which is where the Otolaryngology Department is.

8, 3/20/23, I received a MyChart notice that I was going to be postal mailed a letter-of-termination by Patelle.  I received the letter on 3/27/23, and she stated, "As such, we will terminate your care at the CHA Surgical Specialties clinics", which means that she terminated me from all of the sub-departments of the Medical Specialties Department.  She, via presumed violation of MGL c272 s98, interpreted my professionally expressed complaint against Silva and Brady as "frustration and anger", and as violating her department's goal to "have our clinic be a safe and respectful environment" of "collaborative and trusting relationship with our patients" and that my "comments reflect a lack of confidence in the providers and staff".  She added that "multiple attempts to speak with you by phone at that time were unsuccessful".  However, there was only one attempt from Patient Relations.  I called that office 10+ times over many days, at many times of the day, and no one answered.  I left a voicemail requesting an appointment-time to discuss the matter, and no one replied.

9, 3/22/23, which is prior to my receiving the above letter, I sent the CEO of the hospital, Dr. Assaad Sayah, and the chief of medicine, Dr. Richard Pells, a brief and professionally expressed email objecting to the above termination.  I provided many of the arguments that I provide in this Complaint, but over a brief paragraph.  Dr. Khalid telephoned me that day, and we spoke for about 30 minutes.  She then sent me an email summarizing some of our conversation, and cc'd Dr. Hoffman and Patient Relations.  She stated the following:

> I will retract my statement that Dan can no longer be seen in the ENT practice. Dan is no longer terminated from CHA Otorlaryngology … He will be seeing me as his provider

> Hi Dan - it was a pleasure to speak with you and I am very glad we had a chance to talk.  I am so sorry that I had not had a chance to speak with you earlier. I wanted to followup on our discussion and am cc'ing Dr. Hoffman and patient relations here.

> @Dr. Hoffman and Patient Relations Team: I had a very good and insightful conversation with Dan and I would like us to have a follow up meeting as I would like to hear more about the patient complaint process. I was sad to learn that I was the first person Dan was verbally speaking to in regards to the outcome of his complaint. I apologized to him for that as I know that we want patients at CHA, especially in the Department of Surgery, to feel heard.

> Second, I will retract my statement that Dan can no longer be seen in the ENT practice. Dan is no longer terminated from CHA Otorlaryngology and I am happy to address this in his chart as well. He will be seeing me as his provider next Wednesday, March 29th at 1:30 pm at Cambridge Surgical Specialties and I will have him added to our schedule.

> Third, I will reach out to Dr. Hastings, Dan's PCP, to see if she can fit him in the near future as well.

> Finally, as we strive to provide compassionate care at CHA, I really appreciate your sharing your story Dan and I look forward to meeting you in person.

> I am sending this email to the rest of folks here as I wanted them to be aware that we spoke.

4

Moreover on 3/22/23, Dr. Sayah emailed me the following:

Thank you for having the courage to raise these concerns with me and others at Cambridge Health Alliance. I am sorry that you feel as you do about your experience at CHA

A core value of CHA is that we treat all patients with dignity and respect at all times. We do not tolerate any form of retaliation.

I am directing members of the CHA team to make further inquiries into the matters you have brought to my attention.

_____

PARALLEL MATTER WITH THE PSYCHIATRY DEPARTMENT

10, 6/29/21, I asked clinician Sara Stoddard-Gunn to, per the requirement of McLean Psychiatric Hospital, submit an application for hospitalization for me. I emphasized to her, as I did to Dr. Hastings over many months, that I was in dire need of attending a partial hospitalization program. Ms. Gunn did not reply to me until 9/28/21 despite my several follow up MyChart messages and voice-mails to her. She MyChart messaged me that the McLean program was being conducted via webcam, and asked if I have a computer with which I can do that. I replied that I would. She never contacted me again, nor did anyone else at the hospital. I emailed McLean and was informed that she did not submit an application to them. I contacted the psychiatry department and was told that Ms. Gunn left her role at the hospital for another role at the hospital. Ms. Gunn never informed me of this. I asked that office if I was going to be assigned a new clinician, and was told that I would receive a reply. I never did, and was never assigned a new clinician.

11, 2/25/22, I had a 50 minute 14 second legally recorded telephone conversation with psychiatrist Dr. Elizabeth Marcellino-Boisvert. She repeatedly reiterated that Ms. Gunn did everything to assist me, and even beyond what is expected, and, that I declined the McLean program by stating to Gunn that I did not have a computer with which I could do the webcam program.

_____

12, Dr. Hastings was my primary-care doctor from 2/2021 until my termination from the Primary Care Department. Via MyChart on 4/2/2022, she stated that she would appoint a "complex care specialist" to handle my case, given the nature of my case. However, she never did.

13, I informed Dr. Hastings several times via MyChart, and in-person, that regarding my severe Major Depressive Disorder, if I am ever in danger of harm, I will seek assistance, and that I do not want to be asked the following by her, nor her staff, every time that I have an appointment, because I only discuss such matters with my mental health clinicians: "Are you in danger of harming yourself or others". She agreed each time; but she ensuingly, in future appointments, would ask this again. In my last appointment with her, which I legally audio recorded, she was going through the following standard questions about primary-care matters, and then abruptly transitioned to the below one, which is referenced in her medical-record for that appointment (3rd sentence in section "Asperger's", namely, "He does not have access to firearms or weapons and denies history of aggression").
> "How has your sleep been?"
> "We could do some labs to check some things."
> "Do you have any firearms?"

Since I began mental health care in 1992, I have never been asked the above by anyone. Moreover, there has never been an even minimal basis to ask such a question.

STATEMENT OF CLAIMS

5

1, Patient Relations twice violated MGL c111 s70E(a).  Moreover, their basis for violating it was their violation of MGL c272 s98.

2, Silva and Brady engaged in retaliatory malpractice.

3, Boisvert engaged in malpractice.

4, Hastings engaged in malpractice, and violated MGL c272 s98.

5, The first medical-assistant (Stacy) engaged in malpractice, violated MGL c272 s98, and engaged in harassment.

6, The second medical-assistant engaged in retaliatory defamation.

7, Saravanan engaged in retaliation regarding my complaint against the first medical-assistant, violated MGL c272 s98, and aided and abetted the second medical-assistant's defamation.

8, Zinn engaged in retaliation against my complaint of malpractice against the first medical-assistant..

9, Gunn engaged in malpractice.

10, Patelle engaged in retaliation via violating MGL c265 s43A and MGL c272 s98, and engaged in further retaliation via excluding me from a hospital department.

RELIEF

I would like to ask the court for:

1, General Damages.

2, Punitive Damages.

3, Other damages found by the court to be warranted.

Submitted by,

Dan Howitt
dth055@g.harvard.edu
857-247-0764
10/5/23

CERTIFICATE OF SERVICE
I Dan Howitt the plaintiff certify that on 10/5/23 I served this Complaint to the attorney for the defendant, Vincent Dunn, at vdunn@hmdrslaw.com.

6

# EXHIBIT 6

*20*

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT**
**DOCKET NO. 2381CV1308**

## DAN HOWITT
## V.
## CHA CAMBRIDGE HOSPITAL

---

## ORDER ON PLAINTIFF'S MOPTION TO AMEND COMPLAINT
## PURSUANT TO M. R. CIV. P. RULE 8 And 15

Plaintiff's amended complaint[1] (Paper #19), viewed as if filed pursuant to M. R. Civ. P. 15, was filed with this Court on December 19, 2023[2], and seemingly sets forth fourteen (14) causes of action claiming, seemingly, violations of multiple statutes, including claims for medical malpractice and a criminal action[3], against the named defendant, CHA Cambridge Hospital ("CHA") and otherwise, against approximately twelve (12) individuals who are not named as defendants[4]. Prior to addressing what is deemed the proposed amended complaint, the plaintiff seeks two other requests for relief: the first entitled "Disability Reasonable Accommodation Request" and the second entitled "Request for Tolling of Statute of Limitations", are not addressed by this court as neither "motion" is addressed within the

---

[1] Paper #19 is entitled "Motion to Amend Complaint" also contains two unrelated motions, and seemingly, a proposed amended complaint. The motion to amend does not mention or address, whatsoever, the standard(s) for consideration pursuant to Rule 15.

[2] Plaintiff has attempted, on numerous occasions, to amend his complaint, and again here, does so without conforming to Rule 8 or Rule 15, and further not in recognition to the standards identified under Rule 11.

[3] Plaintiff, in paragraph 10 identifies a violation of M. G. L. 265 §43A which states, in part: "(a) Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment and shall be punished by imprisonment in a house of correction for not more than 21/2 years or by a fine of not more than $1,000, or by both such fine and imprisonment. The conduct or acts described in this paragraph shall include, but not be limited to, conduct or acts conducted by mail or by use of a telephonic or telecommunication device or electronic communication device including, but not limited to, any device that transfers signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system, including, but not limited to, electronic mail, internet communications, instant messages or facsimile communications."

[4] No individual is identified as a party to the action, yet the majority of claims are directed at individuals.

document and they are otherwise subject to Superior Court Rule 9A and the present Order. Additionally, there were various facts enumerated which seemingly address claims in 2015 and 2016, certain undiscernible claims, claims pursuant to M.G.L. c. 111 §70E(a) and M.G.L. c. 272 §98, and identification of what are entitled "Parallel Matter with the Medical Specialties Department" and "Parallel Matter with the Psychiatry Department". There's an inability to comprehend, and therefore incorporate, the 'facts and parallel matters' into and/or with the enumerated claims, which is left to the analysis addressed below.

The proposed amended complaint, read in the light most favorable to the plaintiff, presents, seemingly, the following claims (identified in numbered paragraphs 1-14)[5]:

1. A violation of M.G.L. c. 111 §70E(a) and c. 272 §98, against CHA for failure to provide the names of two providers the plaintiff sought complaints against;
2. Medical malpractice[6] against two individuals, James Silva, P.A. ("Silva") and Meghan Brady ("Brady"), an Audiologist (neither of whom are named as defendants).
3. Medical malpractice against Elizabeth Marcellino-Boisvert ("Boisvert"), however she is not named as a defendant, there was no allegation she had a physician-patient relationship with plaintiff, and no specific claim was identified;
4. Medical malpractice[7] against Stephanie Hastings M.D. ("Hastings"), however she is not named as a defendant nor is there an identifiable claim sounding in malpractice;

---

[5] Plaintiff initially describes the claims to be identified as: Defamation and Slander, Disability Discrimination (pursuant to M.G.L. c. 272 §98), Medical Malpractice (pursuant to M.G.L. c. 231 §60B, Violation of M.G.L. c. 111E §18(e), Violation of M.G.L. c. 111 § 70E(a), Violation of M.G.L. c. 272 §98, Criminal Harassment (pursuant to M.G.L. c. 265 § 43A, and Intentional Infliction of Emotional Distress.

[6] Claims for medical malpractice are governed pursuant to M.G.L. c. 231 §60B which states, in part; "Every action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal,…at which hearing the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result…Each such action for malpractice shall be heard by said tribunal within fifteen days after the defendant's answer has been filed. Substantial evidence shall mean such evidence as a reasonable person might accept as adequate to support a conclusion. Admissible evidence shall include, but not be limited to, hospital and medical records, nurses' notes, x-rays and other records kept in the usual course of the practice of the health care provider without the necessity for other identification or authentication, statements of fact or opinion on a subject contained in a published treatise, periodical, book or pamphlet or statements by experts without the necessity of such experts appearing at said hearing…For the purposes of this section, a provider of health care shall mean a person, corporation, facility or institution licensed by the commonwealth to provide health care or professional services as a physician, hospital, clinic or nursing home, dentist, registered or licensed nurse, optometrist, podiatrist, chiropractor, physical therapist, psychologist, social worker, or acupuncturist, or an officer, employee or agent thereof acting in the course and scope of his employment."

[7] Although identified as medical malpractice the violations is identified pursuant to M.G.L. c. 272 §98.

2

5. Medical malpractice, occurring in 2015 and 2016, against "Stacey", a medical assistant, however she is not named as a defendant and the claims would be barred by the statute of limitations;

6. Retaliatory discrimination against an unnamed medical assistant, however he/she/they are not named as a defendant;

7. Medical malpractice against Yamini Saravanan M.D. ("Saravanan"), pursuant to M.G.L. c. 272 §98, however the doctor is not named as a defendant nor was there any allegation of there being a physician-patient relationship;

8. Retaliation against William Zinn, M.D. ("Zinn"). There is however no claim as to any resulting damage and/or claim for damage;

9. Medical malpractice against Sara Stoddard-Gunn ("Gunn"), who is not named as a defendant, claiming that she did not respond to a request made by the plaintiff;

10. Retaliation and criminal harassment, pursuant to M.G.L. c. 272 §98 and M.G.L. c. 265 §43A, respectively, against Judy Pattele (Pattele");

11. Violation of M.G.L. c. 111E §18(e) against Pattele, Gunn, Zinn, Saravanan, Boisvert, Silva, Brady, and Hastings;

12. Violation of M.G.L. c. 272 §98 against Lorraine Vendetti and Denise Patterson by conceiving of plaintiff's professionally expressed complaint against "Stacey". Neither of the two named individuals were named as defendants;

13. Violation of M.G.L. c. 111 §70E(a) against the Patient Relations Department (assumed to be against CHA); and

14. Seemingly plaintiff claims multiple CHA staff violated provisions of the CHA website and that plaintiff will be investigating further claims.

Plaintiff's attempt to amend his complaint, even reading the proposed amended complaint in a light most favorable to the plaintiff, fails to state recognizable claims or relief against the named defendant, CHA, and fails to comply with Massachusetts Rules of Civil Procedure Rule 8. Specifically, Rule 8 (a) states: "**Claims for Relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain (1) *a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled.* Relief in the alternative or of several different types may be demanded." and Rule 8 (e) **Pleading to be concise and Direct; Consistency.** (1) *Each averment of a pleading shall be simple, concise, and direct.* No technical forms of pleading or motions are required. And (2) A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many

3

separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds. ***All statements shall be made subject to the obligations set forth in Rule 11.*** (emphasis added).

Therefore, for the reasons stated herein, the motion to amend plaintiff's complaint is **DENIED**.

**<u>SO ORDERED</u>**.

Dated: January 2, 2024

Camille F. Sarrouf, Jr., Justice
Superior Court

# EXHIBIT 7

**COMMONWEALTH OF MASSACHUSETTS**
**THE TRIAL COURT**
**MIDDLESEX SUPERIOR COURT**

Docket # 2381CV01308

Dan Howitt,                          )
                                        )
                  Plaintiff,       )
v.                                )
                                        )
Cambridge Health Alliance, Cambridge Hospital, )
                                        )
                                        )
                Defendant.     )
                                        )

**COMPLAINT AND REQUEST FOR BENCH TRIAL**

**COMPLAINT**

This is a complaint about the following. A multitude of violations of MGL c272 s98. A multitude of instances of retaliation in response to complaints that I filed, including being terminated from CHA's Medical Specialties Department and Primary Care Department. A multitude of instances of medical malpractice, in violation of MGL c231 s60B. Two instances of the failure to provide requested medical-provider information, in violation of MGL c111 s70E(a). A multitude of instances of tortious conduct. A multitude of instances of breach of contract, and breach of the implied covenant of good faith and fair dealing. Defamation.

**JURISDICTION**

Middlesex Superior Court has jurisdiction over the aforementioned violations via MGL c212 s3 (exclusive original jurisdiction), MGL c212 s4 (original jurisdiction), MGL 151B s9 (exclusive jurisdiction over violations of MGL c272 s98), and MGL c231 s60B (jurisdiction over malpractice actions against health care providers). Middlesex Superior Court has jurisdiction over complaints about defamation that results in harm to the plaintiff.

**PARTIES**

Plaintiff: I Dan Howitt. My address is on-file at the court.
Defendant: Cambridge Health Alliance (CHA), Cambridge Hospital: 1493 Cambridge, Cambridge, MA 02139.

**FACTS**

(1) I have diagnosed Autism Spectrum Disorder (Level 2 severity), and diagnosed chronic severe Major Depressive Disorder. I receive Supplemental Security Income, MassHealth medicaid medical insurance, and SNAP Food Stamp income. My MassHealth insurance is "MassHealth Tufts | Cambridge Health Alliance", and as such it is a contracted health insurance between the State and CHA.

1

(2) On 8/8/15, CHA employee, medical-assistant Stacy (last name withheld by CHA), engaged in breach of contract, and beach of the implied covenant of good faith and fair dealing, during her attempted fulfillment of the blood-order of my then primary care doctor, CHA employee Dr. William Zinn. She verbally accosted me, verbally demeaned me, subjected me to her using two highly contaminated medical gloves on her hands (both contaminated by one falling to the ground, which was sticky with filth, and her then handling it with her gloved hand; she used both gloves to begin handling and administering the equipment for the blood-draw), engaged in further abuse via using sexually vulgar profanity, engaged in further abuse by removing all of the blood-draw equipment from my arm and having forgotten to extract an additional full vial of blood per Dr. Zinn's order, engaged in further abuse by caustically informing me that "it doesn't matter" and "I don't care" if the vial is done, engaged in further abuse by hastily administering a new set of blood-draw equipment during which time she vigorously needled my arm causing 10+ days of massive bruising, which has never occurred to even 1% of that before.

(2a) Stacy engaged in tortious conduct by harming me during that appointment via causing me substantial and enduring psychological disturbance via her above conduct. Moreover, ensuingly I was caused immense anxiety and depression regarding why a clinician in a hospital devoted to caring for patients would treat me like that. Moreover, it appears that she did this because of my autistic appearance, which caused me further substantial harm that my autistic appearance would elicit such abuse by a clinician.

(3) 8/16/16, Zinn engaged in retaliation regarding my professionally expressed complaint to him about the above medical-assistant. Via MyChart Messaging, he terminated being my primary care doctor.

(3a) Zinn's retaliation is a breach of contract, and breach of the implied covenant of good faith and fair dealing.

(3b) Zinn's retaliation was tortious conduct: I was caused substantial psychological disturbance, especially as someone who Zinn knew to be mentally ill, by being rejected by my own then primary-care doctor, and at a hospital that is devoted to caring for patients. I was left to think that he, a talented physician, thinks so poorly of me that he would rather reject me than try to discuss the matter with me, or even refer me to the Patient Relations Department. Moreover, I was caused to be extremely wary of expressing any concerns about any clinicians to any other clinicians, including to my own primary care doctor, despite that CHA via its literature promises, and encourages, patients to express any concerns to clinical staff at the hospital.

(4) On 10/14/22, my primary-care doctor, CHA employee Dr. Stephanie Hastings, told me, in response to my inquiry about Stacy, that Stacy "no longer has access to patients", and "instead has an administrative position".

(4a) On 10/14/22, I legally audio recorded my 8 minute 03 second visit with my second medical-assistant (name withheld by CHA) for Dr. Hasting's blood-order.

(4b) Via MyChart message to Hastings, I informed her that given Stacy's conduct I am impelled to video record and/or audio record my future appointments with clinicians.

(4c) I informed the second medical-assistant of the above about Stacy. She asked me for Stacy's last name. I said that I only remember her first name. She began to try to remember her last name, and then told it to me, which I since have forgotten.

(5) On 4/25/23, I legally recorded my 13 minute 42 second telephone call with the practice-manager of the

2

Primary Care Department, CHA employee Dr. Yamini Saravanan.

(5a) I had an appointment with Hastings, the next day (4/26/23), which was scheduled 1 month prior.

(5b) Saravanan stated that I was "terminated" from the Primary Care Department, and obsessively reiterated a multitude of times that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated".

(5c) I spent approximately the first 10 minutes of our conversation politely inquiring into whether there are any examples of what she stated, and she would, instead, continue to embark on the above repetitive statements. She finally, at my final request for even one example of what she claimed, stated, "you called her fat", referring to the above medical-assistant of 10/14/22.

(5d) I stated that I did not, and that I never use such language, nor any language of that nature.

(5e) She added that I asked the medical-assistant "for the name" of my 2015 medical-assistant, and that this demonstrates that I am unable to "move on" from that past incident, and that this, as such, causes "staff" "safety concerns".

(5f) I stated that I did not ask for that name (her last name; I knew her first name), and that the medical-assistant on her own accord desired to try to remember her last name, and then provided it to me.

(5g) Saravanan violated MGL c272 s98 by conceiving of my professional complaints against medical-assistant Stacy as being of misconduct.

(5h) Saravanan violated MGL c272 s98 by subjecting me, regarding my professional complaints against medical-assistant Stacy, to discriminatory language: She characterized me as being "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns".

(5i) Saravanan violated MGL c272 s98 by terminating me from CHA's Primary Care Department on the basis of her conceiving of my professional complaints against medical-assistant Stacy as being of misconduct.

(5j) Saravanan violated MGL c272 s98 by not affording me the investigatory process offered by CHA regarding complaints, disputes, etc.

(5k) Saravanan engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by terminating me, via violating MGL c272 s98, from CHA's Primary Care Department.

(5l) Saravanan engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by not affording me the investigatory process offered by CHA regarding complaints, disputes, etc.

(5m) Saravanan engaged in tortious conduct against me via violating MGL c272 s98 a multitude of times: Her disablism toward me caused me immense psychological disturbance, and ensuingly so for considerable time, and has contributed to a worsening of my overall mental health; and that a clinician at a hospital, who also is the director of the Primary Care Department, would do this has entailed substantially greater harm, because such a person, perhaps more than other clinicians, would know about the impropriety of disablism, retaliation, and due investigatory process.

(6) My several emailed requests to the hospital's Patient Relations Department in 2015 and 2023 for the names of the above 2015 medical-assistant and the above 2022 medical-assistant were not fulfilled, in violation of MGL c111 s70E(a) twice.

3

(6a) On 1/25/16, CHA employees Lorraine Vendetti and Denise Peterson, of the Patient Relations Department, stated in writing that they declined my request because of their "concern for the safety" of medical-assistant Stacy, on the basis that I made my request for her name several times over several weeks (each of my requests were not fulfilled), and stated that I was engaging in "harassment", and that if it continued they would contact "Public Safety and Security", and "the date of service and concern is enough information to report", and "We have a concern regarding your intentions", "You have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us."

(6b) My complaints and voicemails were professional in nature.

(6c) Vendetti and Peterson therefore violated MGL c272 s98 by conceiving of my professional complaints and professional voicemails as being of misconduct (including harassment), and as portending criminal misconduct.

(6d) Vendetti and Peterson therefore violated MGL c111 s70E(a) via violating MGL c272 s98.

(6e) Vendetti and Peterson therefore engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by violating MGL c111 s70E(a).

(6f) Vendetti and Peterson engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by violating MGL c272 s98.

(6g) Vendetti and Peterson engaged in tortious conduct against me. By conceiving of my mental illnesses as entailing that I possibly requested the name of medical-assistant Stacy for the purpose of engaging in criminal conduct against her, I was caused substantial humiliation, substantial anxiety about my value as a person, and substantial depression, especially because both persons are hospital employees who, as such, are commonly considered to be especially sensitive to being respectful to patients.

(7) 11/9/22, I was evaluated by two clinicians of the CHA's Otolaryngology Department, namely CHA employees James Silva and Meghan Brady. I conveyed my following complaint about them to Dr. Hastings; and on 2/1/23, I submitted that complaint to the medical-director of the department, Dr. Ayesha Khalid, and the chief-medical-officer of the hospital, Dr. Jeffrey Hoffman; and on 2/3/23, I submitted that complaint to CHA's Patient Relations Department. The following is my complaint:

(7a) I first met with Silva. I was substantially ill with acute viral nasopharyngitis, including an extreme sore throat, caused by being repeatedly physically assaulted by a boy of about 10 years old at a public park while I sat on a bench motionless, including being spat at into my eyes and over my mouth twice from millimeters away, and then screamed at 1-2 mm from the opening of my left ear. I conveyed this to both Silva and Brady, and that I was planning on filing a lawsuit against the parents of the boy, who watched him from approximately 15 feet away repeatedly assault me, and who never intervened, nor apologized afterward.

(7b) Silva was appointed to examine me prior to my audiology exam with Brady. He stayed 6 + feet away from me at all times, and in a rapid movement of $1/10^{th}$ of a second, he raised and lowered a pinpoint light in front of his face from 6 + feet away, and immediately said, "Your throat looks completely normal". Clearly he did not examine, nor even look at, my throat.

(7c) Due to this, the next day I went to Cambridge Hospital, Urgent Care in Somervile, and the clinician who evaluated me examined my throat within about 1 foot of it, and over 20+ seconds, and stated that my throat was "severely

4

inflamed", and then made an ensuing diagnosis and treatment-recommendation.

(7d) Due to Silva's conduct, I was misdiagnosed, I was left to suffer untreated, I was left confused about what I should do, I suffered immense anxiety and depression, as someone who is chronically mentally ill this was even more strenuous for me, I was put into the position of having to doubt and then reject the opinion of a licensed clinician at a hospital that is devoted to caring for people's well-being, I had to travel to a different facility that confirmed my doubt and rejection, I had to evasively not convey Silva's opinion to them, and I was ensuingly caused by Silva to be worried about what every clinician does and concludes (which entails that I subject them to verbal doubt, questioning, my worry, etc, which harms the patient-physician relationship).

(7e) Regarding Brady: I asked her if there were sterilization cloths that I could use on the two seats that I would be using, namely the office seat, and the audiology-room seat. She stated that they were clean, but that she would wipe them. I assumed that the two sets of instruments that were to be used on me were already sterilized; and I did not ask for them to be further sterilized. One set of instruments was next to the office seat, and the other set was in the audiology room. Brady proceeded to use one large white sterilization cloth on the office seat, while I stood 2 feet away. She used both sides of the cloth, and each side became brown from having wiped up embedded filth on the surface. She then used that same cloth to wipe the many instruments that were to be used on, over, and inside, my ears. She then used the same wipe on the seat in the audiology room, and then on the instruments in that room, two of which were inserted deeply into both of my ear-canals.

(7f) I proceeded with her audiology exam. About 1/4 of the way through the testing of my left ear, she paused the testing, spoke to me via my headphones, and told me to be sure to listen for all of the sounds, and to be sure to press the response-button when needed.

(7f) Brady concluded that my audiology exam was relatively normal.

(7h) Due to Brady's conduct, I decided to be evaluated by a different Otolaryngology department, namely at Mt. Auburn Hospital. The results were significantly different than Brady's results, especially for the left ear, which was found to be significantly abnormal. I received a different diagnosis, and a treatment recommendation.

(7i) Due to Brady's conduct, I was left with misdiagnosis, I received no treatment recommendations, I was confused about what I should do, I suffered immense anxiety and depression, as someone who is chronically mentally ill this was even more strenuous for me, I was put into the position of having to doubt and then reject the opinion of a licensed clinician at a hospital that is devoted to caring for people's well-being, I had to travel to a different facility that confirmed my doubt and rejection, I had to evasively not convey Brady's opinion to them, and I was ensuingly caused by Brady to be worried about what every clinician does and concludes (which entails that I subject them to verbal doubt, questioning, my worry, etc, which harms the patient-physician relationship).

(7j) Silva engaged in negligent malpractice, in violation of MGL c231 s60B, which was motivated by his biased support of the assaulting boy and/or his parents, or perhaps his lack of desire to be involved in potential litigation.

(7k) Brady engaged in negligent malpractice, in violation of MGL c231 s60B, which was motivated by her biased support of the assaulting boy and/or his parents, or perhaps her lack of desire to be involved in potential litigation.

(7l) Silva engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via his

5

negligent malpractice.

(7m) Brady engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her negligent malpractice.

(8) On 2/6/23 (approximately 5 days after my aforementioned complaint), at 1:25pm, I received a terroristic anti-mental illness voicemail, expressed with a contrived monstrous guttural voice. The voicemail-source appeared as "Unknown Number". I subpoenaed the Legal & Emergency Response department of T-Mobile in Parsippany, NJ, via the Morris County Sheriff, Civil Process, and the 8/28/23 result of the subpoena shows that the source of the voicemail is the home telephone number in Peperelle, MA of the below discussed CHA employee Judy Petelle, who is the practice-manager of 20+ years (per public literature) of the hospital's Medical Specialties Department, which is where the Otolaryngology Department is.

(8a) Petelle violated MGL c272 s98 via her voicemail, which demonstrates that she conceives of my professional complaints against Silva and Brady as being of mental illness.

(8b) Petelle engaged in harassment against me via both the content of, and nature of, her voicemail.

(8c) Petelle committed a tort against me by causing me substantial and ongoing psychological disturbance via her MGL c272 s98-violative voicemail.

(8d) Petelle engaged in in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her violation of MGL c272 s98.

(8e) 3/20/23, I received a MyChart notice that I was going to be postal mailed a letter-of-termination by Petelle. I received the letter on 3/27/23, and she terminated me from all of the departments of the Medical Specialties Department, of which the above Otolaryngology Department is only one of its many departments.

(8f) Petelle's motivation for terminating me from that department is her violation of MGL c272 s98.

(8g) Petelle engage in breach of contract, and breach of the implied covenant of good faith and fair dealing, by terminating me from that department without affording me the hospital's investigatory process.

(8h) 3/22/23, which is prior to my receiving the above letter, I sent the CEO of the hospital, Dr. Assaad Sayah, and the chief of medicine, Dr. Richard Pells, a brief and professionally expressed email objecting to the above termination.

(8i) Dr. Khalid telephoned me that day, and we spoke for 30 minutes. She then sent me an email summarizing some of our conversation, and cc'd Dr. Hoffman and Patient Relations. She said to me, and emailed to me and the above others, that she rescinded my termination.

(8j) Prior to my telephone call with Khalid, Sayah emailed me that a core value of the hospital is to treat patients with dignity at all times, and that no form of retaliation is tolerated, and that he was directing the relevant people at the hospital to further inquire into the matters that I presented to him.

(9) 6/29/21, via MyChart and in-person, I asked my then mental health clinician, CHA employee Sara Stoddard-Gunn, per the requirement of McLean Psychiatric Hospital, to submit an application for partial hospitalization for me. I emphasized to her, as I did to Dr. Hastings over many months, that I was in dire need of attending a partial hospitalization program due to extreme depression.

(9a) Stoddard-Gunn did not reply to me for 3 full months (9/28/21), despite my several follow up MyChart messages and voice-mails to her.

(9b) She MyChart messaged me that the McLean program was being conducted via webcam, and asked if I have a computer with which I can do that. I replied that I would have this for the program.

(9c) She never contacted me again, nor did anyone else at the hospital.

(9d) I emailed McLean Hospital on 2/23/22, and was informed that she did not submit an application to them.

(9e) I contacted CHA's Psychiatry Department on 12/2/22, and was told that she left her "role" at the hospital for another role at the hospital. She never informed me of this.

(9f) I asked that office if I was going to be assigned a new clinician, and was told that I would receive a reply. I did not receive a reply until 2/15/22.

(9g) Stoddard-Gunn engaged in negligent malpractice, in violation of MGL c231 s60B, via her negligent attention to my medical circumstance, and via her consistent negligent failure to apply to McLean Hospital for me.

(9h) She caused me substantial medical harm because my severe, and escalating, symptomology of diagnosed Major Depressive Disorder was left untreated for an immense time-period. I endured severe to extreme sleep impairment, including being unable to wake until 5pm or later over a multitude of months, I endured an extreme lack of enjoyment of 95% to 100% of every day, I endured immense sleep impairment, loss of appetite, immense social isolation, escalated desire to discontinue my life, extreme worry, an immense undermining of my even basic productivity regarding my already limited academic work, etc.

(9i) Stoddard-Gunn engaged in additional tortious conduct against me because her malpractice caused me secondary substantial psychological harm, due to how she, as my own mental health clinician, engaged in such severe negligence, apathy, and dishonesty about me. This demonstrated to me that not only do I encounter substantial chronic social rejection in the practical world due to my mental illnesses, but my own mental health clinician subjected me to this. This caused me horrid humiliation, and a substantial worsening of my already severe to extreme depression.

(9j) Stoddard-Gunn engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by engaging in this malpractice.

(9k) On 2/27/22, 3/9/22, and 3/10/22, I emailed my complaint about Stoddard-Gunn, and conveyed my intent to file a lawsuit against CHA regarding her, to CHA's general-counsel Andrew Fuqua, my CHA primary doctor Stephanie Hastings, and the chief of psychiatry Phillip Wang. Neither responded.

(10) On 2/25/22, I had a 50 minute 14 second legally recorded telephone conversation with CHA psychologist Elizabeth Marcellino-Boisvert. She repeatedly and mockingly reiterated that Gunn did everything to assist me, and even beyond what is expected, and, that I declined the McLean program by stating to Gunn that I did not have a computer with which I could do the webcam program. This is false.

(10a) As is demonstrated in that conversation, Marcellino-Boisvert was highly adversarial.

(10b) For example, she strenuously criticized me for not being able to conduct video-appointments prior to that date, and on the date of my appointment with her. I politely stated, as she of course knew, that CHA's telehealth system, Mend, which was used for increased security, consistently did not operate properly for both clinicians and patients, and

7

that, for example, my first telehealth appointment with Stoddard-Gunn, and before her with Mayte Forte, resulted in the video working for only 3-4 seconds, and then disconnecting; and 4-5 attempts over 5+ minutes to reconnect failed, resulting in the need for the appointments to be held by telephone. She sheepishly conceded this, which ended her feverous attempt to deceive me that the problem was my fault.

(10c) Due to how the predominance of our conversation consisted of the above abuse, I found no basis to continue with her as my psychologist.

(10d) It is imperative, as is well known, for the clinical relationship between a patient and mental health clinician, such as a psychologist, to be one of mutual respect; and she not only violated this repeatedly, but did so in my first appointment with her.

(10e) First appointments with mental health clinicians are well known to be for establishing a trusting and respectful rapport, and for gradually entering into what often is a very delicate, difficult, and complex relationship.

(10f) She instead subjected me to substantial mental discord, humiliation, and deceptive feverous argumentation in support of her colleague (thereby causing me shame and humiliation), and caused me, a severely mentally ill person, to have to try to respond to her deception, which I did in a polite manner, but which caused me substantial anguish, severe anxiety, and proliferating lack of respect for her as a doctor who would be treating me over many months and possibly many years. More specifically, she attempted to deceive me that I was the cause of the absence of telehealth appointments, that I was the cause of the lack of placement at McLean Hospital, and that Stoddard-Gunn did more than is even expected for my benefit; and all of this caused me severe mental discord, humiliation, and severe anxiety.

(10g) Her conduct also harmed me because I had to discontinue meeting with her due to her conduct; and thereafter I had no mental health clinician.

(10h) Moreover, her conduct harmed me because despite that she knew very clearly of my chronic precarious mental health circumstance, and my, at that time, immense worsening of my circumstance as of a multitude of months, she elected to engage in the above conduct, and during our first meeting.

(10i) It is reasonable to conclude that most, if not essentially all patients, who are adults, and of even minimal education, would find her above conduct to be incompatible with having an even minimally acceptable patient-doctor relationship, and that, as such, such patients would discontinue their relationships with her.

(10j) She therefore engaged in medical malpractice, in violation of MGL c231 s60B, by violating a well established standard of patient-respect, which entailed causing me multifaceted psychological harm (which endured over time), and which resulted in my reasonable decision to discontinue having her as my psychologist, which resulted in my no longer having a mental health clinician.

(10k) Given the conduct of her and Stoddard-Gunn, I no longer had faith in seeking mental health assistance at CHA. As such, their conduct against me resulted in my reasonable decision to discontinue seeking mental health assistance at the hospital that I was contracted with via my medicaid insurance, namely "MassHeath Cambridge Health Alliance".

(10l) She (Marcellino-Boisvert) engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by engaging in the above malpractice.

8

(11) Dr. Hastings was my primary-care doctor from 2/2021 until my termination from the Primary Care Department. Via MyChart on 4/2/2022, she stated that she would appoint a "complex care specialist" to handle my case, given the nature of my case. However, she never did.

(11a) My medical circumstance obviously warranted a referral to such a specialist in her own; yet she, via clear apathy, did not implement her own opinion.

(11b) I was caused harm by her self-established negligent malpractice because my medical circumstance that warranted such a referral in her own opinion was left untreated via her negligent failure to provide me with such a referral, which she stated that she was going to provide.

(11c) The failure of a physician to provide a specialist-referral that the physician himself or herself, on his or her own accord, stated to the patient in writing would be done, means that the patient was deprived of warranted specialty care, which possibly could have helped the patient.

(11d) In my case it is unknown whether the specialty care could have been of assistance to me; but it is reasonable to conclude that it could have, and that I therefore was harmed by not being afforded such specialty care. And such care could have included both treatment, and my being psychologically benefited by being given a different and more thorough understanding of my medical circumstance.

(12) The above second medical-assistant, in conveying to the above Saravanan, that I verbally stated that she (the medical-assistant) is "fat", engaged in retaliatory defamation (in retaliation for my complaint against her colleague Stacy), that resulted Saravanan terminating me from the Primary Care Department.

(12a) The above second medical-assistant, in engaging in retaliatory defamation, engaged in tortious conduct: I was harmed by how her conduct resulted in my being terminated from my the CHA Primary Care Department. I was moreover harmed by being caused immense anxiety and depression due to being treated in this way by a clinician at a hospital that is devoted to the well-being of patients. Moreover, she caused me to worry about the honesty of my ensuing clinicians, whether they will engage in such conduct, or any kind of detrimental conduct, against me, and about what I say to clinicians (rather than speaking openly about issues regarding medical care).

(13) CHA's Patient Relations department (unnamed person(s)), violated MGL c111 s70E(a) regarding my 4/26/23 written request for the name of the above second medical-assistant.

(14) CHA's Patient Relations department (unnamed person(s)), engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, by violating MGL c111 s70E(a) regarding my 4/26/23 written request for the name of the above second medical-assistant.

(15) The presumption is that CHA's Patient Relations department (unnamed person(s)), engaged in the above violation of MGL c111 s70E(a), breach of contract, and breach of the implied covenant of good faith and fair dealing, via violating MGL c272 s98 against me, as this is the only practical explanation for their violation and breaches; and it is consistent with the 2016 violation of MGL c111 s70E(a), via explicit violations of MGL c272 s98, by Vendetti and Peterson of that department.

(16) The presumptive violation of MGL c272 s98 by CHA's Patient Relation's department implies that their basis for violating MGL c111 s70E(a) was the same as the basis of Vendetti and Peterson of that department. As such, CHA's

9

Patient Relation's department engaged in tortious conduct against me by causing me to presume that they, like Vendetti and Peterson, conceive of me, a mentally ill person, to be a potential criminal. Being conceived of like this by anyone, especially hospital personal, and especially hospital personal whose occupation is "patient relations", caused me to think extremely poorly of myself, namely as if my polite attempts to obtain the name of the two medical-assistants were of monstrous uncivil conduct that directly portended criminal violence.

## CAUSES OF ACTION

### COUNT 1

(17)  CHA employee Stoddard-Gunn engaged in malpractice in violation of MGL c231 s60B.

### COUNT 2

(18)  Stoddard-Gunn engaged in additional tortious conduct via her violation of MGL c231 s60B.

### COUNT 3

(19)  CHA employee Stoddard-Gunn, in engaging in malpractice, engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing.

### COUNT 4

(20)  CHA's Patient Relations department (the CHA employees Vendetti and Peterson) violated MGL c111 s70E(a) by not responding to my written requests for the name of medical-assistant Stacy.

### COUNT 6

(21)  CHA employees Vendetti and Peterson violated MGL c111 s70E(a) via violating MGL c272 s98.

### COUNT 6

(22)  CHA employees Vendetti and Peterson, in violating MGL c111 s70E(a) via violating MGL c272 s98, engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing.

### COUNT 7

10

(23) CHA employees Vendetti and Peterson, in violating MGL c272 s98, engaged in tortious conduct.

## COUNT 8

(24) CHA's Patient Relations department (unnamed person(s)) violated MGL c111 s70E(a) by not responding to my written requests for the name of my second medical-assistant.

## COUNT 9

(25) CHA's Patient Relations department (unnamed person(s)) violated MGL c111 s70E(a) via violating MGL c272 s98.

## COUNT 10

(26) CHA's department, Patient Relations (unnamed person(s)), in violating MGL c111 s70E(a), engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing.

## COUNT 11

(27) The presumption is that CHA's department, Patient Relations (unnamed person(s)), engaged in the above violation of MGL c111 s70E(a), breach of contract, and breach of the covenant of good faith and fair dealing, via violating MGL c272 s98.

## COUNT 12

(28) The presumptive violation of MGL c272 s98 by CHA's Patient Relations department entailed that CHA's Patient Relation's department implicitly engaged in the same kind of explicit tortious conduct that Vendetti and Peterson engaged in.

## COUNT 13

(29) CHA employee Silva engaged in malpractice in violation of MGL c231 s60B.

## COUNT 14

(30) CHA employee Silva engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via his malpractice.

11

## COUNT 15

(31)  CHA employee Brady engaged in negligent malpractice, in violation of MGL c231 s60B.

## COUNT 16

(32)  CHA employee Brady engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her malpractice.

## COUNT 17

(33)  CHA employee Marcellino-Boisvert engaged in malpractice, in violation of MGL c231 s60B.

## COUNT 18

(34)  CHA employee Marcellino-Boisvert engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her malpractice.

## COUNT 19

(35)  CHA employee Stephanie Hastings engaged in malpractice, in violation of MGL c231 s60B.

## COUNT 20

(36)  CHA employee Stephanie Hastings engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her malpractice.

## COUNT 20

(37)  CHA employee Stacy engaged in malpractice, in violation of MGL c231 s60B.

## COUNT 21

(38)  CHA employee Stacy engaged in tortious conduct.

## COUNT 22

12

(39) CHA employee Stacy engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her malpractice.

## COUNT 23

(40) CHA employee Stacy engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her harassment.

## COUNT 24

(41) CHA employee (the unnamed second medical-assistant), engaged in retaliatory defamation.

## COUNT 25

(42) CHA employee (the unnamed second medical-assistant) engaged in engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her retaliatory defamation.

## COUNT 26

(43) CHA employee (the unnamed second medical-assistant) engaged in tortious conduct via her retaliatory defamation.

## COUNT 27

(44) CHA employee Saravanan violated MGL c272 s98 via conceiving of my complaints against CHA employee Stacy as being of civil and potential criminal misconduct.

## COUNT 28

(45) CHA employee Saravanan violated MGL c272 s98 via using discriminatory language against me.

## COUNT 29

(46) CHA employee Saravanan engaged in retaliatory discrimination in violation of MGL c272 s98 by terminating me from CHA's Primary Care Department on the basis conceiving of my complaints against CHA employee Stacy as being of misconduct.

13

**COUNT 30**

(47)  CHA employee Saravanan violated MGL c272 s98 by not affording me the investigatory process offered by CHA regarding complaints.

**COUNTS 31-34**

(48)  CHA employee Saravanan engaged in four counts of breach of contract, and breach of the implied covenant of good faith and fair dealing, via her above four violations of MGL c272 s98.

**COUNT 35**

(49)  CHA employee Saravanan engaged in engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via her retaliation.

**COUNT 36**

(50)  CHA employee Saravanan engaged in tortious conduct via her violations of MGL c272 s98.

**COUNT 37**

(51)  CHA employee Zinn engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via his retaliation against my complaint of malpractice against CHA medical-assistant Stacy.

**COUNT 38**

(52)  CHA employee Zinn engaged in tortious conduct via his retaliation against my complaint of malpractice against CHA medical-assistant Stacy.

**COUNT 39**

(53)  CHA employee Petelle engaged in retaliatory discrimination in violation of MGL c272 s98 via her voicemail.

**COUNT 40**

(54)  CHA employee Petelle engaged in retaliatory discrimination in violation of MGL c272 s98 via excluding me

14

from CHA's Medical Specialties Department.

## COUNT 41

(55) CHA employee Petelle engaged in tortious conduct via violating MGL c272 s98 (via her voicemail to me).

## COUNT 42

(56) CHA employee Petelle engaged in tortious conduct via violating MGL c272 s98 (via excluding me from CHA's Medical Specialties Department)

## COUNT 43

(57) CHA employee Patelle engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via violating MGL c272 s98 (via her voicemail to me).

## COUNT 44

(58) CHA employee Patelle engaged in breach of contract, and breach of the implied covenant of good faith and fair dealing, via violating MGL c272 s98 (via excluding me from the CHA's Medical Specialties Department).

## REQUEST FOR RELIEF

I would like to ask the court for:

(59) Judgment on the aforementioned counts.

(60) General Damages.

(61) Punitive Damages.

(62) Injunctions against the offenders to not engage in such conduct against other patients.

(63) Other damages found by the court to be warranted.

## REQUEST FOR BENCH TRIAL

I would like to request a bench trial on the above violations.

Submitted by,

*[signature]*

Dan Howitt, 1/30/24

**CERTIFICATE OF SERVICE**

On 1/30/24 I served this document to the defendant's attorney Vincent Dunn at vdunn@hmdrslaw.com.

*[signature]*

15

# EXHIBIT 8

*31*

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT**
**DOCKET NO. 2381CV1308**

## DAN HOWITT
## V.
## CHA CAMBRIDGE HOSPITAL

---

## DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

Defendant moves to dismiss plaintiff's original complaint (the "Complaint"), dated May 8, 2023[1]. The Complaint, a six (6) page introductory-type dialogue about plaintiff's interactions with CHA Cambridge Hospital ("CHA"), read in the light most favorable to the plaintiff, seemingly, forwards claims against CHA, for psychological abuse by an unnamed medical assistant dating back to interactions in August 2015, defamation, disruption of medical care, and claims of medical malpractice[2]. The only named defendant however is, and remains throughout the pendency of this action, CHA. CHA has moved numerous times to dismiss, however during the pendency of this litigation there have been a multitude of motions to amend filed by the plaintiff, the last of which was denied by this court on January 30, 2024 (see fn. 1).

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a claim must allege facts *plausibly suggesting an entitlement to relief* (emphasis added). *Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 636 (2008). Rule 12(b)(6) imposes a relatively low standard for surviving a motion to dismiss. *Marram v. Kobrick Offshore Fund, Ltd.,* 442 Mass. 43, 45 (2004). Nevertheless, a plaintiff is obligated to provide more than mere labels and conclusions. *Iannacchino,* 451 Mass. at 636. When considering a claim, the court accepts as true the allegations set forth in the complaint and draws any reasonable inferences in the plaintiff's favor.

---

[1] Although the plaintiff filed his original complaint on May 8, 2023, he filed and/or attempted to file approximately 8 amended complaints, each denied by the court (Tabit, J. and Sarrouf, J.), the last filing being dated January 30, 2024.

[2] Later, attempted amended versions of the Complaint (none of which were accepted by the court, for various reasons, including but not limited to, those reasons identified in the court's rulings of January 2, 2024 and January 30, 2024 (both incorporated herein by reference)), allegedly set forth fourteen (14) causes of action claiming, seemingly, violations of multiple statutes, including claims for medical malpractice and a criminal action, against the named defendant, CHA Cambridge Hospital ("CHA") and otherwise, against approximately twelve (12) individuals who are not named as defendants. The court took exhaustive steps to guide the plaintiff toward those Rules of Civil Procedure (Rules 8 and 11) and relevant statutory requirements related to medical malpractice filings.

1

*Sisson v. Lhowe,* 460 Mass. 705, 707 (2011). In the instant case the Complaint does not forward claims which would '*plausibly suggest the plaintiff is entitled to relief'. (emphasis added).*

Further, understanding the constraints by which this court must analyze the Complaint, in recognition of M. R. Civ. P. 8[3], and based upon the foregoing analysis and consideration of the history of amended complaints, Rule 12 (b)(6), relevant case law and arguments by the parties at the hearing held, the motion seeking dismissal of all claims is **ALLOWED**.

**SO ORDERED**.

Dated: May 3, 2024

_____
Camille F. Sarrouf, Jr., Justice
Superior Court

---

[3] Rule 8, which states in part: Rule 8(a) "**Claims for Relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain (1) *a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled.* Relief in the alternative or of several different types may be demanded." and Rule 8(e) "***Pleading to be concise and Direct; Consistency.*** (1) *Each averment of a pleading shall be simple, concise, and direct.* No technical forms of pleading or motions are required. And (2) A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds. *All statements shall be made subject to the obligations set forth in Rule 11."* (emphasis added).

2

# EXHIBIT 9

| JUDGMENT ON MOTION TO DISMISS | Trial Court of Massachusetts<br>The Superior Court |
|---|---|

| DOCKET NUMBER<br>**2381CV01308** | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
|---|---|

| CASE NAME<br>Howitt, Dan<br>vs.<br>Cambridge Health Alliance - Cambridge Hospital | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |
|---|---|

JUDGMENT FOR THE FOLLOWING DEFENDANT(S)
Cambridge Health Alliance - Cambridge Hospital

JUDGMENT AGAINST THE FOLLOWING PLAINTIFF(S)
Howitt, Dan

This action came on before the Court, Camille Sarrouf, presiding, and upon review of the motion to dismiss pursuant to Mass. R.Civ.P. 12(b),

It is **ORDERED AND ADJUDGED:**

that the matter is hereby DISMISSED with prejudice

| DATE JUDGMENT ENTERED<br>05/03/2024 | CLERK OF COURTS/ ASST. CLERK<br>X |
|---|---|

Date/Time Printed:  05-03-2024 11:53:39

SCV083\ 03/2016

# EXHIBIT 10

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-10100-IT

Howitt v. CHA Cambridge Hospital et al
Assigned to: Judge Indira Talwani
Demand: $9,999,000
Case in other court: US Court of Appeals, 25-01818
Cause: 29:754 Discrimination

Date Filed: 01/14/2025
Jury Demand: None
Nature of Suit: 446 Civil Rights: Americans with Disabilities - Other
Jurisdiction: Federal Question

**Plaintiff**

**Pro se litigant Daniel Howitt**

represented by **Daniel Howitt**
37 Bay State Road #5
Boston, MA 02215
617-200-2000
Email: dancambridge0@gmail.com
PRO SE

V.

**Defendant**

**CHA Cambridge Hospital**

**Defendant**

**Stacey Doe**
*TERMINATED: 01/18/2026*

**Defendant**

**William Zinn**
*TERMINATED: 01/18/2026*

**Defendant**

**Lorraine Vendetti**
*TERMINATED: 01/18/2026*

**Defendant**

**Denise Peterson**
*TERMINATED: 01/18/2026*

**Defendant**

**Judy Petelle**

**Defendant**

**Jane Doe 1**

**Defendant**

**Yamini Saravanan**

**Defendant**

**Sara Stoddard Gunn**
*TERMINATED: 01/18/2026*

**Defendant**

**Elizabeth Marcellino Boisvert**
*TERMINATED: 01/18/2026*

**Defendant**

**Stephania Hastings**
*TERMINATED: 01/18/2026*

**Defendant**

**Dr Wong**
*TERMINATED: 01/18/2026*

**Defendant**

**Patient Relations Department**
*TERMINATED: 01/18/2026*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/13/2025 | 1 | COMPLAINT against All Defendants, filed by Dan Howitt. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(FC) (Entered: 01/14/2025) |
| 01/13/2025 | 2 | MOTION for Leave to Proceed in forma pauperis by Dan Howitt.( attachment(s) # 1 Exhibit Support IFP) ( 01/14/2025) (FC). (Entered: 01/14/2025) |
| 01/13/2025 | 3 | MOTION Equitable Tolling by Dan Howitt.(FC) (Entered: 01/14/2025) |
| 01/13/2025 | 4 | MOTION for Leave to file electronically Pro Se by Dan Howitt.(FC) (Entered: 01/14/2025) |
| 01/14/2025 | 5 | NOTICE of Case Assignment. Magistrate Judge M. Page Kelley assigned to case. Plaintiff's counsel, or defendant's counsel if this case was initiated by the filing of a Notice of Removal, are required to submit a form indicating whether the parties consent to proceed before a U.S. Magistrate Judge. The submission of the form is mandatory. Completed forms shall be filed promptly. The parties are directed to the Notice and Procedures regarding Consent to Proceed before the Magistrate Judge which can be downloaded here. These documents will be mailed to counsel not receiving notice electronically. Pursuant to General Order 09-3, until the Court receives for filing either a consent to the Magistrate Judge's jurisdiction or the reassignment of the case to a District Judge, the initial assignment of a civil case to the Magistrate Judge is a referral to the Magistrate Judge under 28 USC 636(b) for all pretrial non-dispositive matters and Report and Recommendations, but not for the Rule 16(b) scheduling conference. (JAM) (Entered: 01/14/2025) |
| 06/27/2025 | 6 | Magistrate Judge M. Page Kelley: ORDER entered granting 2 Motion for Leave to Proceed in forma pauperis; denying without prejudice 3 Motion for Equitable Tolling.

If Howitt wishes to pursue this action, he must show cause within thirty-five (35) days why the complaint should not be dismissed for failure to state a claim upon which relief may be granted based on the doctrine of res judicata (claim preclusion). Failure to do so may result in dismissal of this action by a District Judge. (jm) (Entered: 06/27/2025) |

| | | |
|---|---|---|
| 06/27/2025 | 7 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 4 Motion for leave to electronically file Pro Se.<br><br>Pro se litigants must have an individual PACER account to electronically file in the District of Massachusetts and must register to E-file. To register for a PACER account, go the PACER website at https://pacer.uscourts.gov/register-account.<br><br>To register to E-file, follow the instructions on our website at https://www.mad.uscourts.gov/caseinfo/nextgen-pro-se.htm.<br><br>If the Massachusetts District Court is not in the dropdown list of courts, please email tracy_mclaughlin@mad.uscourts.gov with the docket number so your account can be updated allowing you to E-file.<br><br>(jm) (Entered: 06/27/2025) |
| 06/27/2025 | 8 | Copy re 6 Order on Motion for Leave to Proceed in forma pauperis,,, Order on Motion for Miscellaneous Relief,, 7 Order on Motion for leave to electronically file Pro Se,,, mailed to Dan Howitt on 6-27-2025. (JKK) (Entered: 06/27/2025) |
| 07/06/2025 | 9 | RESPONSE TO ORDER TO SHOW CAUSE by Dan Howitt. (Howitt, Dan) (Entered: 07/06/2025) |
| 07/06/2025 | 10 | First MOTION to Amend 6 Order on Motion for Leave to Proceed in forma pauperis,,, Order on Motion for Miscellaneous Relief,, by Dan Howitt.(Howitt, Dan) (Entered: 07/06/2025) |
| 08/24/2025 | 11 | NOTICE OF APPEAL as to 6 Order on Motion for Leave to Proceed in forma pauperis,,, Order on Motion for Miscellaneous Relief,, by Dan Howitt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US **District Court Clerk to deliver official record to Court of Appeals by 9/15/2025. (Howitt, Dan) (Entered: 08/24/2025)** |
| 08/25/2025 | 12 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 11 Notice of Appeal. (JAM) (Entered: 08/25/2025) |
| 08/25/2025 | 13 | USCA Case Number 25-1818 for 11 Notice of Appeal filed by Dan Howitt. (NMC) (Entered: 08/25/2025) |
| 10/31/2025 | 14 | First ADDENDUM re 10 First MOTION to Amend 6 Order on Motion for Leave to Proceed in forma pauperis,,, Order on Motion for Miscellaneous Relief,, *Addendum To Motion To Amend Complaint* filed by Dan Howitt. (Howitt, Dan) (Entered: 10/31/2025) |
| 11/04/2025 | 15 | USCA Judgment as to 11 Notice of Appeal, filed by Dan Howitt (MAP) (Entered: 11/05/2025) |
| 11/04/2025 | 16 | MANDATE of USCA as to 11 Notice of Appeal, filed by Dan Howitt. Appeal 11 Terminated (MAP) (Entered: 11/05/2025) |
| 11/05/2025 | 17 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 10 Motion to Amend. The motion to amend is GRANTED because, at this juncture of the litigation, Howitt may amend his complaint as a matter of course. *See* Fed. R. Civ. P. 15 (a)(1). |

| | | |
|---|---|---|
| | | Howitt shall, no later than November 19, 2025, file an amended complaint. Because Howitt is proceeding in forma pauperis, the Court will review the sufficiency of the amended complaint, and summons will not issue except upon order of the Court. (Ferguson, Kerry) (Entered: 11/05/2025) |
| 11/09/2025 | 18 | ~~AMENDED COMPLAINT *Of 11/9/25* against CHA Cambridge Hospital, filed by Dan Howitt.(Howitt, Dan)~~ **Modified on 11/10/2025 to strike entries 18 and 19 please refer to doc. 20 .** (SP). (Entered: 11/09/2025) |
| 11/09/2025 | 19 | ~~AMENDED COMPLAINT *Of 11/9/2025* against CHA Cambridge Hospital, filed by Dan Howitt.(Howitt, Dan)~~ **Modified on 11/10/2025 to strike entries 18 and 19 please refer to doc 20 .** (SP). (Entered: 11/09/2025) |
| 11/09/2025 | 20 | AMENDED COMPLAINT *Of 11/9/2025* against CHA Cambridge Hospital, filed by Dan Howitt.(Howitt, Dan) (Entered: 11/09/2025) |
| 01/20/2026 | 21 | Magistrate Judge M. Page Kelley: ORDER entered. The Clerk shall issue summons for the defendant. Summons must be completed within 90 days. (jm) (Entered: 01/20/2026) |
| 01/20/2026 | 22 | NOTICE to Plaintiff re service by USMS; Local Rule 4.1 (jm) (Entered: 01/20/2026) |
| 01/20/2026 | 23 | Form and Instructions for Consent/Refusal of Magistrate Judge Jurisdiction.(jm) (Entered: 01/20/2026) |
| 01/20/2026 | 24 | USM-285 Form for Service by USMS. Fillable version available at https://www.usmarshals.gov/sites/default/files/media/document/usm-285_process-receipt_0.pdf (jm) (Entered: 01/20/2026) |
| 01/20/2026 | 25 | Summons Issued as to Elizabeth Marcellino Boisvert, CHA Cambridge Hospital, Stacey Doe, Stephania Hastings, Jane Doe 1, Patient Relations Department, Judy Petelle, Denise Peterson, Yamini Saravanan, Sara Stoddard Gunn, Lorraine Vendetti, Wong, William Zinn. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (SP) (Entered: 01/20/2026) |
| 03/03/2026 | 26 | Refusal to Consent to Proceed Before a US Magistrate Judge. . (Howitt, Daniel) (Entered: 03/03/2026) |
| 03/04/2026 | 27 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jessica D. Hedges. (SP) (Entered: 03/04/2026) |
| 03/04/2026 | 28 | CONSENT by all parties to Jurisdiction by US Magistrate Judge by Daniel Howitt.. (Howitt, Daniel) (Entered: 03/04/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/04/2026 14:51:55 | | |
| **PACER Login:** | tjfarris | **Client Code:** | howitt |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10100-IT |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2025 JAN 13 PM 1:19

U.S. DISTRICT COURT
DISTRICT OF MASS.

Dan Howitt,

                Plaintiff,

v

CHA Cambridge Hospital,
Stacey Doe,
William Zinn,
Lorraine Vendetti,
Denise Peterson,
Judy Petelle,
Jane Doe 1,
Yamini Saravanan,
Sara Stoddard-Gunn,
Elizabeth Marcellino-Boisvert,
Stephania Hastings,
Dr. Wong,
Patient Relations Department,

                Defendants.

## COMPLAINT
## AND REQUEST FOR BENCH-TRIAL

| | |
|---|---|
| 2 | PARTIES |
| 3 | JURISDICTION AND VENUE |
| 4 | BACKGROUND AT MIDDLESEX SUPERIOR COURT |
| 5 | INTRODUCTION |
| 6 – 16 | FACTS |
| 17 – 27 | CAUSES OF ACTION |
| 28 | REQUEST FOR BENCH-TRIAL |

1

## PARTIES

Plaintiff:     Dan Howitt
              37 Bay State Road #5
              Boston, MA 02215

Defendants:    CHA Cambridge Hospital ("CHA")
              Stacey Doe ("Stacey")
              William Zinn ("Zinn")
              Lorraine Vendetti ("Vendetti")
              Denise Peterson ("Peterson")
              Judy Petelle ("Petelle")
              Jane Doe 1 ("Jane Doe 1")
              Yamini Saravanan ("Saravanan")
              Sara Stoddard-Gunn ("Gunn")
              Elizabeth Marcellino-Boisvert ("Boisvert")
              Stephanie Hastings ("Hastings")
              Dr. Wong ("Wong")
              Patient Relations Department ("Patient Relations Department")

              1493 Cambridge Street
              Cambridge, MA 02139

(1)     Plaintiff:  I was a patient at CHA who received medical services and administrative services by the following defendants.

(2)     Defendant CHA is the hospital where I received medical care.

(3)     Defendant Stacey Doe was a medical-assistant and phlebotomist of CHA.

(4)     Defendant William Zinn was one of my primary-care physicians of CHA.

(5)     Defendant Lorraine Vendetti was the manager of the Patient Relations Department of CHA.

(6)     Defendant Denise Peterson was the manager of Risk Management & Patient Safety of CHA.

(7)     Defendant Judy Petelle was the manager of the Medical Specialties Department of CHA.

(8)     Defendant Jane Doe 1 was a medical-assistant and phlebotomist of CHA.

(9)     Defendant Yamini Saravanan was the clinical director of the Primary Care Department of CHA.

(10)    Defendant Sara Stoddard-Gunn was a mental health social worker of CHA.

(11)    Defendant Elizabeth Marcellino-Boisvert was a psychologist of CHA.

(12)    Defendant Stephanie Hastings was one of my primary care physicians of CHA.

(13)    Defendant Wong was one of my dentists of CHA.

(14)    Defendant Patient Relations Department is a department of CHA.

2

**JURISDICTION AND VENUE**

Via USC 28 s1367(a), the court has supplemental jurisdiction over claims about violations of the below discussed MGL statutes, because those claims arise out of the same case or controversy as my federal claims.

Via USC 28 s1331, and due to the above, the court has jurisdiction over violations of the following statutes:

USC 42 s12182
MGL c272 s98
USC 42 s12203
MGL c265 s43A

Via the following, the court has jurisdiction over violations of MGL c272 s98:

*Currier v. National Board. of Medical Examiners*, 462 Mass. 1, 17 (2012)
*Folly-Notsron v. 180 Broadway Liquor Inc.*, No. 1:22-CV-11983-WGY, 2023 WL 3958453, at 8 (D. Mass. Apr. 27, 2023)
*Brooks v. Martha's Vineyard Transit Authority*, 433 F. Supp. 3d 65, 70 (D. Mass. 2020)

The court has jurisdiction over defamation that entails harm to the plaintiff.

Via USC 28 s1343, the court has jurisdiction over civil actions whose purposes are to recover damages for harm that was entailed by violations of the aforementioned statutes.

Via USC 42 s12181(7), the location of the incidents of this case is a place of public accommodation.

Via USC 28 s1391(b), the venue of the eastern division of the Massachusetts US District Court is proper because the incidents occurred in Boston, Massachusetts.

Via USC 42 c126 s12188, this court provides for presenting this complaint to, and requesting the assistance of, the Massachusetts Attorney General:

(a) Request for the Massachusetts Attorney General, per its obligation, to investigate the violations that are presented in this complaint, and to take part in my complaint, or initiate its own complaint against the defendant.

(b) In order to vindicate the public interest, assess a civil penalty against the defendant of up to $50,000 for the first violation, and up to $100,000 for each subsequent violation.

(c) Punitive damages

3

**BACKGROUND AT MIDDLESEX SUPERIOR COURT**

On 5/8/23, I first filed a complaint against the defendants in Middlesex Superior Court (2381CV01308); however at that time I was less familiar with how to construct complaints per civil-procedure; and despite my several improved amended-complaints to 5/2024, Judge Sarrouf, who seemed to ignore the following, declined them:

Documents filed by a pro se party are:

"to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up)

"the Court ignores statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements, takes the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and sees if they plausibly narrate a claim for relief." Sonoiki v. Harvard Univ., 37 F.4th 691, 703 (1st Cir. 2022) (cleaned up).

Fed. R. Civ. P. 8(e):

"Pleadings must be construed so as to do justice."

Moreover, in early 2024, the judge in a hearing stated that my complaint satisfied the requirements of civil-procedure, except for my causes-of-action section; and he asked that I write, for each cause of action, that I restate and reincorporate the preceding enumerated discussions that I provided. I however decided to re-write my facts section in a way that provided more detail; and due to encountering substantial disability symptoms, I was not able to improve the causes of action section as he asked. He then dismissed my amended complaint. And because I had done several amended complaints from 5/2023 onward, he dismissed with it prejudice. I filed a motion for reconsideration recently, in which I cite the above two case-laws and the above rule. He denied it.

I reconstructed my complaint here so that it hopefully better complies with civil-procedure in the sense of being more focused, clear, and succinct.

4

**INTRODUCTION**

The hideousness of this case is that it is of hospital staff who engaged in violations of USC 42 s12182, MGL c272 s98, USC 42 s12203, and defamation, against me. It is widely assumed throughout the world that of all public places of society, a hospital is a rare place of immense compassion, especially toward those who have diagnosed chronic illnesses of any kind, including the mentally ill. The conduct of the defendants against me is ghastly sordid, and was done via calculated intention, and clearly on the presumption that I, as a disabled person, and with governmental medical insurance, would not know how to contend with the abuse via the law, nor have the courage, nor money, to do so. And as such, the psychological harm that I was, and continue to be, subjected to, is unusually severe and cruel. To explain, millions of persons like me world-wide have severely limited social lives, to the extent that suicide (or self-euthansia) is eventually considered to be the most humane way to discontinue our suffering, including suffering that is caused by social cruelty, including by family, school-peers, school-teachers, co-workers, passers by in public, staff at retail businesses, and even staff at hospitals. Because hospitals, and other medical contexts, are widely considered to be contexts of dignity that are apart from other contexts where cruelty against the mentally ill, and against other disabled persons, is prevalent, as Congress has observed (USC 42 s12101), when abuse against the mentally ill, in violation of federal law and state law, occurs in such contexts, the people who are subjected to the abuse may find the abuse of the hospital staff against them to be an authoritative justification that they should self-euthanize. That is, if even medical providers engage in such abuse, then there is no hope for an even minimally enjoyable life, many may conclude. The danger of being abused by hospital staff is extreme. And that such staff would engage in such abuse, including those who did so via calculated methods of passive mental violence, is of unusual sociopathy. I have done academic work in the Munchausen By Proxy field since 2016, including that one of my cases is presented in the eminent expert Dr. Marc Feldman's 2018 Routledge Press book *Dying To Be Ill*; and since 2021 I have been a co-editor of the Journal Of Autism & Developmental Disorders; and witnessing, and enduring, the abuse of the hospital staff, including of several high level administration staff, has been an atrocity to my life, and has repeatedly, despite my academic understanding of the matters, resulted in my encountering emotional devastation that has repeatedly threatened my life.

5

**FACTS**

(1)        I am diagnosed with marked (Type 1-2) Autism Spectrum Disorder (DSM-V, 299.00 (F84.0)), severe Major Depressive Disorder (DSM-V, 296.33 (F33.2)), and severe Post Traumatic Stress Disorder (DSM-5, 309.81(F43.10) caused by chronic disability-based social abuse. I receive SSI Disability Income, MassHealth Medicaid, Supplemental Nutrition Assistance Program, and a HUD Section 8 Voucher.

(2)        CHA is a private Massachusetts business that provides medical care, and related medical-administrative services, to the public.

(3)        The other defendants are medical providers, or hospital administrative providers, who, at the time of the violations, were employees/agents/representatives of CHA when they engaged in violations against me, which resulted in harm to me.

(4)        8/8/15: Stacey Doe, who was/is a medical-assistant, and who received my then-physician William Zinn's order for blood samples, engaged in the following discriminatory-based conduct against me:

(4a)        She, upon entering the room, and immediately after looking at me (I have an appearance of someone with marked Autism Spectrum Disorder), verbally accosted me by angrily yelling at me, "What are you doing?!", as I simple was standing and pacing slowly in the room while I was waiting for her,

(4b)        She subjected me to her using two contaminated medical gloves on her hands (both were contaminated by, first, one falling to the ground, which was sticky with filth, and her then picking it up it with her gloved hand; and she then used both gloves to begin handling and administering the equipment for the blood samples, which included sterile-gauze, an antiseptic wipe, needle-equipment, several vials, a tourniquet, and several areas of my harm).

(4c)        She removed all of the blood-draw equipment from my arm, and forgot to extract an additional vial of blood per Zinn's order.

(4d)        Upon realizing this, she loudly yelled "Fuck!" while 3 feet from me.

(4e)        I meekly and politely asked her if she should change her gloves because one fell to the ground, and because both are contaminated. I was too afraid to do so prior to this (regarding 4b).

(4f)        She severely looked at me, and sternly and angrily said "What!", and then looked to the ground, and back to my face, and to the ground, and back to my face, and said "I don't see a glove!".

(4e)        She then sternly and angrily said "Do you want me to take the other vial?!". And she immediately added, in a tone of severe apathy, "It doesn't matter!"; "I don't care!".

(4f)        I politely said that it is probably best to take it because Zinn ordered it.

(4g)        She angrily and hastily, while smacking various medical products to the table, began the above process of using the above equipment for a second blood sample.

6

(4h)     Her conduct is in violation of USC 42 s12182, and MGL c272 s98.

(4i)     Per USC 42 s12101, Congress finds that discriminatory abuse against the mentally ill is highly prevalent, and, rarely responded to via the legal system by the mentally ill, because of the widespread unfamiliarity with anti-discrimination and anti-retaliation federal law and state law, the lack of advocacy legal services for the mentally ill, and the typical inability of the mentally ill to afford legal services.

(4j)     I have been a co-editor of the leading autism medical and science journal, The Journal Of Autism & Developmental Disorders, since 2021.

(4k)     It is highly prevalent world-wide that persons who have Autism Spectrum Disorder are subjected to abuse upon other people visually experiencing their outward symptomology, such as blunted facial affect, intense eye gazes, over eye-contact, under eye-contact, fatigued eye gazes, monotone speech prosody, diminished non-verbal communication, etc.

(4l)     I observed Stacey to interact with other patients in the waiting room in a very polite way at all times, including patients who were before me.

(4l)     Her conduct with me was radically different.


(5)     8/8/16:  After the above occurred, I saw Zinn in the hallway, and informed him of the above, and he rapidly said "It doesn't matter".

(5a)     From that date to 8/16/16:  I sent Zinn a MyChart message about the above, and on 8/16/16 he told me that I should find a different physician, implying that decided to withdraw from being my physician.

(5b)     As such, he violated USC 42 s12203.

(5c)     Such retaliation, for my having reported to him the violation of USC 42 s12182 and MGL c272 s98 by Stacey, should be considered to be another form of a violation of USC 42 s12182 and MGL c272 s98: I invoke the following case-law, which applies to sex-discrimination, and ask that it be applied to my case (regarding disability-discrimination):

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).


(6)     Several times to 10/14/22, I informed my then primary-care physician Stephanie Hastings, including via email (we had some email exchanges, in addition to MyChart-message exchanges) of the above about Stacey.

(6a)     I emailed Hastings that given Stacey's conduct, I would likely audio and/or video my future appointments with other staff besides Hastings.

7

(6b)          10/14/22: I legally audio recorded my 8 minute 03 second visit with my second medical-assistant (Jane Doe 1), which was a visit for Hasting's blood-order.

(6c)          I politely informed Jane Doe 1 about the above about Stacey.

(6d)          She asked me for Stacey's last name, and I said that I could not remember.

(6e)          She then remembered it, told it to me, and asked me if that is her; and I said that I could not remember her last name.

(6f)          My visit with Jane Doe 1 went well from start to finish, including that, at the outset, she said that I have "very good veins" for a blood-draw; and we had a mutually polite interaction the entire time.

(6g)          1.5 years later (4/25/24), I was told by Saravanan (practice manager of the CHA primary care department), that Jane Doe 1 reported that I referred to her as "fat" during my visit with her.

(6h)          I legally recorded my 13 minute 42 second telephone call with Saravanan.

(6i)          I had an appointment with Hastings the next day (4/26/24), which was scheduled 1 month prior, to discuss various medical problems.

(6j)          Saravanan stated that I was "terminated" from the Primary Care Department, cancelled my appointment with Hastings, and obsessively reiterated a multitude of times that I had been "rude" "disrespectful" "unprofessional", "with staff", causing them "safety concerns", and was "terminated", and that "you called her fat" regarding Jane Doe 1, and that I asked her for the last name of Stacey Doe, and that this demonstrates that I am unable to "move on" from that past incident, and that this, as such, causes "staff" "safety concerns".

(6k)          I informed Saravanan that what Jane Doe 1 stated to her is false; and I conveyed 6c - 6f to her.

(6l)          As such, Saravanan violated USC 42 s12203 regarding my complaints about, and discussions about, Stacey's violations of USC 42 s12182 and MGL c272 s98.

(6m)          Such retaliation, for my having reported to her, and to Jane Doe 1 (who then conveyed my report to her), the violations of USC 42 s12182 and MGL c272 s98 by Stacey, should be considered to be another form of a violation of USC 42 s12182 and MGL c272 s98: I invoke the following case-law, which applies to sex-discrimination, and ask that it be applied to my case (regarding disability-discrimination):

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

(7)          2015-2024: My several emailed requests to the hospital's Patient Relations Department for the full names of Stacey and Defendant Jane Doe 1, with the reason (notwithstanding that no reason is necessary per the below MGL) that I needed the names in order to proceed with Massachusetts State Board complaints against them, were not fulfilled, in violation of MGL c111 s70E(a).

8

(7a)        1/15/16:  Peterson of CHA's Patient Relations Department stated via email to me, as I demonstrate in my motion for equitable tolling, that if I proceeded with a lawsuit against CHA, or continued to contact CHA about Stacey, she (Peterson) would consider my doing so to be "harassment" (presumably criminal harassment), and as such would notify the police ("public safety"), and hospital-security, and I would be excluded from "Cambridge Health Alliance" (presumably all of the 37 CHA care-facilities in Massachusetts).

(7a1)       1/25/16:  Vendetti and Peterson, of CHA's Patient Relations Department, stated via a letter to me that they declined my request because of their "concern for the safety" of Stacey Doe, on the basis that I made my request for her name several times over several weeks, ignoring that each of my requests were not fulfilled,

(7b)        They added that I was engaging in "harassment", and that if it continued they would contact "Public Safety and Security".

(7c)        They added, regarding my request for the above names for my Massachusetts State Board complaints, that "the date of service and concern is enough information to report".

(7d)        They added that "We have a concern regarding your intentions", "You have left voicemails with the Patient Relations Office and Ms. Peterson that are concerning to us."

(7e)        My complaints to Vendetti and Peterson were professional and detailed; and I continued to convey my complaints to them because they did not abide by the above MGL c111 s70E(a).

(7f)        Prior to their concluding the above about me, Peterson left me a voicemail, after two weeks of my asking for the name of Stacey (in those two weeks I had to respond to her and Vendetti's arguments that "you do not need the name") in which she, when she said the full name of Stacey, said it in an abruptly rapid and inaudible way.

(7g)        I saved the voicemail.

(7h)        I then had to call and email Peterson again; and she did not respond for approximately two weeks, at which time she and Peterson embarked on the above 7b - 7e.

(7i)        In particular, and as a summary, they, via passive-aggressive abuse, over several weeks, would not return my calls, would not provide me with the requested name, and argue to me that I did not need the name.  And once Peterson left me a voicemail in which she, when she said the full name of Stacey, said it in an abruptly rapid and inaudible way, and then did not respond to my request for the name again for approximately two weeks.  And then when I continued to professionally and politely ask for the name, including professionally objecting to their refusal, and the above inaudible voicemail, they transitioned to conceiving of me, as I discuss above, as dangerous, and as, as such, a threat to the physical safety of various staff.  This is a system of calculated passive-abuse, that they used to violate MGL, and abuse me, including severely psychologically abuse me.  Surely if I was a non mentally ill person who had a career and family, they would have not embarked on the above abuse against me.

9

(7j)     Aside from MGL c111 s70E(a), there are dozens of "Patient Rights" literature-postings on walls throughout the hospital, on all floors of the hospital, such as in the waiting rooms of all departments, in the patient-registration room, in examination roomes, etc. and in CHA's website, stating what the MGL states, namely that all patients have the right to the names of anyone who provides them with medical care.

(7k)     Vendetti violated USC 42 s12182 and MGL c272 s98 by conceiving of my mental illness as portending that I would engage in criminal conduct against Stacey, and by mistreating on that basis.

(7l)     Peterson violated USC 42 s12182 and MGL c272 s98 by conceiving of my mental illness as portending that I would engage in criminal conduct against Stacey, and my mistreating on that basis.

(7m)     Vendetti violated MGL c111 s70E(a) as I discuss above.

(7n)     Peterson violated MGL c111 s70E(a) as I discuss above.


(8)     11/9/2022: I received medical care at CHA's Otolaryngology Department, with James Silva and Meghan Brady, regarding having been repeatedly assaulted by a child at a public park in Somerville - he spat in my face from inches away, twice over a few minutes, and screamed into my left ear, in the opening, after sneaking to my ear from behind me. I was enduring a substantial cough, auditory ringing, and a severe sore-throat. The boy had snot running down his face, and his parents who were 10 yards away did not intervene.

(8a)     I informed Silva and Brady of the above because I thought that it would be relevant in a medical context. I added to Silva, who I met with first before Brady, that I was considering filing a lawsuit against the parents for not intervening into the boy repeatedly assaulting me while I sat on a bench at the park.

(8b)     Silva while standing 6+ feet away, asked me to open my mouth, and in 1 second, rapidly raised his light, pointed it at my mouth, and lowered it, and said that everything is normal. I was immediately concerned that he was engaging in biased negligence.

(8c)     For decades, whenever physicians and other medical providers examine my throat, they do so by having their faces within inches of my mouth, and hold the flashlight even closer to my mouth, and then use a tongue depressor to expose the throat for visual examination more. This is the standard-of-care.

(8d)     Brady, during my auditory exam, could not tolerate that the hearing of my above left ear was considerably worse than my right ear, and interrupted my testing in the auditory room and asked me to be sure that I was responding to the sounds for my left ear.

(8e)     Via my aforementioned role as a co-editor of a medical and science journal, it is obvious that her intervention was based on bias, and is of malpractice (failure to abide by standard-of-care).

(8f)     The next day I went to CHA Somerville Urgent Care, and the physician assistant examined my throat properly, and diagnosed "acute viral nasopharyngitis".

10

(8g)        Shortly thereafter I was evaluated by an otorhinolaryngologist at Mt. Auburn Hospital, who diagnosed significant left ear hearing impairment.

(8h)        Both of the above confirmed the failed standard-of-care of Silva and Brady.

(8i)        2/1/23: I emailed a detailed professional complaint about Silva and Brady, via several emails in which I continued my complaint with additional discussion, to the medical-director of the department, Dr. Ayesha Khalid, and the chief-medical-officer of the hospital, Dr. Jeffrey Hoffman, and I included in my complaint that Silva and Brady may have engaged in disability-discrimination against me as a visibly mentally ill person.

(8j)        2/3/23: I submitted that complaint to the Patient Relations Department.

(8k)        2/6/23, at 1:25pm: I received a terrorizing anti mental illness voicemail, expressed in monstrous guttural voice, saying, "Yorrrrrrrrrrrr Craaaaaaaazyyyyyyyyy".

(8l)        The voicemail-source appeared as "Unknown Number".

(8m)        I thought that one of my then-current highly abusive landlords (1:24CV11991PBS) did this; and I subpoenaed the Legal & Emergency Response department of T-Mobile in Parsippany, NJ, via the Morris County Sheriff Civil Process

(8n)        The 8/28/23 result of the subpoena shows that the source of the voicemail is the home telephone number in Pepperell, MA of Judy Petelle, who is the practice-manager of 20+ years of the hospital's Medical Specialties Department, which is where the Otolaryngology Department is.

(8o)        I saved the voicemail.

(8p)        Each department of the CHA has access to my patient-profile, which lists all of my diagnoses, and in particular my aforementioned mental illnesses (as categorized by the DSM (Diagnostic & Statistical Manual Of Mental Disorders)).

(8q)        Via CHA's MyChart, I also have access to my patient-profile, which lists the above in a one-page summary.

(8r)        Clearly Petelle viewed my patient-profile.

(8s)        Even if she did not, her conduct was of anti mental illness disability discrimination: Via USC 42 s12101, Congress states:

"; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination."

At a minimum, she regarded me as having a disability; and discrimination on that basis is also disability-discrimination.

(8t)        Therefore Petelle violated USC 42 s12182 and MGL c272 s98.

(8u)        She also violated USC 42 s12203 because my complaint against Silva and Brady included my statements that they likely also engaged in disability-discrimination against me.

11

(8u)     3/27/23: I received a letter via MyChart that she "terminated" me from all of the departments of the Medical Specialties Department.

(8v)     Therefore Petelle violated USC 42 s12182 and MGL c272 s98 a second time.

(8v1)    And as such, she also violated USC 42 s12203, because my complaint against Silva and Brady included my statements that they likely also engaged in disability-discrimination against me.

(8w)     3/27/23: I spoke with the aforementioned medical-director of the Otolaryngology department, Ayesha Khalid, and she rescinded Petelle's termination.

(8x)     3/20/23: I received a MyChart notification that I was going to be postal-mailed a letter-of-termination by Petelle, but the notification did not provide any reasons for the termination.

(8y)     3/22/23: I emailed CHA's president Assaad Sayah and chief of medicine Richard Pels a professional email about this matter.

(8z)     Sayah replied with the following, and cc'd Pels:

"Thank you for having the courage to raise these concerns with me and others at Cambridge Health Alliance. I am sorry that you feel as you do about your experience at CHA
A core value of CHA is that we treat all patients with dignity and respect at all times. We do not tolerate any form of retaliation.
I am directing members of the CHA team to make further inquiries into the matters you have brought to my attention."

(9)      6/29/21: Via MyChart and in-person, and after having had an appointment with her, I asked my then mental health clinician, Sarah Stoddard-Gunn. per the requirement of McLean Hospital, to submit an application for partial hospitalization for me.

(9a)     She stated that she would.

(9b)     I emphasized to her, as I did to Hastings over many months, that I was in dire need of attending a partial hospitalization program due to extreme depression.

(9b1)    I conveyed to her in my first appointment the abuse of Stacey, and the ensuing abuse of the Patient Relations Department (Peterson and Vendetti).

(9c)     She did not reply to me for 3 full months (9/28/21), despite my several follow up MyChart messages and voice-mails to her.

(9d)     She MyChart messaged me that she was the McLean program was being conducted via webcam. asked if I have a computer with which I can do that, and stated that she learned of my complaint against Stacey and all of the problems that arose from that.

(9e)     I replied that I would obtain a webcam for the program.

(9f)     However, she never contacted me again, nor did anyone else at the hospital.

12

(9g)     12/2/22: I contacted CHA's Psychiatry Department, and was told that she "left her role" at the department for another role at the hospital; and I found that she is now also, in addition to being a social worker, the director of Urgent Care & Access Services.

(9h)     2/23/22: I contacted McLean Hospital's partial hospitalization program, and was informed that she did not submit an application to them.

(9i)     2/25/22: I had a 50 minute 14 second legally recorded telephone conversation with CHA psychologist Elizabeth Marcellino-Boisvert, which was my first appointment with her.

(9j)     She said several times, and with mocking derision, that Gunn did everything possible for me, and that I was not able to proceed with the McLean Hospital program because I did not have a webcam.

(9k)     I politely informed her that that is not true, and she responded with mocking derision, saying that Gunn told her this.

(9l)     Due to the aggressive mocking derision of Boisvert, and aggressive distrust of me, I was not comfortable to continue with her as my psychologist.

(9m)     3/9/22: Hastings (6 above), email-replied to me that she spoke with Gunn and Boisvert in the near-past, and that they conveyed to her they became aware of my problems with Stacey and the Patient Relations Department staff, including emails from, and a letter from, those staff about me. (A friend assisting me with my case in this court has assisted me with finding past emails in my three email accounts, and emails that I saved as pdf's in various computer folders and in one USB drive)

(9n)     It is apparent that Gunn's negligence of me, and Boisvert's aggressive derision of me (despite that I was trying to establish a clinical relationship with her in my first appointment with her), were done in retaliation to my complaints about Stacey, and likely in retaliation to how Stacey, as Hastings stated to me, was no longer permitted to work with patients at the hospital.

(9o)     Therefore, Gunn violated USC 42 s12203.

(9p)     Such retaliation, for my having reported to her the violations of USC 42 s12182 and MGL c272 s98 by Stacey, and for others reporting to her my complaints against Stacey, should be considered to be another form of a violation of USC 42 s12182 and MGL c272 s98: I invoke the following case-law, which applies to sex-discrimination, and ask that it be applied to my case (regarding disability-discrimination):

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

(9p)     Also therefore, Boisvert violated USC 42 s12203.

(9q)     Such retaliation, for my having reported to her the violations of USC 42 s12182 and MGL c272 s98 by Stacey, and for others reporting to her my complaints against Stacey, should be considered to be another form of a violation of USC 42 s12182 and MGL c272 s98: I invoke the following case-law, which applies to sex-discrimination, and ask that it be applied to my case (regarding disability-discrimination):

13

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

(9r) Gunn and Hastings surely have never engaged in such conduct against others, and are known to be excellent clinicians.

(9s) Both clearly wanted to dispose of me as a patient, and succeeded via their calculated conduct in doing so.

(9t) Treating a severely mentally ill and highly vulnerable person like they did is atrocious.

(9u) It is clear that both desired to not only dispose of me as a patient, but to severely harm me, via causing me to be without treatment, despite my dire circumstance. I assume both did not care if I self-euthanized.

**(10)** Hastings was my primary-care doctor from 2/2021 until my termination from the Primary Care Department on 4/25/23.

(10a) 4/2/2022: Via MyChart, she stated that she would refer me to a "complex care specialist" to handle my case, given the nature of my case.

(10b) However, she never did.

(10c) Clearly this was in violation of USC 42 s12203, regarding my matter with Stacey: My medical circumstance warranted receiving that referral, and Hastings stated on her own accord that she would make the referral, but she never did, despite that making such a referral is a simple matter.

(10d) Clearly Hastings elected to decide to not provide me with the referral in order to surreptitiously harm me.

(10e) Moreover, clearly she desired to abuse me via passive-aggressive abuse by telling me that such a referral is warranted, and that she would make the referral, but then not doing so.

(10f) Moreover, clearly she desired that my medical circumstance worsened without the proper treatment, including that I may euthanize myself.

(10g) In early 2021, after I discussed Stacey with her during an appointment, she mentioned to me that Stacey no longer has access to working with patients, clearly per the decision of the CHA administration regarding my complaints against her, and perhaps others' complaints against her.

**(11)** January 2020: I met with CHA Dental Services dentist Wong (although I may be mistaken about her last name), at the Windsor Street Care Center.

14

(11a)        The temporary filling for my #5 tooth fell out approximately 2.5 months prior, and the appointment was for a new filling.

(11b)        Due to not being able to afford paying for the required crown since 2010, I instead obtained one replacement filling in 2014, and this was to be my second one.

(11c)        All of my previous dentists (two in Portland, OR, and several in Cambridge, MA, including at Wong's office (CHA Dental Services)) since 2010, and since 2014 at CHA Dental Services, stated that due to the extremely minimal structure that was remaining from the previously fractured tooth, no drilling of any degree should be done.

(11d)        As was the case with Stacey, upon Wong entering the room and looking at me, she began to aggressively verbally abuse me, including angrily scolding me for not having the appointment 2.5 earlier as was previously scheduled, angrily asking me why I missed the appointment, and then upon my politely telling her that I contend with severe mental illness, staring at me viciously and opening her eyes widely as if she found me to be disgusting.

(11e)        All of the above, and below, was witnessed by her assistant.

(11f)        She proceeded to drill the above tooth substantially (intermittently over approximately five minutes), contrary to what I state in 11c.

(11f1)        After her first approximate ten seconds of drilling, I asked her why she was drilling, and I mentioned what I state in 11c; and she angrily said that she has to do some drilling for the filling.

(11f2)        When I had the first replacement filling done in 2014, no drilling was done.

(11f3)        According to all of the aforementioned dentists, no drilling was needed for the filling.

(11g)        She then stated that she was finished, and her assistant removed my protective glasses and bib.

(11h)        I then bit down, and was shocked that my upper and lower teeth in that area did not align, and instead that my lower teeth and jaw slid over several millimeters when I bit down, due to her having drilled away the surface of the #5 tooth in such a way that it no longer aligned with the tooth below.

(11i)        In substantial fear, I told this to her assistant, and I stood up to see Wong attending to a different patient in a different room across the hallway.

(11j)        The assistant told Wong of the problem, and she angrily said to her that she would return to me shortly.

(11k)        She clearly intentionally neglected to do the paper-alignment method that shows how the teeth are misaligned, and how to correct it, which was done with me by all of my previous dentists from my first root-canal in 2004.

(11l)        Akin to Stacey, her conduct was clearly of disability-discrimination in violation of USC 42 s12182 and MGL c272 s98: She observed my Autism Spectrum Disorder appearance, and not only immediately embarked on being verbally psychologically abusive toward me, but elected to intentionally harm me by doing what all other dentists over a multitude of years stated should not be done in any circumstance to that tooth.

15

(11m)        Within three weeks, that #5 tooth completely fractured while I was eating, causing substantial pain, because the fractured section remained in the tooth-socket, and any even minimal movement of the fracture caused immense pain.

(11n)        I had to have an emergency extraction of it; and due to the pandemic, there was a delay in obtaining an appointment.

(11n1)       Dr. Alec Eidelman of the same office as Wong (CHA Dental Services) is who did the emergency extraction of the fractured segment, as well as extraction of the underlying root-canal segments.

(11n2)       I told him of the above about how the tooth had been drilled away substantially prior to the filling being put in, and he stated that the tooth should have never been drilled to any extent because of the already very minimal structure.

(11o)        Due to how I was not able to afford a crown, I went 2.5 years with a missing tooth in that area, which had a poor appearance, which caused self-consciousness, and which.entailed frequent injury to that gum area.

(11p)        The then-chief of the office, Dr. Lee, who did the dental-implant procedure on me, stated that the nature of the #5 area required a dental-implant, and he reduced the cost by 20% for me after I informed him of what Wong did.

(11q)        I paid 50% of the high cost myself because my insurance, MassHealth, did not provide any coverage.

(11r)        I had to have several appointments over substantial time for the dental-implant process.

(11s)        The succeeding chief of the office, Caleb Tam, given what I conveyed to him about Wong, was kind to waive the second 50% of the cost.

(11t)        Given the above about the delay in my obtaining a dental-implant, the gum/bone area above the tooth has a caved-in appearance, which occurs when there is no structure where the #5 tooth was.


**(12)**        As I discuss in (6), Jane Doe 1 violated USC 42 s12203, and via the additional violation of defamation, which caused substantial harm to me: She retaliated against my polite conveyance to her of the discriminatory abuse of her colleague Stacey by stating to one or more others at CHA that I referred to her (Jane Doe 1) as "fat", and, that I asked for Stacey's last name, which resulted in my being excluded from my place of primary care medical care.


**(12-1)**        The Patient Relations Department did not respond to my several professional requests for the name of Jane Doe 1, in violation of MGL c111 s70E(a).

(12-1a)      Clearly their basis to not respond to my request is their continued violations of Peterson and Vendetti violations of USC 42 s12182 and MGL c272 s98.

## CAUSES OF ACTION

### COUNT 1

13.     I restate, and reincorporate by reference, 1 – 12.

Stacey violated USC 42 s12182.

Due to this, I request the following relief:

a.  Judgment on the violation.

b.  General damages.

c.  Punitive damages

d.  An injunction prohibiting the defendant from engaging in such a violation against me and others.

e.  Additional orders and damages that the court may find are warranted.

### COUNT 2

14.     I restate, and reincorporate by reference, 1 – 13.

Stacey violated MGL c272 s98.

Due to this, I request the following relief:

a.  Judgment on the violation.

b.  General damages.

c.  Punitive damages

d.  An injunction prohibiting the defendant from engaging in such a violation against me and others.

e.  Additional orders and damages that the court may find are warranted.

### COUNT 3

15.     I restate, and reincorporate by reference, 1 – 14.

Zinn violated USC 42 s12203.

Due to this, I request the following relief:

a.  Judgment on the violation.

b.  General damages.

c.  Punitive damages

d.  An injunction prohibiting the defendant from engaging in such a violation against me and others.

e.  Additional orders and damages that the court may find are warranted.

### COUNT 4

17

16. I restate, and reincorporate by reference, 1 – 15.

Zinn violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 5

17. I restate, and reincorporate by reference, 1 – 16.

Zinn violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 6

18. I restate, and reincorporate by reference, 1 – 17.

Jane Doe 1 violated USC 42 s12203.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 7

19. I restate, and reincorporate by reference, 1 – 18.

18

Jane Doe 1 violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 8

20.   I restate, and reincorporate by reference, 1 – 19.

Jane Doe 1 violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 9

21.   I restate, and reincorporate by reference, 1 – 20.

Jane Doe 1 engaged in retaliatory defamation against me that caused me substantial harm.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 10

22.   I restate, and reincorporate by reference, 1 – 21.

Peterson violated USC 42 s12182.

Due to this, I request the following relief:

19

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 11

23. I restate, and reincorporate by reference, 1 – 22.

Peterson violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 12

24. I restate, and reincorporate by reference, 1 – 23.

Peterson violated MGL c111 s70E(a).

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 13

25. I restate, and reincorporate by reference, 1 – 24.

Vendetti violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

20

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 14

26. I restate, and reincorporate by reference, 1 – 24.

Vendetti violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 15

27. I restate, and reincorporate by reference, 1 – 26.

Vendetti violated MGL c111 s70E(a).

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

e. Additional orders and damages that the court may find are warranted.

## COUNT 16-17

28. I restate, and reincorporate by reference, 1 – 27.

Petelle violated USC 42 s12182 twice.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

21

e. Additional orders and damages that the court may find are warranted.

## COUNT 18-19

29. I restate, and reincorporate by reference, 1 – 28.

Petelle violated MGL c272 s98 twice.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 20-21

30. I restate, and reincorporate by reference, 1 – 29.

Petelle violated USC 42 s12203 twice.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 22

31. I restate, and reincorporate by reference, 1 – 30.

Gunn violated USC 42 s12203.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 23

32. I restate, and reincorporate by reference, 1 – 31.

Gunn violated USC 42 s12182.

22

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 24

33. I restate, and reincorporate by reference, 1 – 32.

Gunn violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 25

34. I restate, and reincorporate by reference, 1 – 33.

Boisvert violated USC 42 s12203.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 26

35. I restate, and reincorporate by reference, 1 – 34.

Boisvert violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

23

## COUNT 27

36. I restate, and reincorporate by reference, 1 – 35.

Boisvert violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 28

37. I restate, and reincorporate by reference, 1 – 36.

Hastings violated USC 42 s12203.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 29

38. I restate, and reincorporate by reference. 1 – 37.

Hastings violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 30

39. I restate, and reincorporate by reference, 1 – 38.

Hastings violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

24

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 31

40. I restate, and reincorporate by reference, 1 – 39.

Wong violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 32

41. I restate, and reincorporate by reference. 1 – 40.

Wong violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 33

42. I restate, and reincorporate by reference, 1 – 41.

The Patient Relations Department violated MGL c111 s70E(a) regarding my request about Jane Doe 1.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 34

43. I restate, and reincorporate by reference, 1 – 42.

25

The Patient Relations Department violated USC 42 s12182 regarding my request about Jane Doe 1.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 35

44. I restate, and reincorporate by reference, 1 – 43.

The Patient Relations Department violated MGL c272 s98 regarding my request about Jane Doe 1.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 36

45. I restate, and reincorporate by reference, 1 – 44.

Saravanan violated USC 42 s12203.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

## COUNT 37

46. I restate, and reincorporate by reference, 1 – 45.

Saravanan violated USC 42 s12182.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

26

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

### COUNT 38

47. I restate, and reincorporate by reference, 1 – 46.

Saravanan violated MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. General damages.

c. Punitive damages

d. An injunction prohibiting the defendant from engaging in such a violation against me and others.

### COUNT 39

48. I restate, and reincorporate by reference, 1 – 47.

Petelle violated MGL c265 s43A via her hate-crime natured voicemail to me, and her concurrent pattern of a multitude of violations of USC 42 s12203, USC 42 s12182, and MGL c272 s98.

Due to this, I request the following relief:

a. Judgment on the violation.

b. Criminal charge.

c. General damages.

d. Punitive damages

e. An injunction prohibiting the defendant from engaging in such a violation against me and others.

27

**REQUEST FOR BENCH-TRIAL**

I request a bench-trial on the aforementioned violations.


Submitted by,

Dan Howitt
1/13/25


**CERTIFICATE OF SERVICE**
I served this document today to the defendant's attorney Vincent Dunn at vdunn@hmdrslaw.com.

Dan Howitt
1/13/25

28

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAN HOWITT,

     Plaintiff,

         v.

CHA CAMBRIDGE HOSPITAL, et al.,

     Defendants.

CIVIL ACTION NO. 25-10100-MPK

ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*
AND REVIEW OF THE COMPLAINT PURSUANT TO 28 U.S.C. § 1915(e)(2)
June 27, 2025

KELLEY, U.S.M.J.

Dan Howitt, who is representing himself, has filed a civil complaint in which he alleges that while receiving medical treatment at CHA Cambridge Hospital ("the Hospital"), the Hospital and its employees unlawfully discriminated against him on the basis of his disability. *See* #1. Howitt has also filed a motion for leave to proceed *in forma pauperis* (#2) and a motion for equitable tolling of the statute of limitations (#3).[1]

For the reasons set forth below, the Court will grant the motion to proceed *in forma pauperis*, deny without prejudice the motion for equitable tolling, and direct Howitt to show cause why this action should not be dismissed.

---

[1] Howitt has also filed a motion for leave to file electronically (#4) which the Court will grant by separate order.

## I.       Motion for Leave to Proceed in Forma Pauperis

Upon review of Howitt's motion for leave to proceed *in forma pauperis*, the Court concludes that Hewitt has adequately shown that he is unable to pay the filing fee.  Accordingly, the motion (#2) is GRANTED.

## II.      Motion for Equitable Tolling

In this motion, Howitt asks that under the doctrine of equitable tolling, the applicable statute of limitations be extended.  He represents that a 2016 email demonstrates that he was "threatened into inaction" from presenting his claims to the Court.  (#3 at 1.)  The motion (#3) is DENIED without prejudice to Howitt raising the issue of equitable tolling if the timeliness of this action becomes relevant to the adjudication of this case.

## III.     Review of the Complaint

When a plaintiff is proceeding *in forma pauperis*, the Court may conduct a preliminary review of the complaint and dismiss any claims that are malicious or frivolous, fail to state a claim upon which relief may be granted, or seek monetary damages from a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e)(2).  In conducting this review, the Court construes Howitt's complaint liberally because he is proceeding *pro se*.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

### A.       Complaint

Howitt brings this action against the Hospital (including its Patient Relations Department), and Hospital employees.  In his complaint, Howitt represents that he has been diagnosed with Autism Spectrum Disorder, Major Depressive Disorder, and Post Traumatic Stress Disorder.  He claims that while receiving treatment at the Hospital, the defendants interacted with him in a derogatory, impatient, angry, and demeaning manner and even denied

2

him treatment because of his mental disability.  According to Howitt, these alleged actions constituted unlawful discrimination based on disability.  Howitt also alleges that when he reported this conduct to certain defendants, they did not believe him, refused to investigate, and even retaliated against him for making the accusations.

Howitt asserts claims under (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* ("Title III"), and M.G.L. ch. 272, § 98, both of which broadly prohibit disability discrimination in any place of public accommodation; (2) 42 U.S.C. § 12203, which prohibits retaliation against someone who has opposed a practice made unlawful under Title III; and (3) M.G.L. ch. 111, § 70E(a), which enumerates the rights of patients.  Howitt also brings one claim for defamation.

Howitt's complaint is in 39 counts, twenty-one of which assert claims under Title III for unlawful discrimination or under 42 U.S.C. § 12203 for unlawful retaliation or coercion.  (#1 at 17-27.)  For each of these counts, Howitt seeks general and punitive damages in an unspecified amount, an injunction prohibiting the defendant identified in that count from "engaging in such a violation against [him] and others." *Id*.

Howitt's complaint contains a section titled "Background at Middlesex Superior Court." *Id.* at 4.  In this section, Howitt states that, on May 8, 2023, he filed a complaint against the defendants in Middlesex Superior Court, and he provides the case number for that action: 2381CV01308.[2]  Howitt alleges that he followed the court's directive on more than one

---

[2] 2 Based on the state court docket number Howitt provides in his complaint, it is clear he is referring to *Howitt v. CHA Cambridge Hospital*, 2381CV01308 (Middlesex Super. Ct., Mass.). The electronic docket of the case is available to the public through the website https://www.masscourts.org/eservices/home.page.  The Court may take judicial notice of this action. *See Wiener v. MIB Group, Inc.*, 86 F.4th 76, 81 n.3 (1st Cir. 2023) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings

occasion, but that "due to encountering substantial disability symptoms," he "was not able to improve the causes of action section as [the court] asked." *Id.* Howitt reports that, "because [he] had done several amended complaints from 5/2023 onward, [the court] dismissed [the amended complaint] with prejudice." *Id.* The Superior Court judge subsequently denied Howitt's motion for reconsideration. *Id.* Howitt believes that the state court "ignored" its duty to construe *pro se* filings less stringently than those filed by attorneys. *Id.*

**B.    Discussion**

To state a claim upon which relief may be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Where it is clear from the face of the complaint and other documents subject to judicial notice that the action will not survive a common affirmative defense, the complaint fails to state a claim upon which relief may be granted. *See Bock v. Jones*, 549 U.S. 199, 215 (2007); *Rivera-Rosario v. LSREF2 Island Holdings, Ltd., Inc.*, 79 F.4th 1, 2 (1st Cir. 2023).

Res judicata is a common affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), which prevents a plaintiff from bringing certain claims that the plaintiff litigated or could have litigated in an earlier action (claim preclusion) or from relitigating an issue actually decided in a litigant's prior case (issue prelusion). *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 411-12 (2020).[3] To determine whether Howitt's earlier state court action against the

---

have relevance to the matters at hand." (quoting *Law Offices of David Efron v. Matthews & Fullmer Law Firm*, 782 F.3d 46, 56 n.7 (1st Cir. 2015))).

[3] The doctrine of res judicata "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Cruz Berrios v. Gonzalez-Rosario*, 630 F.3d 7, 11 (1st Cir. 2010) (alteration in original; footnote omitted) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

Hospital has preclusive effect on this action, the Court must look to the preclusion law of Massachusetts. "Disposition of [a] federal action, once [a] state-court adjudication is complete, [is] governed by preclusion law." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293, (2005). Under the full faith and credit statute, 28 U.S.C. § 1738, "a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered." *In re Sonus Networks, Inc., S'holder Derivative Litig.*, 499 F.3d 47, 56 (1st Cir. 2007). Thus, if, under Massachusetts law, the preclusive effect of the judgment against Howitt in the state action against the Hospital for disability discrimination would bar him from reasserting the disability discrimination claims asserted in the present action, the action is similarly barred in this Court. *Id.*

Under Massachusetts law, "[c]laim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." *Laramie v. Philip Morris USA Inc.*, 488 Mass. 399, 405 (2021) (quoting *O'Neill v. City Manager of Cambridge*, 428 Mass. 257, 259 (1998)). "Three elements must be established to show claim preclusion: '(1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits.'" *Id.* (quoting *DaLuz v. Dep't of Corr.*, 434 Mass. 40, 45 (2001)).

Here, it appears likely that all of Howitt's federal claims for disability discrimination and retaliation are barred by claim preclusion because a similar case he filed in state court was dismissed with prejudice. By Howitt's own admission, the present action is another iteration of the pleadings he filed or attempted to file in the state court case. According to Howitt, he has now "reconstructed [his] complaint so that it hopefully better complies with civil-procedure in the sense of being more focused, clear, and succinct." (#1 at 4.)

5

If, indeed, the disability discrimination claims in this action were raised or could have been raised in the state court action, all the elements of claim preclusion are met.[4] The earlier action was dismissed with prejudice for failure to state a claim upon which relief may be granted, which constitutes a final judgment on the merits for purposes of claim preclusion. *See Saade v. Wilmington Tr., Nat'l Ass'n*, 494 Mass. 1013, 1015 (Mass. 2024) ("[D]ismissal for failure to state a claim operates as a dismissal on the merits with res judicata effect." (ellipses omitted) (quoting *Mestek, Inc. v. United Pac. Ins. Co.*, 40 Mass. App. Ct. 729, 731 (1996))); *Commonwealth v. Hernandez*, 481 Mass. 582, 595 (2019) ("In Massachusetts, as elsewhere, a trial court judgment is final for purposes of res judicata or issue preclusion regardless of the fact that it is on appeal."). The Hospital is a defendant in both actions, and for purposes of the disability discrimination claims, there is privity between the Hospital and its employees.

## III. Conclusion

In accordance with the foregoing, the Court hereby orders:

1. The motion for leave to proceed *in forma pauperis* (#2) is GRANTED.

2. The motion for equitable tolling of the statute of limitations (#3) is DENIED without prejudice.

3. If Howitt wishes to pursue this action, he must show cause within thirty-five (35) days why the complaint should not be dismissed for failure to state a claim upon which relief

---

[4] Further, unless appealed, the denial of a motion to amend can be a final judgment on the merits with regard to the claim a party sought to add through amendment. *See Hatch v. Trail King Indus., Inc.*, 699 F.3d 38-49 (1st Cir. 2012); *cf. Silva v. City of New Bedford*, 677 F. Supp. 2d 367, 370-371 (D. Mass. 2009) ("Courts have . . . distinguished cases where amendment was sought to add a new defendant rather than simply new claims. For that reason, whether a motion to amend seeking to add a new party will preclude subsequent action depends upon whether the parties are identical or in privity under standard rules of claim preclusion." (citation omitted)).

may be granted based on the doctrine of res judicata (claim preclusion).[5] Failure to do so may

result in dismissal of this action by a District Judge.

SO ORDERED.

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

---

[5] If all the federal claims are barred, Howitt's remaining state law claims would fail since the federal court would have no jurisdiction over them and they could have been adjudicated in the prior state court action.

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1:25CV10100MPK

_____

Dan Howitt,

                 Plaintiff,

v

CHA Cambridge Hospital, et al

                 Defendants.

_____

### RESPONSE TO ORDER TO SHOW CAUSE

(1)          I actually do not state, nor admit, nor imply, the following statement that is made by the court:

"By Howitt's own admission, the present action is another iteration of the pleadings he filed or attempted to file in the state court case."

Moreover, I do not invoke any federal statutes in my state complaint. And, my federal complaint predominately focuses on federal statutes.

(2)          Regarding claim preclusion, the essence of this preclusion is that a case that has been litigated cannot be litigated again. However, there was no litigation in my state complaint: It never proceeded to any stage of litigation. including not even an initial memorandum on order by the judge about my complaint. Rather, the judge, via his screening process, dismissed it. I discuss this further below.

(2)
"According to Howitt, he has now "reconstructed [his] complaint so that it hopefully better complies with civil-procedure in the sense of being more focused, clear, and succinct." (#1 at 4.)"

The court interprets what I state, to mean the above ( #1 above), which is not accurate. First, my federal complaint is substantially different than my state complaint, including that I predominately focus on violations of federal statutes. Secondly, in my state complaint, I do not invoke any federal statutes. Moreover, I do not have in my federal complaint most of the state claims that I had in my state complaint . Also, what I mean by "focused, clear, and succinct" is what I state above. That is, focused on federal violations, focused on the clear violations of federal law, and focused on presenting my claims to accord with civil procedure via brief, clear, and relevant statements.

(3)          Regarding claim preclusion:  (a) again none of my claims about violations of federal statutes in my federal complaint are presented in my state complaint; (b) I did not place them there because state court does not have jurisdiction over the federal statutes that I argue were violated; (c) my defendant-list is not the same in my state complaint as it is in my federal complaint.

1

(4)        Notwithstanding the above 1-3, I understand, from the liberal and edifying discussions provided to me by some judges of this court about cases that they are presiding over, such as Judges Sterns, Cabell, and Joun, all of which are proceeding, there are a substantial number of aspects of my complaint in my Facts section and Causes Of Action section that I should remove and revise.  I have completed a draft amended complaint, and I have reduced my original complaint of 28 pages to 6 pages.  I will concurrently file with this Response a Motion To Amend Complaint.

(5)        Regarding the issue of whether my complaint stats claims for relief:  My complaints that the above judges are presiding over, and some other complaints of mine in this court, are (a) of the same general structure as my complaint for this case, and (b) each judge approved of them as stating claims for relief, and as according with civil procedure.  Notwithstanding, and as I mention above (#4), I understand that I should substantially revise/amend my complaint.

(6)        I am unclear from the court's order (a) whether the court states that my claims, themselves, regardless of the claim preclusion issue, do not state claims for relief, or (b) whether the court states that they state claims for relief, but due to the claim preclusion issue, they may not.  I ask the court to clarify this for me.  Although, hopefully my above 1-5 are accepted by the court, especially since this is a case of horrid disablist harm by hospital personnel, including the Practice Manager of 20+ years of the Surgical Specialities Department, Judy Petelle, calling me from her home, far outside of Boston, as is shown by my subpoena to T-Mobile, and leaving me a ghastly disablist voicemail from a blocked number saying, with a monstrous guttural voice, "Yourrrrrr Craaaaaaazy", shortly after I filed a complaint with the hospital about the treatment of two of her staff.  And she knew from my simple patient file with my diagnoses that I have mental illness.

(7)        Due to disorganization, I did not submit the correct exhibits for my Motion For Equitable Tolling (there are two, and they are not what I submitted); and I would do so in a motion to reconsider.

Submitted by,

Dan Howitt
7/6/25

2

# EXHIBIT 14

UNITED STATES DISTRICT COURT     DISTRICT OF MASSACHUSETTS

Dan Howitt (pro se),

                                        Plaintiff,                                                    **1:25CV10100MPK**

v

Cambridge Health Alliance - Cambridge Hospital,

_____ Defendant.

**AMENDED COMPLAINT AND REQUEST FOR BENCH TRIAL**

**I.   PARTIES**

1)       Plaintiff:       Dan Howitt, 37 BayState Road #5, Boston, MA 02215

2)       Defendant:    Cambridge Health Alliance - Cambridge Hospital ("CHA"), 1493 Cambridge St, Cambridge, MA 02139

**II.   JURISDICTION AND VENUE**

1)       Via USC 28 s1331, the court has jurisdiction over violations of 42 USC s12182 and 42 USC s12203, contextual defamation that results in harm of the plaintiff, contextual intentional infliction of psychological distress, and contextual beaches of contract and of the covenant of good faith and fair dealing.

2)       Via USC 28 s1343, the court has jurisdiction over civil actions whose purposes are to recover damages for harm that was entailed by violations of the aforementioned statutes, and of contextual misconduct.

3)       Via USC 42 s12181(7), and MGL c272 s92A, CHA is a place of public accommodation.

4)       Via USC 28 s1391(b), the venue of the eastern division of the Massachusetts US District Court is proper because the incidents occurred in the eastern region of Massachusetts.

**III.   INTRODUCTION**

1)       The defendant and its employees violated 42 USC s12182 and 42 USC s12203 a multitude of times, and engaged in defamation, the intentional infliction of psychological distress, breach of contract, and breach of the covenant of good faith and fair dealing.

**IV.   FACTS**

1)       I receive SSI, MassHealth, and treatment with Massachusetts General Hospital, and have diagnosed Asperger's Syndrome and Depression.

2)       Defendant CHA is a private Massachusetts business that provides medical care, and related medical administrative services, to the public.

3)       The employees who are discussed below are employees of CHA.

4)       CHA is liable for the violations of federal law of its employees.

5)       As background regarding employee Judy Petelle:  On 11/9/2022, I received medical care at CHA's Otolaryngology Department, with physician assistant James Silva and audiologist Meghan Brady, regarding having been repeatedly assaulted by a child at a public park in Somerville, who spat on my eyes and mouth from 3-4 inches away, and screamed into my left ear, a half inch from the opening, after sneaking to my ear from behind me.  I was enduring a substantial bronchitis cough, auditory ringing, and a severe sore throat.  The boy had snot running down his face, and his parents who were 10 yards away did not intervene.

6)       I informed Silva and Brady of the above about the body because I thought that it would be relevant in a medical context.  I added to Silva, who I met with first before Brady, that I was considering filing a lawsuit against the parents for not intervening into the boy repeatedly assaulting me while I sat on a bench at the park.

1

7)      Silva, while standing 6+ feet away, asked me to open my mouth, and in 1 second, rapidly raised his light, pointed it at my mouth, and lowered it, and said that everything is normal.  I was immediately concerned that he was engaging in intentional medical negligence, in retaliation to my complaint about the boy.

8)      For decades, whenever physicians and other medical providers examine my throat, they do so by having their faces within inches of my mouth, and hold the flashlight even closer to my mouth, and then use a tongue depressor to expose the throat for even better visual examination.

9)      Brady, during my auditory exam, could not tolerate that the hearing of my above mentioned left ear was considerably worse than my right ear, and interrupted my testing in the auditory room and asked me to be sure that I was responding to the sounds for my left ear.

10)     I am a co-editor of the Journal Of Autism & Developmental Disorders, which largely provides articles of experimental studies; and it is basic knowledge that clinicians are not supposed to intervene into experimental testing as Brady did, because this can compel a test-subject to provide inaccurate results.

11)     The next day, due to my above concerns about Silva and Brady, I went to CHA Somerville Urgent Care, and the physician assistant examined my throat properly, and diagnosed "Acute Viral Nasopharyngitis".

12)     Shortly thereafter, I was evaluated by an otorhinolaryngologist physician at Mt. Auburn Hospital, who diagnosed significant left ear hearing impairment.

13)     Both of the above confirmed the failed standard of care of Silva and Brady.

14)     On 2/1/23, I emailed a detailed professional complaint about Silva and Brady, via several emails in which I continued my complaint with additional discussion, to the medical director of the department, Dr. Ayesha Khalid, and the chief medical officer of the hospital, Dr. Jeffrey Hoffman.

15)     On 2/3/23, I submitted that complaint to the Patient Relations Department.

16)     On Monday, 2/6/23, at 1:25pm, during CHA working hours, I received a terrorizing anti mental illness voicemail, expressed in monstrous guttural voice, saying, over several seconds, "Yourrrrrrrrrrrrrr Craaaaaaaazyyyyyyyyy".

17)     The voicemail source appeared as "Unknown Number".

18)     I thought that one of my then-current abusive landlords did this; and I subpoenaed the Legal & Emergency Response department of my telephone company, T-Mobile, in Parsippany, NJ, via the Morris County Sheriff Civil Process in New Jersey.

19)     The 8/28/23 result of the subpoena provides a particular telephone number, which I then searched on several widely used Internet reverse telephone number search websites, which show that the source of the voicemail is the cellular telephone number of Judy Petelle, and registered for Pepperell, MA, where she has a residence address, which is also listed at the above websites.

20)     Since she called me at the above date and time, she called during her working hours at CHA.

21)     She is the practice manager of 20+ years of the hospital's Medical Specialties Department, which is where the above Otolaryngology Department is.

22)     I saved the voicemail.

23)     Each department of the CHA has access to my patient profile, which lists all of my diagnoses.

24)     I have received mental health care at CHA since 2014.

2

25) Via CHA's MyChart, I also have access to my patient profile, which lists all of my diagnoses in a one page summary.

26) Petelle, as the practice manager, had access to my diagnoses.

27) Petelle's conduct is of disability discrimination in violation of 42 USC s12182: Her telephoning a patient of the hospital who is known to have mental illness, from an "unknown number" in order to hide her telephone number, and referring to me as "crazy", and in the monstrous manner that she did, is severe disablism (disability discrimination).

28) Moreover, that she, a 20+ year practice manager of a well known hospital in Cambridge, MA, did this to me as a patient, and who has received mental health care with the hospital since 2014, constitutes that her disability discrimination is even more severe and violative.

29) She also violated 42 USC s12203 because my complaint against Silva and Brady included my statements that they likely also engaged in disability discrimination against me.

30) 3/27/23: I received a letter via MyChart from her that she "terminated" me from all of the departments of the Medical Specialties Department.

31) Therefore, Petelle violated 42 USC s12203 a second time.

32) 3/27/23: I spoke via telephone, and emailed with, the above medical director of the Otolaryngology department, Ayesha Khalid, and she rescinded Petelle's termination.

33) 3/20/23: I received a MyChart notification that I was going to be postal mailed a letter of termination by Petelle, but the notification did not provide any reasons for the termination.

34) 3/22/23: I emailed CHA's president Assaad Sayah and chief of medicine Richard Pels a professional email about this matter.

35) Sayah replied with the following, and cc'd the above Pels:

"Thank you for having the courage to raise these concerns with me and others at Cambridge Health Alliance. I am sorry that you feel as you do about your experience at CHA. A core value of CHA is that we treat all patients with dignity and respect at all times. We do not tolerate any form of retaliation. I am directing members of the CHA team to make further inquiries into the matters you have brought to my attention."

36) As background regarding the below employee Yamini Saravanan: 8/8/15: CHA medical assistant, Stacey Doe (last name is unknown by me), during a simple blood draw order of 10 minutes in a private room, subjected me to multifaceted psychological verbal abuse, a contaminated glove that she dropped to the floor and then put on with her gloved hand thereby contaminating both gloves, vulgar profanity, negligent failure to take an additional vial of blood per the doctor's order for a particular test, and causing immense widespread bruising of my arm that has never occurred to even 1% of that in my decades of medical treatment.

36a) I emailed CHA patient relations a complaint of disability discrimination against the above Stacey Doe.

37) 10/14/22: CHA medical assistant, Jane Doe (name unknown by me), sometime after I informed her, during my 10 minute blood draw appointment with her, of the above Stacey's disability discriminatory conduct, and possibly as late as 4/25/24, stated to CHA practice manager of the primary care department, Dr. Yamini Saravanan, that in my appointment with her (Jane Doe) I referred to her as "fat".

37a) This is a violation of 42 USC s12203 by the above Jane Doe.

37a) I emailed CHA patient relations, and conveyed to my primary care doctor Dr. Stephanie Hastings, that the above Jane Doe engaged in retaliatory dishonesty against me via her claim that I referred to her as "fat".

3

37b)    Nowhere in the above Jane Doe's medical record for me does she state that I referred to her as "fat", nor even that I, more generally, was rude, impolite, abusive, etc., to her.

38)    4/25/24:  The above Saravanan terminated me from the CHA primary care department, where I had been a patient since 2014, stating to me that my complaints about the above Stacey Doe (8/8/15), Jane Doe (10/14/22), and staff of CHA rhinolaryngology in February-March 2023, warranted my termination, because, according to her, I was "rude" "disrespectful" "unprofessional" causing the employees "safety concerns", and that I asked for the last name of Stacey Doe (for the purpose of filing a complaint with the State), and mentioned her abuse to two other employees to 2024, and that these demonstrate that I am unable to "move on" from that past incident, and that this causes "safety concerns" for the employees.

38a)    This is a violation of 42 USC s12203 by Saravanan.

### V.  CAUSES OF ACTION

#### COUNT 1

39)    I restate, and incorporate by reference, 1-38.  Petelle violated 42 USC s12182 by leaving me a severely disablist voicemail.  Due to this, I request the following relief:

   a.  Judgment on the violation.
   b.  General damages.
   c.  Punitive damages.
   d.  Treble damages.
   e.  An injunction prohibiting the employee from engaging in such a violation against me and others.
   f.  Additional orders and damages that the court may find are warranted.

#### COUNT  2

40)    I restate, and incorporate by reference, 1-39.  Petelle violated 42 USC s12203 by leaving me the above severely disablist voicemail in retaliation to my complaint of disability discrimination against two CHA employees who she oversees, namely Silva and Brady.  Due to this, I request the following relief:

   a.  Judgment on the violation.
   b.  General damages.
   c.  Punitive damages.
   d.  Treble damages.
   e.  An injunction prohibiting the employee from engaging in such a violation against me and others.
   f.  Additional orders and damages that the court may find are warranted.

#### COUNT  3

41)    I restate, and incorporate by reference, 1-40.  Petelle violated 42 USC s12203 by terminating my being a patient of her department in retaliation to my complaint of disability discrimination against two CHA employees who she oversees, namely Silva and Brady.  Due to this, I request the following relief:

   a.  Judgment on the violation.
   b.  General damages.
   c.  Punitive damages.
   d.  Treble damages.
   e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

4

f. Additional orders and damages that the court may find are warranted.

**COUNT 4**

42) I restate, and incorporate by reference, 1-41. Saravanan violated 42 USC s12203 by terminating my being a patient of her department in (a) retaliation to my complaint of disability discrimination against three CHA employees, namely Stacey Doe, Silva, and Brady, and in (b) support for the retaliation of Jane Doe. Due to this, I request the following relief:

    a. Judgment on the violation.

    b. General damages.

    c. Punitive damages.

    d. Treble damages.

    e. An injunction prohibiting the employee from engaging in such a violation against me and others.

    f. Additional orders and damages that the court may find are warranted.

**COUNT 5**

43) I restate, and incorporate by reference, 1-42. Jane Doe violated 42 USC s12203 by retaliating against my disability discrimination complaint against her medical assistant colleague Stacey Doe by contriving that I referred to her as "fat" in my appointment with her. Due to this, I request the following relief:

    a. Judgment on the violation.

    b. General damages.

    c. Punitive damages.

    d. Treble damages.

    e. An injunction prohibiting the employee from engaging in such a violation against me and others.

    f. Additional orders and damages that the court may find are warranted.

**COUNT 6**

44) I restate, and incorporate by reference, 1-43. Jane Doe engaged in defamation, leading to my termination from my primary care department since 2014, by retaliating against my disability discrimination complaint against her medical assistant colleague Stacey Doe by contriving that I referred to her as "fat" in my appointment with her. Due to this, I request the following relief:

    a. Judgment on the violation.

    b. General damages.

    c. Punitive damages.

    d. Treble damages.

    e. An injunction prohibiting the employee from engaging in such a violation against me and others.

    f. Additional orders and damages that the court may find are warranted.

**COUNT 7**

45) I restate, and incorporate by reference, 1-44. Petelle, by engaging in the above Count 1-3 violations, intentionally subjected me to substantial psychological distress. Due to this, I request the following relief:

    a. Judgment on the violation.

    b. General damages.

    c. Punitive damages.

5

    d.  Treble damages.

    e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

    f.  Additional orders and damages that the court may find are warranted.

**COUNT 8**

46)     I restate, and incorporate by reference, 1-45. Saravanan, by engaging in the above Count 4 violation, intentionally subjected me to substantial psychological distress. Due to this, I request the following relief:

    a.  Judgment on the violation.

    b.  General damages.

    c.  Punitive damages.

    d.  Treble damages.

    e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

    f.  Additional orders and damages that the court may find are warranted.

**COUNT 9**

47)     I restate, and incorporate by reference, 1-46. Jane Doe, by engaging in the above Count 5-6 violations, intentionally subjected me to substantial psychological distress. Due to this, I request the following relief:

    a.  Judgment on the violation.

    b.  General damages.

    c.  Punitive damages.

    d.  Treble damages.

    e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

    f.  Additional orders and damages that the court may find are warranted.

**COUNT 10**

48)     I restate, and incorporate by reference, 1-47. CHA engaged in a breach of contract by committing the above Count 1-10 violations, regarding their contract with me as a patient to not engage in any violations. Due to this, I request the following relief:

    a.  Judgment on the violation.

    b.  General damages.

    c.  Punitive damages.

    d.  Treble damages.

    e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

    f.  Additional orders and damages that the court may find are warranted.

**COUNT 11**

49)     I restate, and incorporate by reference, 1-48. CHA engaged in a breach of the covenant of good faith and fair dealing by intentionally committing the above Count 1-10 violations. Due to this, I request the following relief:

    a.  Judgment on the violation.

    b.  General damages.

    c.  Punitive damages.

    d.  Treble damages.

    e.  An injunction prohibiting the employee from engaging in such a violation against me and others.

6

f.  Additional orders and damages that the court may find are warranted.

## REQUEST FOR BENCH TRIAL

I request a bench trial on the aforementioned facts and causes of action.

Submitted by,

Dan Howitt, 11/9/25